Krista J. Nielson (Nevada Bar No. 10698)

**TB  T I F F A N Y & B O S C O**
P.A.

10100 W. CHARLESTON BLVD., STE. 220
LAS VEGAS, NV 89135
TELEPHONE: (702) 258-8200
FACSIMILE: (702) 258-8787
knielson@tblaw.com

William M. Fischbach (Arizona Bar No. 019769)
(*will comply with LR IA 11-2 within 14 days.*)
Elliot C. Stratton (Arizona Bar No. 034025)
(*will comply with LR IA 11-2 within 14 days.*)

**TB  T I F F A N Y & B O S C O**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-4237
TELEPHONE: (602) 255-6000
FACSIMILE: (602) 255-0103
wmf@tblaw.com; ecs@tblaw.com

Richard M. Paul III (Missouri Bar No. 44233)
(*will comply with LR IA 11-2 within 14 days.*)
Laura C. Fellows (Missouri Bar No. 65896)
(*will comply with LR IA 11-2 within 14 days.*)
David Bodenheimer (Missouri Bar No. 74580)
(*will comply with LR IA 11-2 within 14 days.*)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Laura@PaulLLP.com
David@PaulLLP.com

Jonathan Greiner (Texas Bar No. 24101830)
(*will comply with LR IA 11-2 within 14 days.*)
Christopher Ross (Texas Bar No. 24103331)
(*will comply with LR IA 11-2 within 14 days.*)
**GREINER & ASSOCIATES, PLLC**
401 Austin Highway, Suite 110
San Antonio, Texas 78209
Telephone: (210) 829-6529
Facsimile: (210) 829-5528
chris@greinerattorneys.com
jon@greinerattorneys.com
service@greinerattorneys.com
***Attorneys for Plaintiffs***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| STEVEN RAYMOND, KYONG 'GINA' RAYMOND, and CHASE HYON individually and on behalf of all persons similarly situated,<br><br>                Plaintiffs<br><br>v.<br><br>ZACH CONINE, in his official capacity as NEVADA STATE TREASURER & ADMINISTRATOR OF THE NEVADA UNCLAIMED PROPERTY PROGRAM, NEVADA STATE TREASURER'S OFFICE, and DANIELLE ANTHONY, in her official capacities as DEPUTY TREASURER OF UNCLAIMED PROPERTY, NEVADA STATE TREASURER'S OFFICE,<br><br>                Defendants. | Case No.<br><br>**COMPLAINT – CLASS ACTION** |

Plaintiffs Steven Raymond, Kyong 'Gina' Raymond, and Chase Hyon, individually and on behalf of all persons similarly situated, for their Complaint against defendants Zach Conine, in his official capacity as Nevada State Treasurer and Unclaimed Property Administrator, Nevada State Treasurer's Office, and Danielle Anthony, in her official capacity as Deputy Treasurer of Unclaimed Property, Unclaimed Property Division, allege as follows:

**PRELIMINARY STATEMENT**

1.     This action is brought under 42 U.S.C § 1983 for declaratory, preliminary, and permanent injunctive relief, an accounting and other relief based on the unconstitutional and unlawful conduct of Defendants through their enforcement of the Nevada Uniform Unclaimed Property Act, ("NUUPA") (Nev. Rev. Stat. §§ 120A.010 *et*

*seq.*)[1]. Plaintiffs and putative class members have had their property seized without notice, sometimes sold, and generally mishandled by the custodial Defendants.

2.      The NUUPA is designed to reunite people with their property, but Defendants use the NUUPA to take private property from people and businesses without meeting the basic threshold requirements under the U.S. Constitution for escheatment and without the requisite notice and due process of law required by the U.S. Constitution. This property includes, but is not limited to, cash, money, uncashed checks, drafts, state warrants, uncashed payroll checks, interest, dividends or income, savings and checking accounts, safe deposit box contents, credit balances, customer overpayments, unidentified remittances, securities, and other tangible and intangible personal property.

3.      Defendants' actions in taking possession of private property without adequate pre- and post-deprivation notice to Plaintiffs and putative class members violated, and continues to violate, the Fourteenth Amendment of the United States Constitution, which states that no state shall "deprive any person of life, liberty, or property without due process of law." These actions directly caused the injuries described herein.

4.      Defendants' actions in retaining and utilizing private property for public purposes without providing adequate pre- and post-deprivation notice to Plaintiffs and putative class members violated, and continues to violate, the Fifth Amendment to the United States Constitution, as incorporated into the Fourteenth Amendment, which provides that no state shall take private property without just compensation. These policy decisions and actions directly caused the injury described herein that was inflicted on Plaintiffs and putative class members.

---

[1] *See Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'") (quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1879)).

5.      Defendants are "persons" under 42 U.S.C. § 1983.2

6.      Defendants acted intentionally to generate revenue for the State, but these funds were neither authorized tax levies nor funds rightfully belonging to the State. Instead, Defendants abdicated their duties to return this property to its rightful owners.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343. This action arises under the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution arising from Defendants' actions as custodians of the Nevada State General Revenue Fund, which contains private property known as "unclaimed property funds."

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district in that each of the Plaintiffs had their property seized in this district.

## PARTIES

*Plaintiffs*

10.      Steven Raymond is a Nevada Citizen and has been a permanent resident since September 2020. Mr. Raymond lived in the Las Vegas, Nevada metropolitan area from 2004 through 2014 and from 2020 to the present. Mr. Raymond has had a vehicle registered with the Nevada Division of Motor Vehicles and paid taxes on that motor vehicle to the state of Nevada from 2004 through 2014 and from 2020 to the present. Mr. Raymond has had a Nevada Driver's license from 2004 through 2014 and from 2020 to

---

[2] *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Ky v. Graham*, 473 U.S. 159, 167 n.14 (1985)); *Ex parte Young*, 209 U.S. 123, 159-160 (1908).

the present. Moreover, Mr. Raymond has owned real property in Nevada since 2022, rented property in Nevada from 2020 through 2022, and paid Nevada property utility services bills in his name from 2004 through 2014 and from 2022 to the present. Further, Mr. Raymond has been registered to vote in Nevada from 2004 through 2014 and from 2020 to the present.

11. Recently, in 2022, Mr. Raymond learned (through his own efforts) that Defendants seized his private property without notice, his knowledge, or consent. Mr. Raymond never received any notice from Defendants, the holders, or anyone else prior to Defendants taking custody and control of his personal property. Mr. Raymond also did not receive adequate notice from Defendants, the holder, or anyone else after Defendants took custody and control of his personal property.

12. Defendants have failed to identify the value, amount, and quantity of Mr. Raymond's taken property, as reflected in the below screenshots of NSTO's website.

13. Despite this inadequate information, Mr. Raymond believes the State is holding the four below items of his personal property.

14. For the first item of property, the owner name, Steven Raymond, matches his name. Although the screenshot does not provide specific information about the holder but merely describes the property as "wages, payroll, salary," Mr. Raymond believes in good faith that this is his property because, as stated above, the property matches his name.



Moreover, Mr. Raymond earned wages when he was employed in Nevada from 2004 through 2014 and 2020 to present.

15. The second item, shown below, also includes Mr. Raymond's full name. Mr. Raymond insured his motor vehicle in Nevada through USAA from 2004 through 2014 and from 2020 to the present. Mr. Raymond had a car collision in Nevada and was compensated through the adverse driver's insurance company, Liberty Mutual Insurance

Co., around 2014.  Further, the address identified, 10649 San Palatina Street, Las Vegas, Nevada 89141, matches an address where Mr. Raymond lived from 2010 through 2013.



16.     The third item shown below matches Mr. Raymond's full name, including Mr. Raymond's middle name, James, which starts with the letter "J." Mr. Raymond attended and received his MBA from Devry University's Keller Graduate School of Management in 2007 in Nevada. Third, the listed address in Henderson, Nevada matches an address where Mr. Raymond resided from 2004 through 2006.



17.     The fourth item, reported by United Guaranty Corporation on behalf of Regions Mortgage, is also Mr. Raymond's property because it, again, matches his name, including his middle initial. Second, it matches his former address in Henderson, Nevada where he resided from 2004 through 2006. Third, Mr. Raymond previously owned a property in Nevada that had a mortgage with Regions Bank.

18.     Mr. Raymond is subject to ongoing harm because he continues to hold property within the state of Nevada that could be seized by the State without any pre-deprivation notice. For example, Mr. Raymond owns real property with a mortgage, continues to insure his vehicle in Nevada, earns wages in Nevada, and has other accounts in Nevada, such as his cell phone account, utilities accounts, savings account, checking account, and investment accounts. This property is subject to seizure under NUUPA

6

without any pre-deprivation notice. Thus, Mr. Raymond is threatened with additional deprivations of his property without notice in violation of the U.S. Constitution.

19.    Kyong 'Gina' Raymond is a Nevada Citizen and has been a permanent resident from 2004 through 2014 and from September 2020 to the present. Mrs. Raymond has lived in the Las Vegas, Nevada metropolitan area from 2004 to 2014 and from 2020 to the present. Mrs. Raymond has had one vehicle registered in Nevada from 2004 through 2014 and from 2020 to the present, and paid taxes on that vehicle to Nevada from 2004 to 2014 and from 2020 to the present. Moreover, Mrs. Raymond has had a Nevada Driver's license from 2004 through 2014 and from 2020 to the present. Mrs. Raymond has owned real property in Nevada from 2006 through 2009 and from 2022 to the present. Mrs. Raymond paid Nevada property utility services bills in her name from 2004 through 2006, 2009 through 2014, and from 2022 to the present. Further, Mrs. Raymond has been registered to vote in Nevada from 2004 through 2014 and from 2020 through the present.

20.    Recently, in 2022, Mrs. Raymond learned (through her own efforts) that Defendants seized her private property without notice, her knowledge, or consent. Mrs. Raymond never received any notice from Defendants, the holders, or anyone else prior to Defendants taking custody and control of her personal property. Mrs. Raymond also did not receive adequate notice from Defendants, the holders, or anyone else after Defendants took custody and control of her personal property.

21.    Defendants have failed to identify the value, amount, and quantity of Mrs. Raymond's taken property, as reflected in the screenshot of NSTO's website, below:

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9904122227 | RAYMOND GINA | 4492 GREY SPENCER DRIVE | LAS VEGAS | NV | 89141 | Under 25 | |

Reported By: DIGNITY HEALTH
Reported Date: 10/13/2016
Description: REFUNDS DUE

22.    Despite this inadequate information, Mrs. Raymond believes the property is hers because the owner name matches her name and the address matches an address at

which she lived from 2006 through 2009. Moreover, the reported by, "Dignity Health" is a hospital in Las Vegas at which Mrs. Raymond received care from 2006 through 2009.

23.    Mrs. Raymond is subject to ongoing harm because she continues to hold property within the state of Nevada that could be seized by the State without any pre-deprivation notice. For example, Mrs. Raymond owns real property with a mortgage in Nevada, owns a motor vehicle that she insures in Nevada, earns wages in Nevada, and has other accounts in Nevada, such as his cell phone account, utilities accounts, savings account, checking account, and investment accounts. Mrs. Raymond has earned wages in Nevada from 2020 to the present. This property is subject to seizure under NUUPA without any pre-deprivation notice. Thus, Mrs. Raymond is threatened with additional deprivations of her property without notice in violation of the U.S. Constitution.

24.    Chase Hyon is a Nevada Citizen and has been a permanent resident since 2004. Mr. Hyon has had a Nevada Driver's license since 2004 to the present. Mr. Hyon has had a Nevada car registered from 2008 through 2022. Mr. Hyon has had Nevada utility services in his name from 2007 through 2021. Moreover, he has been registered to vote in Nevada since 2004 to the present.

25.    Recently, in 2022, Mr. Hyon learned (through his own efforts) that Defendants seized his private property without notice, his knowledge, or consent. Mr. Hyon never received any notice from Defendants, the holder, or anyone else prior to Defendants taking custody and control of his personal property. Mr. Hyon also did not receive adequate notice from Defendants, the holder, or anyone else after Defendants took custody and control of his personal property.

26.    NSTO has failed to identify the value, amount, and quantity of Mr. Hyon's taken property, as reflected in the below screenshot of NSTO's website:

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9905394954 | HYON CHASE M | 8610 S MARYLAND PKWY | LAS VEGAS | NV | 89123 | Under 25 | |

Reported By: SDMI LIMITED PARTNERSHIP
Also Reported By: SDMI LIMITED PARTNERSHIP
Reported Date: 10/30/2019
Description: CR BALS/ACCTS RECEIVABLE

27.     Despite this inadequate information, Mr. Hyon believes the above referenced screenshot shows his personal property and is in the State's possession. First, the owner name matches his name. His middle initial is "M." Second, the address matches an address where he lived in Nevada from 2013 through 2018. Further, the reported by, SDMI Limited Partnership, is a diagnostic imaging center at which Mr. Hyon received medical services from 2015 through 2019.

28.     Mr. Hyon is subject to ongoing harm because he continues to hold property within the state of Nevada that could be seized by the State without any pre-deprivation notice. Mr. Hyon continues to own accounts in Nevada, such as his cell phone account, utilities accounts, savings account, checking account, and investment account. This property is subject to seizure under NUUPA without any pre-deprivation notice. Thus, Mr. Hyon is threatened with additional deprivations of his property without notice in violation of the U.S. Constitution

*Defendants*

29.     Defendant Zach Conine was elected as Nevada State Treasurer on November 6, 2018, and currently holds that position.3 Defendant Conine is sued in his official capacity.

30.     As the Nevada State Treasurer, Defendant Conine is the executive charged with custody and control of all moneys, funds, and property of the State of Nevada. (Nev. Rev. Stat. Ann § 226.115). This includes serving as the Administrator of Unclaimed Property. (Id. at § 226.110(l), 120A.025). As the Administrator, Defendant Conine is responsible for the custody and safekeeping of all property received under NUUPA, and the enforcement of NUUPA. (Id. at § 120A.590, .710).

31.     Defendant Conine, since his appointment in 2018, has failed to ensure that Nevada, the Unclaimed Property Program, and the Deputy Treasurer of Unclaimed Property, Defendant Danielle Anthony, have complied and continue to comply with the

---

[3] *Meet Treasurer Conine*, Nevada State Treasurer, https://www.nevadatreasurer.gov/Home/Meet_Zach_Conine/ (last visited May 26, 2023).

United States Constitution before taking citizens' private property. Defendant Conine, absent legal action from the Court, will not stop his wrongful and unconstitutional acts and enforcement of NUUPA as described herein.

32.    Defendant Danielle Anthony serves as the Deputy Treasurer over the Unclaimed Property Division and is sued in her official capacity. As Deputy Treasurer of Unclaimed Property, (i.e., NUUPA), Nevada Department of Treasury, Defendant Anthony reports to Defendant Conine and is responsible for collecting citizens' private property from businesses and reuniting the property with its rightful owners.[4] Defendant Anthony is sued in her official capacity.

33.    Despite her obligations under Federal law, Defendant Anthony has enforced NUUPA and failed to provide reasonably adequate notice as required by the United States Constitution before taking citizens' private property. Defendant Anthony, absent legal action from the Court, will not stop her wrongful and unconstitutional acts as described herein.

**FACTUAL BACKGROUND**

*Defendants Use the Unclaimed Property Fund to Satisfy Budget Shortfalls*

34.    As the Nevada State Treasurer and Deputy Treasurer of Unclaimed Property, Defendants operate and administer the NUUPA.

35.    Nevada, since at least 2010, has been misusing property seized in accordance with the enforcement of the NUUPA as a "general revenue source" to compensate and supplement failing state revenues.  (See Nev. Rev. Stat. Ann. §§ 120A.620)

36.    The NUUPA's sweeping breadth and short timetables for presumptive abandonment, combined with Defendants' systematic auditing of holders, allows the Defendants to possess huge sums of private property and convert them to public use. Unless otherwise provided, personal property is "presumed abandoned" after 3 years of

---

[4] *Staff List*, Nevada State Treasurer, https://www.nevadatreasurer.gov/About/StaffList/ (last visited May 26, 2023).

purported inactivity by the rightful owner. (Nev. Rev. Stat. Ann. § 120A.500(1)(o)). For many forms of personal property, the presumptive abandonment periods are even shorter: for example, unclaimed wages and utility deposits are "presumed abandoned" after only one year of inactivity. (Id. at § 120A.500(1)(k)-(l)).

37.    Additionally, holders are required to affirmatively report property as abandoned pursuant to the NUUPA's aggressive timetable for presumptive abandonment, or else face potentially severe civil penalties. (See Nev. Rev. Stat. Ann. §§ 120A.690, .710, .730).

38.    Defendants may review the records of holders who have not filed a report, or filed a report incorrect, and then create their owner reports and seize property based on that information. (*See id.* at § 120A.690).

39.    All property seized through the enforcement of the NUUPA is held in trust forever and can be claimed at any time by the property owner. (Nev. Rev. Stat. Ann. § 120A.590) ("Upon the payment or delivery of property to the Administrator, the State assumes custody and responsibility for the safekeeping of the property."); (see also Nev. Rev. Stat. Ann. § 120A.620).5

40.    NUUPA defines unclaimed property as "tangible property" held in a safe-deposit box or other safekeeping depository, or "a fixed and certain interest in intangible property that is held, issued or owed in the course of a holder's business or by a government, governmental subdivision, agency or instrumentality," and expressly includes: all income from or increments to property; money, virtual currency or interest, or a payroll card, dividend, check, draft or deposit; a credit balance, customer's overpayment, stored-value card, security deposit, refund, credit memorandum, unpaid wage, unused ticket for which the issuer has an obligation to provide a refund, mineral proceeds or unidentified remittance; securities, except those incumbered by a lien or

---

5    Unclaimed    Property,    Nevada    State    Treasurer, https://www.nevadatreasurer.gov/Unclaimed_Property/UP_Home/ (last visited June 21, 2023) ("The State Treasurer's office is solely a custodian of [unclaimed property] funds and will never take ownership.")

similar restriction that prevents the owner from receiving, selling, transferring, or negotiating the security; a bond, debenture, note or other evidence of indebtedness; money deposited to redeem a security, make a distribution or pay a dividend; an amount due and payable under the terms of annuity or insurance policy; and an amount distributable from a trust or custodial fund established under a plan to provide health, welfare, pension, vacation, severance, retirement, death, stock purchase, profit sharing, employee savings, supplemental unemployment insurance or similar benefits. (Nev. Rev. Stat. Ann. § 120A.113).

41.    Defendants are currently the custodians of over $940 million in unclaimed property delivered by financial institutions, businesses, insurance companies, government agencies, utility companies, etc. and serve as the custodians for such property with the continuing responsibility to account for such property.[6]

*Defendants Convert Unclaimed Property for Public Use.*

42.    Defendants have disregarded and are disregarding Plaintiffs' guaranteed rights under the United States Constitution so they can seize private property from citizens, use it to generate interest income for the State, and then convert it for use as revenue for the State. Defendants are using the enforcement provisions of the NUUPA, (*see* Nev. Rev. Stat. Ann. §§ 120A.690, .710, .730), to permit and even coerce financial institutions, businesses, nonprofits, etc. to surrender Plaintiffs' and putative class members' private property and continuously fail to provide constitutionally adequate notice both before and after transfer of the private property by the holders to the NSTO.

43.    Defendants, in many instances, unlawfully sell unclaimed property, (*see* Nev. Rev. Stat. Ann. § 120A.610), and deposit the proceeds into the General Revenue Fund, again in violation of the United States Constitution, including the Fifth and Fourteenth Amendments.

---

[6] Unclaimed Property, Nevada State Treasurer, https://www.nevadatreasurer.gov/Unclaimed_Property/UP_Home/ (last visited, June 21, 2023).

44. Defendants may sell property almost immediately upon receiving it, with the only limitation being that a single newspaper publication must precede the sale by 21 days. (Id.). This practice violates the United States Constitution, including the Fifth and Fourteenth Amendments, and irreparably harms property owners because it ensures they cannot get their actual property back.

45. Defendants wrongfully commingle Plaintiffs' and putative class members' private property with the General Revenue Fund[7] to supplement the State's budget and pay the State's debts. Although NUUPA states that the "State assumes custody and responsibility for the safekeeping of the property," (Nev. Rev. Stat. Ann. § 120A.590), and the Defendants tell the public that, "Nevada Unclaimed Property exists for the purpose of accepting custody of abandoned property belonging to current or former Nevada residents and working to return the property to its rightful owners and heirs,"[8] NUUPA irreconcilably requires Defendants to comingle unclaimed property funds with the General Revenue Fund. (Nev. Rev. Stat. Ann. § 120A.620).[9]

46. The State, by and through Defendants, made expenditures from the General Revenue Fund, including from unconstitutionally seized unclaimed property funds, thereby unconstitutionally converting Plaintiffs' and putative class members' private property for public use.

---

[7] *Village of Norwood v. Baker*, 172 U.S. 269, 277 (1898) ("The plaintiff's suit proceeded upon the ground, distinctly stated, that the assessment in question was in violation of the fourteenth amendment. . . .It has been adjudged that the due process of law prescribed by that amendment requires compensation to be made or secured to the owner when private property is taken by a state, or under its authority, for public use."); *see also Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) ("[j]ust compensation is provided for by the [U.S.] Constitution and the right to it cannot be taken away by statute.").

[8] Unclaimed Property, Nevada State Treasurer, https://www.nevadatreasurer.gov/Unclaimed_Property/UP_Home/ (last visited June 21, 2023).

[9] Section 120A.620 was revised by the Nevada legislature in 2023; effective January 1, 2024, Nevada will begin spending even more of the unconstitutionally obtained unclaimed property act of June 9, 2023, ch. 265 (A.B. 45), sec 12, § 120A.620 (codified as amended at Nev. Rev. Stat. Ann. § 120A.620). This amendment further illustrates that the State has no intent of returning property to its owners.

13

47.    The State similarly uses unconstitutionally seized unclaimed property funds to fund state projects, including annual expenditures of $7.6 million to the Millennium Scholarship Trust Fund and another $1 million to the Grant Matching Account. (*Id.*).

48.    Therefore, Defendants' past and ongoing enforcement of the NUUPA effectuates a physical takings—even though or if they never acquired title—because they took physical possession of Plaintiffs' and putative class members' private property and converted it to public use.

*Defendants' Enforcement of the NUUPA is Causing an Ongoing Violation of the United States Constitution*

49.    Defendants violated, and continue to violate, the notice requirements of the Fifth Amendment and the Fourteenth Amendment of the United States Constitution by failing to provide property owners reasonable notice that Defendants intend to take custody of their property prior to seizure.

50.    The NUUPA's failure to provide mandatory pre- and post-deprivation notice from the State renders the statute facially unconstitutional.

51.    Specifically, the NUUPA does not require Defendants to provide any notice to property owners before depriving them of their constitutionally protected property interests, and Defendants do not otherwise provide any form of pre-deprivation notice to property owners. This violates the "notice" requirements afforded under the United States Constitution, including the Fifth and Fourteenth Amendments.

52.    Defendants do not provide actual notice to property owners post-deprivation. Post-deprivation, Defendants are currently only required to publish notice at least six times in counties with a population of 700,000 or more, and at least once in counties with a population of less than 700,000. (Nev. Rev. Stat. Ann. § 120A.580).[10]

---

[10] Beginning July 1, 2023, the defendants' notice obligations under NUUPA shrink even further. Section 120A.580 was amended to reduce the number of published notices going out, and rely primarily on an unclaimed property website. Act of June 2, 2023, ch. 179 (A.B. 55), sec 10, § 120A.580 (codified as amended at Nev. Rev. Stat. Ann. § 120A.580).

53.    The Defendants may provide additional notice in a manner decided by Defendant Conine. (Id.).

54.    The discretionary notice provisions of the NUUPA essentially permit Defendants to choose whether to comply with the Due Process Clause.

55.    The NUUPA website does not satisfy the notice requirements of the Due Process Clause.

56.    For example, a "Joseph H Smith" had their savings account possessed by Defendants. But the address, city, state, and zip code associated with the property is not provided. Further, Defendants do not provide the date the property was reported, and even list themselves as the holders:



57.    Even if one stumbles upon the website, the lack of notice provided precludes some individuals from ever knowing whether the State has their money.

58.    If the Defendants do not provide any notice to property owners informing them the State has custody of their property, many property owners will be forced to either file numerous claims hoping one of them matches or simply leave their property in the State's possession forever.

59.    According to the NUUPA website, a property owner must prove they resided, conducted business, or received mail at the last-known address associated with the property, or that they had a business association with the reporting company are association with the last known address if a social security number was not reported with the property.11

---

11  Unclaimed Property Frequently Asked Questions, *Nevada State Treasurer*, https://www.nevadatreasurer.gov/Unclaimed_Property/FAQ/ (last visited June 27, 2023) (under dropdown, "What do I do if I find a matching name?").

60.     Thus, it may be impossible for some property owners, such as Plaintiff Raymond or the above-mentioned Joseph Smith, to recover some or all of their property because the requisite information is not provided by Defendants.

61.     Moreover, the NUUPA does not even require the holders to provide any form of "notice" to a property owner for any property valued at under $50. (Nev. Rev. Stat. Ann. § 120A.560). This violates the "notice" requirements afforded under the United States Constitution, including the Fifth and Fourteenth Amendments.

62.     Defendants violated, and continue to violate, the notice requirements of the Fifth and Fourteenth Amendments of the United States Constitution by failing to provide reasonably adequate notice that the Defendants intend to sell property owners' private property. The NUUPA does not require any direct notice to the property owners prior to the sale of their property. Instead, the NUUPA only requires "a single publication of notice, not less than 21 days before sale, in a newspaper of general circulation in the county in which the property is to be sold."  (Nev. Rev. Stat. Ann. § 120A.610). This violates the "notice" requirements afforded under the United States Constitution, including the Fifth and Fourteenth Amendments.

63.     Defendants' duty to provide pre- and post-deprivation notice is non-delegable. The Defendants (plus the State of Nevada) sit in the best position to provide notice by virtue of their access to driver's license records, tax records, etc., and in any event, the Defendants (and State) may not discharge their obligation to provide pre- and post-deprivation notice by relying on private third-party holders.

64.     Despite the purported purpose being to reunite individuals with their property, the NUUPA does not require Defendants to make any sort of attempt to directly notify individuals that their property has been taken, and Defendants make no attempt to notify individuals who they could readily contact. For example, Defendants currently possess the private property of:

a. Justice Lidia S. Stiglich, a current Supreme Court of Nevada justice.[12]

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 3000083716 | STIGLICH LIDIA | PO BOX 1084 | RENO | NV | 895041084 | Under 25 | |

Reported By: CHARTER COMMUNICATIONS INC

Reported Date: 6/1/2017

Description: REFUNDS OR REBATES

b. Justice James W. Hardesty, a former Supreme Court of Nevada justice.[13]

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9906551465 | HARDESTY JAMES | 5300 VALLEY VISTA WAY | SPARKS | NV | 894311016 | Under 25 | |

Reported By: JPMORGAN CHASE BANK N A

Also Reported By: JPMORGAN CHASE BANK N A

Reported Date: 10/21/2021

Description: CR BALS/ACCTS RECEIVABLE

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9901853179 | HARDESTY JAMES W | 5300 VALLEY VISTA DRIVE | SPARKS | NV | 89431 | Under 25 | |

Reported By: TOYOTA MOTOR CREDIT COPORATION

Reported Date: 11/1/2010

Description: ACCOUNTS PAYABLE

c. Dr. Tya R. Mathis-Coleman, current Deputy Treasurer of College Savings, Nevada State Treasurer's Office. [14]

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9906944167 | MATHIS TYA R | PO BOX 271733 | LAS VEGAS | NV | 89127 | Under 100 | |

Reported By: Las Vegas Medical Group

Also Reported By: Las Vegas Medical Group

Reported Date: 5/5/2022

Description: CR BALS/ACCTS RECEIVABLE

---

[12] Justice Lidia Stiglich operated her law firm and lived in Reno, Nevada. *See* https://nvcourts.gov/supreme/court_information/justices/stiglich,_lidia_s_ (last visited on June 21, 2023).

[13] Former Justice James W. Hardesty has ties to Sparks, Nevada like being a member and Past President of the Rotary Club of Sparks. *See* https://www.washoecourts.com/Historical/1991/Hardesty (last visited June 22, 2023).

[14] Dr. Tya R. Mathis-Coleman is a native from Las Vegas and her initials match the result on the search. *See* https://nvigate.gov/meet-the-team/tya-mathis-coleman/ (last visited June 27, 2023).

d. Aaron D. Ford, current Nevada Attorney General.[15]



e. Mark Amodei, current United States Representative for Nevada's 2nd Congressional District.[16]



---

f. Steven Horsford, current United States Representative for Nevada's 4th Congressional District.[17]



g. Catherine Cortez Masto, current United States Senator for Nevada.[18]

---

[17] Rep. Steven Horsford represents Nevada's Fourth Congressional District which includes portions of Las Vegas, and his former wife is Sonya Horsford. *See* https://horsford.house.gove/about/about-steven (last visited June 21, 2023).

[18] U.S. Sen. Catherine Cortez Masto has campaigned and been elected by Nevada voters as the Attorney General and as a U.S. Senator. *See* https://www.cortezmasto.senate.gov/about (last visited on June 21, 2023).

### h.  Nevada State Treasurer

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9906024654 | NEVADA STATE TREASURER | 727 FAIRVIEW DR SUITE E | CARSON CITY | NV | 89701 | Under 500 | |

Reported By:  WALGREEN CO
Also Reported By: WALGREEN CO & SUBSIDIARIES
Reported Date: 10/27/2020
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9906024655 | NEVADA STATE TREASURER | 727 FAIRVIEW DR SUITE E | CARSON CITY | NV | 89701 | Under 500 | |

Reported By:  WALGREEN CO
Also Reported By: WALGREEN CO & SUBSIDIARIES
Reported Date: 10/27/2020
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9906095878 | NEVADA STATE TREASURER | 555 EAST WASHINGTON AVE #4200 | LAS VEGAS | NV | 891011070 | Under 1000 | |

Reported By:  APPLE INC
Also Reported By: APPLE INC.
Reported Date: 10/28/2020
Description: MISC OUTSTANDING CHECKS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9906665914 | NEVADA STATE TREASURER | 1865 OLD HOT SPRINGS RD STE | CARSON CITY | NV | 897060666 | Under 500 | |

Reported By:  MAGELLAN HEALTH INC
Also Reported By: MAGELLAN HEALTH INC
Reported Date: 10/26/2021
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9906888384 | NEVADA STATE TREASURER | NEVADA STATE HEALTH DIVISION | CARSON CITY | NV | 89701 | Under 1000 | |

Reported By:  ANTHEM INC
Also Reported By: ANTHEM INC
Reported Date: 4/19/2022
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 3000361621 | NEVADA STATE TREASURER | UNCLAIMED PROPERTY | LAS VEGAS | NV | 89101 | Under 25 | |

Reported By:  CLUBCORP FINANCIAL MGMT
Reported Date: 10/26/2017
Description: VENDOR CHECKS

### i.  Nevada Unclaimed Property Division

| | Property# | Name ▲ | Address | City | Province / State | Postal Code | Amount: | Co-Owner |
|---|---|---|---|---|---|---|---|---|
| Add | 9904130132 | NEVADA UNCLAIMED PROPERTY | UNCLAIMED PROPERTY DIVISION | LAS VEGAS | NV | 89101 | Under 1000 | |

Reported By:  NOVANT HEALTH INC
Reported Date: 10/18/2016
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9904142894 | NEVADA UNCLAIMED PROPERTY | 555 E WASHINGTON AVE #4200 | LAS VEGAS | NV | 89101 | Under 500 | |

Reported By:  CROCS INC
Reported Date: 10/17/2016
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9904502457 | NEVADA UNCLAIMED PROPERTY | OFFICE OF THE TREASURER | LAS VEGAS | NV | 891011070 | Under 25 | |

Reported By:  Spectrum Health Hospitals
Also Reported By: Spectrum Health Hospitals
Reported Date: 10/16/2018
Description: ACCOUNTS PAYABLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9904959243 | NEVADA UNCLAIMED PROPERTY | | | | | Under 25 | |

Reported By:  PRA GROUP INC
Also Reported By: PRA GROUP INC
Reported Date: 5/29/2019
Description: CUSTOMER OVERPAYMENTS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9904966110 | NEVADA UNCLAIMED PROPERTY | 555 E. WASHINGTON AVENUE #4200 | LAS VEGAS | NV | 89101 | Under 500 | |

Reported By:  ALAMEDA ALLIANCE FOR HEALTH
Also Reported By: ALAMEDA ALLIANCE FOR HEALTH
Reported Date: 7/29/2019
Description: PAYMENTS-GOODS,SERVICES

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Add | 9905114186 | NEVADA UNCLAIMED PROPERTY | 555 E WASHINGTON AVENUE | LAS VEGAS | NV | 89101 | Under 500 | |

Reported By:  CONCENTRIX CVG CORPORATION
Also Reported By: CONCENTRIX CVG CORPORATION
Reported Date: 10/23/2019
Description: ACCOUNTS PAYABLE

65.    "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[19] This may include an obligation, upon learning that an attempt at notice has failed, to take "reasonable follow-up measures."[20] Additionally, notice must be sufficient to enable the recipient to determine what is being proposed and what he must do to prevent the deprivation of his interest.[21] Ordinarily, service of the notice must be reasonably structured to assure that the person to whom it is directed receives it.[22]

66.    The lack of mandatory pre-deprivation notice under the NUUPA places Plaintiffs' and other citizens' respective property out of reach.

67.    The lack of mandatory and reasonably adequate post-deprivation notice under the NUUPA places Plaintiffs' and other citizens' respective property out of reach.

68.    In 2022, Defendants collected approximately $109 million in unclaimed property from Nevada Citizens.[23] Of that $109 million, over $63.5 million was spent on government projects, including $7.6 million on grant matching and scholarship programs.

---

[19] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Richards v. Jefferson Cty., Ala.*, 517 U.S. 793 (1996) (lack of notice may negate res judicata).

[20] *Jones v. Flowers*, 547 U.S. 220, 235 (2006) (state's certified letter to property owner that his property would be sold unless he satisfied a tax delinquency was returned "unclaimed"; state should have taken additional reasonable steps to give notice to property owner).

[21] *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970).

[22] *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965); *Robinson v. Hanrahan*, 409 U.S. 38 (1974); *Greene v. Lindsey*, 456 U.S. 444 (1982).

[23] *See* **Exhibit 1,** Annual Report, *Office of State Treasurer Zach Conine Fiscal Year 2022*, at **20,  38, available at https://www.nevadatreasurer.gov/uploadedFiles/nevadatreasurergov/content/PublicInfo/Annual_Reports/FY22_STO_AnnualReport.pdf (last visited June 22, 2023).

The rest of the unclaimed property funds will be transferred to the Nevada State General Revenue Fund the next fiscal year.[24]

69.    In 2021, NSTO collected approximately $99 million in unclaimed property from Nevada Citizens.[25] Of that $99 million, just under $55.5 million was spent on government projects, including $7.6 million on grant matching and scholarship programs.[26] The rest of the unclaimed property funds collected by Defendants is transferred to the State General Fund the following end of the fiscal year.[27]

70.    Defendants' enforcement of the NUUPA has caused, and will continue to cause, violations of the Constitution in the following manner:

   a.   Defendants failed, and continue to fail, to provide notice and due process of law as required by the United States Constitution, which resulted in the unconstitutional taking of property by Defendants and a deprivation of Plaintiffs' clearly established due process rights. Defendants knowingly disregarded these duties, causing Plaintiffs' injuries.

   b.   Defendants failed, and continue to fail, to provide the constitutionally required notices before and after taking private property from Plaintiffs and putative class members. The practical effect of Defendants' failure to provide adequate notice means, that – for all practical purposes – Plaintiffs' and putative class members' property will likely permanently and wrongfully remain in the possession of the State[28].

   c.   Defendants continue to seize, sell, and destroy the contents of private bank safety deposit boxes and securities/investment vehicles without first providing adequate notice reasonably calculated to apprise the property

---

[24] *Id.*
[25] *Id.*
[26] *Id.*

[28] *See* Ex. 1 Annual Report. The amount of citizens' property in Defendants' possession has increased substantially year over year.

owner, and then proceed to utilize the earnings for public use, in violation of property owners' rights provided by the Fifth Amendment and Fourteenth Amendment.

71.    In summary, the United States Constitution does not permit the seizure or sale of private property for public use without adequate prior notice and Due Process of Law. The fact that Defendants subsequently sell the unlawfully seized property, comingle the funds with other accounts in the General Revenue Fund, and then use those funds to generate interest and revenue for the State of Nevada does not sanitize the process.

72.    Likewise, the fact that some of the unconstitutional conduct described above may have originated in an earlier administration does not relieve Defendants of their obligations to enforce the law nor does it relieve Defendants of liability for their own wrongdoing.

73.    Defendants swore binding oaths of office to uphold the United States Constitution (Nev. Rev. Stat. Ann. § 282.020).

74.    Defendants violated, and continue to violate, this oath by taking and selling private property without notice and due process of law, in violation of the Takings Clause of the Fifth Amendment (as incorporated into the Fourteenth) and the Due Process Clause of the Fourteenth Amendment. Post-deprivation, Defendants continue to violate the notice requirements of the Fourteenth Amendment's Due Process Clause by failing to use reasonable effort to identify and notify property owners. This conduct directly caused the injury alleged by Plaintiffs.

*Plaintiffs and Putative Class Members Retain Title to Their Private Property, and Defendants Hold Plaintiffs' and Putative Class Members' Private Property in Trust.*

75.    The NUUPA provides that, "[u]pon the payment or delivery of property to the Administrator, the State assumes custody and responsibility for the safekeeping of the property." (Nev. Rev. Stat. Ann. § 120A.590).

76.    The NUUPA sets up the "Abandoned Property Trust Account" and mandates that, "[a]ll money received by the Administrator under this chapter, including the proceeds from the sale of abandoned property, must be deposited by the Administrator in the State General Fund for credit to the [Abandoned Property Trust Account]." (Id. at § 120A.620).

77.    At the end of each fiscal year, the balance in the Abandoned Property Trust Account is distributed with the first $7.6 million to the Millennium Scholarship Trust Fund, the next $1 million to the Grant Matching Account, and the remainder to the State General Fund. (*Id.*).

78.    Even though the NUUPA allows Defendants to comingle the private property funds with the State's General Revenue Fund, those funds remain subject to owners' claims. (Id.).

79.    Further, if there are insufficient funds in the Abandoned Property Trust Account to pay any cost, charge, or claim, transfers from the State General Fund in amounts necessary to pay those costs, charges, or claims may be authorized. (Id.).

80.    According to the Nevada State Treasurer's Office, "[t]he State Treasurer's office is solely a custodian of [unclaimed property] funds and will never take ownership."[29]

81.    Thus, Nevada never takes title to property possessed through Defendants' enforcement of the NUUPA. That is, Nevada only has a possessory interest in unclaimed property, and is never the owner. The property owners retain title and ownership to their respective property, indefinitely. This is true, even though Defendants commingle the property in the State General Fund.

82.    Therefore, the language of the NUUPA establishes a custodial trust over the property seized in accordance with its provisions.

---

[29] Unclaimed Property, Nevada State Treasurer, https://www.nevadatreasurer.gov/Unclaimed_Property/UP_Home/ (last visited June 21, 2023).

24

**CLASS ALLEGATIONS**

83.     Plaintiffs bring this case on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23(b)(2).

84.     The proposed Class is defined as:

> All persons or entities who have not received individualized and direct notice from the State of Nevada that their property was seized by the State of Nevada between July 26, 2023 and the present.

85.     The number, identity, and location of persons in the proposed Class is unknown at this time, but based on Defendants' own records for the period of January 1, 2010 to present, including Nevada State Treasurer's Office website, the number of persons in the proposed class is estimated to be in the hundreds of thousands.[30] These people are dispersed throughout Nevada and the world. Those persons in the Class are, therefore, so numerous that joinder of the entire proposed Class is impractical for purposes of Rule 23(a)(1).    The disposition of their claims in this class action lawsuit will provide substantial benefits to the parties and the Court.

86.     There are questions of law and fact common to all putative class members for purposes of Rule 23(a)(2), including but not limited to whether Defendants violated, and continue to violate, the constitutional Due Process of Law notice requirement of the Fourteenth Amendment and performs unlawful Takings under the Fifth Amendment when Defendants take and/or sell proposed class members' private property on behalf of the NSTO.

87.     Plaintiffs' claims are typical of those of the putative class members for purposes of Rule 23(a)(3), who are subject to the same deprivations of their rights and misapplication of the law by Defendants. There is a well-defined community of interest in the questions of law and facts involved in this case.

---

[30] In fiscal year 2022, the Nevada State Treasurer reported that it received reports for over 590,000 individual owner properties. *See* Ex. 1 at p. 21.

88.     Plaintiffs and their counsel will adequately represent the putative class members' interests for purposes of Rule 23(a)(4). Plaintiffs have no interests relevant to the lawsuit's subject matter that are antagonistic to the putative class members. Their attorneys are highly experienced in complex, class action litigation.

89.     Defendants' actions and threatened actions are depriving and will continually deprive Plaintiffs and putative class members of their Constitutional rights on grounds generally applicable to all members of the proposed class, thereby making appropriate declaratory, injunctive, and other equitable relief regarding the proposed Class as a whole under Rule 23(b)(2).

## CLAIMS FOR RELIEF

### COUNT I: DECLARATORY RELIEF

### (AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

90.     Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

91.     A real and actual controversy exists between Plaintiffs and Defendants concerning Defendants' duties under the various statutes and laws that define their duties. Specifically, Plaintiffs seek a declaration that:

a.  Nevada's NUUPA is unconstitutional on its face because it does not require Defendants to provide notice to property owners prior to depriving them of their private property;

b.  Nevada's NUUPA is unconstitutional on its face because it does not require Defendants to provide adequate notice to property owners after depriving them of their private property; and

c.  Defendants' enforcement of Nevada's NUUPA, in their official capacities, violated and continues to violate private property owners' guaranteed rights under the United State Constitution, including the rights provided under the Fifth Amendment (Takings Clause) and the Fourteenth Amendment (Due Process Clause).

92.    The dispute between Plaintiffs and Defendants is actual and concrete, and involves a significant financial burden unilaterally imposed on Plaintiffs and the putative class based on the loss of their property.

**COUNT II: VIOLATION OF 42 U.S.C. § 1983**

**(PROCEDURAL DUE PROCESS, LACK OF PRE-DEPRIVATION NOTICE)**

**(AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

93.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

94.    The Due Process Clauses of the United States Constitution prohibits Defendants from depriving citizens of protected property interests without due process of law. A determination of the rights and duties of the parties is necessary and proper at this time so that Plaintiffs may ascertain their rights and establish, as a matter of law, that Defendants have violated and are violating their obligations and duties under the United States Constitution such that Plaintiffs and class members are entitled to avoid future unlawful takings by the Defendants.

95.    Plaintiffs and putative class members have constitutionally protected property interests in their private property, but, nevertheless, it was transferred to the State of Nevada.

96.    Defendants deprived and continue to deprive Plaintiffs and putative class members of their constitutionally protected property interest by seizing, and sometimes selling, property of Plaintiffs and putative class members without providing prior notice, as required by the United States Constitution.

97.    Defendants' failure to comply with the requirements of the Due Process Clauses of the United States Constitution in the manners alleged above, has resulted in and will continue to result in substantial monetary losses to Plaintiffs and putative class members.

98.    Based on the foregoing, Plaintiffs and all similarly situated persons are entitled to and hereby seek a return of their property from the account set up to pay

27

NUUPA claims, and, if necessary, the Nevada State General Fund, because it was seized in violation of Plaintiffs' guaranteed right to Due Process of Law as afforded by the United States Constitution.

99.    Plaintiffs are entitled to an injunction barring Defendants from enforcing the NUUPA and thereby violating their guaranteed right to Due Process as afforded by the United States Constitution.

**COUNT III: VIOLATION OF 42 U.S.C. § 1983**

**(PROCEDURAL DUE PROCESS, LACK OF POST-DEPRIVATION NOTICE)**

**(AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

100.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

101.    The Due Process Clauses of the United States Constitution prohibits Defendants from depriving citizens of protected property interests without due process of law. A determination of the rights and duties of the parties is necessary and proper at this time so that Plaintiffs may ascertain their rights and establish, as a matter of law, that Defendants have violated and are violating their obligations and duties under the United States Constitution such that Plaintiffs and class members are entitled to avoid future unlawful takings by the Defendants.

102.    Plaintiffs and putative class members have constitutionally protected property interests in their private property, but, nevertheless, it was transferred to the State of Nevada.

103.    Defendants deprived and continue to deprive Plaintiffs and putative class members of their constitutionally protected property interest by seizing, and sometimes selling, property of Plaintiffs and putative class members without adequate post-deprivation notice, as required by the United States Constitution.

104.    Defendants' failure to comply with the requirements of the Due Process Clause of the United States Constitution, in the manners alleged above, has resulted in substantial monetary losses to Plaintiffs and class members.

105.     Based on the foregoing, Plaintiffs and all similarly situated persons are entitled to and hereby seek a return of their property from the account setup to pay NUUPA claims, and, if necessary, the Nevada State General Fund, because it was seized in violation of Plaintiffs' guaranteed right to Due Process of Law as afforded by the United States Constitution.

106.     Plaintiffs are entitled to an injunction barring Defendants from enforcing the NUUPA and thereby violating their guaranteed right to Due Process as afforded by the United States Constitution.

## COUNT IV:  VIOLATION OF 42 U.S.C. § 1983

## (TAKINGS CLAUSE)

## (AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

107.     Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

108.     The Takings Clause of the United States Constitution prohibits the Defendants from taking private property for public use without just compensation.

109.     As set forth more fully above, Defendants have, and will continue to unlawfully take control of (i.e., physical possession) and convert to public use the private property of Plaintiffs and putative class members without the notice or just compensation required by the United States Constitution.

110.     To the extent that Plaintiffs' property has not been converted to public use, Plaintiffs are entitled to and hereby seek a return of (i.e., a refund) their property from the account setup to pay NUUPA claims, and, if necessary, the Nevada State General Revenue Fund.

111.     To the extent that Plaintiffs' property has been converted to public use, Plaintiffs are entitled to and hereby seek restitution and just compensation for the property seized for public use as a result of Defendants' violations of the Takings Clause of the United States Constitution, in their official capacities, from the account setup to pay NUUPA claims and, if necessary, the Nevada State General Revenue Fund. Plaintiffs'

property should be valued according to the applicable principles of law for reimbursement purposes.

112.    Plaintiffs are entitled to and hereby seek an injunction barring the Defendants' from enforcing the NUUPA and thereby violating their guaranteed right to own property free from unconstitutional takings.

113.    Plaintiffs seek and are entitled to an accounting ancillary to the aforementioned return of property sought, because the total amount of the Plaintiffs' injuries, which includes not only improperly seized property that may or may not have been sold, also includes other investments and property rights, such as dividends and interest wrongfully taken by Defendants, the proper calculation of principal and interest, and the unnecessary fees, costs, and taxes, cannot be ascertained without an accounting for such property.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(1)    For the return of Plaintiffs' property;

(2)    For declarations that:

    (a)    Nevada's NUUPA is unconstitutional on its face because it does not require Defendants to provide notice to property owners prior to depriving them of their property;

    (b)    Nevada's NUUPA is unconstitutional on its face because it does not require Defendants to provide adequate notice to property owners after depriving them of their property; and

    (c)    Defendants' enforcement of NUUPA, in their official capacities, violated and continues to violate private property owners' guaranteed rights under the United States Constitution, including the rights provided under the Fifth Amendment (Takings Clause) and the Fourteenth Amendment (Due Process Clause).

(3)    To the extent that private funds have been converted to public use, return of

1    the converted private property or value of the converted private property;

2    (4)    A permanent injunction restraining Defendants from engaging in the

3    following:

4    (a)    Continuing to seize and retain private property without providing

5    notice and due process pursuant to, and in the form required by, the

6    United States Constitution;

7    (b)    Prohibiting future unlawful and/or improper transactions, as alleged

8    in this Complaint;

9    (c)    Plaintiffs and putative class members have no plain, adequate, or

10    speedy remedy at law, and will suffer significant, permanent, and

11    irreparable harm, unless the Court issues preliminary and permanent

12    injunctive relief ordering Defendants to comply with the law, as set

13    forth above, and to return Plaintiffs' property and the property

14    belonging to the potential class members.

15    (d)    Plaintiffs accordingly seek an injunction (1) compelling the

16    Defendants to immediately cease all unlawful, unconstitutional

17    conduct as described herein and to (2) provide all ancillary and

18    incidental monetary relief required pursuant to the injunction.

19    (5)    Restitution and disgorgement of all ill-gotten gains to the public and/or

20    claimants in the form of an order requiring Defendants to return the property taken from

21    Plaintiffs and other injured class members that Defendants obtained by engaging in the

22    conduct that violates the United States Constitution;

23    (6)    For an accounting;

24    (7)    For creation of a common fund;

25    (8)    For a reasonable sum of attorneys' fees pursuant to Nevada "common fund

26    doctrine," "private attorney general doctrine," 42 U.S.C. 1988, and other laws, as incurred

27    by Plaintiffs to date and to be incurred by Plaintiffs hereinafter in connection with this

28    action;

1    (9)    For appointment of undersigned counsel as class counsel;

2    (10)    For an order certifying the proposed class under Federal Rule of Civil

3    Procedure 23(b)(2);

4    (11)    For all costs incurred by Plaintiffs to date, and to be incurred by Plaintiffs

5    hereafter, in connection with this action; and

6    (12)    For such other and further relief as the Court deems just and proper.

7    **<u>DEMAND FOR JURY TRIAL</u>**

8    Plaintiffs hereby demand a trial by jury.

9    RESPECTFULLY SUBMITTED this 26th day of July, 2023.

10    **TB   TIFFANY & BOSCO**
                    P.A.

11    By: /s/ Krista J. Nielson, Esq.

12    Krista J. Nielson
        10100 W. Charleston Blvd., Ste. 220
13    Las Vegas, NV 89135

14    William M. Fischbach
15    Elliot C. Stratton
        Seventh Floor Camelback Esplanade II
16    2525 East Camelback Road
        Phoenix, Arizona 85016-4237

17    Richard M. Paul III
18    Laura C. Fellows
        David Bodenheimer
19    PAUL LLP
        601 Walnut Street, Suite 300
20    Kansas City, Missouri 64106

21    and

22    Jonathan Greiner
23    Christopher Ross
        GREINER & ASSOCIATES, PLLC
24    401 Austin Highway, Suite 110
        San Antonio, Texas 78209
25    ***Attorneys for Plaintiffs***

26

27

28

EXHIBIT A



# Annual Report

## Office of State Treasurer Zach Conine

| Fiscal Year 2022 | July 1, 2021 – June 30, 2022 |
|---|---|

**Zach Conine**

*State Treasurer*



STATE OF NEVADA

OFFICE OF THE STATE TREASURER

December 12, 2022

Dear Governor Sisolak and Members of the Nevada Legislature:

Enclosed please find a copy of the Nevada State Treasurer's Office Fiscal Year 2022 Annual Report as required pursuant to NRS 226.120(2).

In Fiscal Year 2022, the State Treasurer's Office continued its work of effectively and efficiently serving Nevadans. Outlined within this report are the multitude of ways in which the Office's six Divisions served Nevadans, State agencies, local governments, and more.

The successes of the year would not have been possible without the hard work and tireless dedication of the State Treasurer's Office staff. Through their efforts, we have consistently provided a high level of customer service, and I couldn't be prouder to work with them every day. Thank you for the opportunity to share more about the Treasurer's Office. Please do not hesitate to contact me should you need additional information or further clarification on any of the information provided in this report.

Sincerely,

Zach Conine
Nevada State Treasurer

# TABLE OF CONTENTS

**OVERVIEW** ...................................................................................................................4

**OPERATIONS DIVISION** ...........................................................................................5
  Division Overview ...................................................................................................5
  Duties ......................................................................................................................5
  Major Accomplishments .........................................................................................6

**CASH MANAGEMENT DIVISION** ............................................................................7
  Division Overview ...................................................................................................7
  Duties ......................................................................................................................7
  Major Accomplishments .........................................................................................7

**INVESTMENT DIVISION** ...........................................................................................9
  Division Overview ...................................................................................................9
  Duties ......................................................................................................................9
  Major Accomplishments .......................................................................................13

**DEBT MANAGEMENT DIVISION** ..........................................................................14
  Division Overview .................................................................................................14
  Duties ....................................................................................................................14
  Major Accomplishments .......................................................................................17

**UNCLAIMED PROPERTY DIVISION** .....................................................................19
  Division Overview .................................................................................................19
  Duties ....................................................................................................................19
  Major Accomplishments .......................................................................................20

**COLLEGE SAVINGS DIVISION** .............................................................................21
  Division Overview .................................................................................................21
  Duties ....................................................................................................................21
  Major Accomplishments .......................................................................................27

**NEVADA ABLE SAVINGS PROGRAM** ..................................................................29
  Division Overview .................................................................................................29
  Duties ....................................................................................................................29
  Major Accomplishments .......................................................................................29

**SPECIAL PROJECTS**.................................................................................................31

**ORGANIZATION CHART** .........................................................................................33

**ZACH CONINE BIOGRAPHY** ..................................................................................34

**SENIOR STAFF BIOGRAPHIES** ..............................................................................35

**FINANCIAL SECTION** ..............................................................................................38

# OVERVIEW

Pursuant to the Nevada Constitution and Nevada Revised Statutes, the State Treasurer's Office (STO) is responsible for a number of state functions. Broadly, these responsibilities fall under one of six working groups, or Divisions, within the STO. The six Divisions of the STO are:

## Operations

The Operation's Division is responsible for managing the State Treasurer's Office budget accounts, Tobacco Master Settlement Agreement (MSA), contracts and purchasing, human resources, IT, and day-to-day operations for the State Treasurer's Office.

## Cash Management

The Cash Management Division is responsible for managing the State's banking relationships, reconciling bank transactions with State accounting records, managing the State's electronic payments, and administering the State's check distribution program.

## Investment

The Investment Division is responsible for the investment of all public money, and the accounting of the General Portfolio, Local Government Investment Pool, and the Permanent School Fund.

## Debt Management

The Debt Management Division is responsible for the issuance of debt obligations authorized on behalf of and in the name of the State (with limited exceptions), as well as the organization and facilitation of statewide pooled financing programs.

## Unclaimed Property

The Unclaimed Property Division is responsible for receiving and safeguarding abandoned property due to Nevadans. The Division also processes and approves claims made by Nevadans for the return of their property.

## College Savings

The College Savings Division is responsible for administering various college savings programs throughout the State, including: the five nationwide 529 College Savings Plans, Nevada Prepaid Tuition Program, Nevada College Kick Start Program, and Governor Guinn Millennium Scholarship Program. The Division is also responsible for the Student Loan Ombudsman Program, in addition to maintaining a comprehensive scholarship database, and administering 529 matching grant programs.

# OPERATIONS DIVISION

## Division Overview

The Operations Division oversees the day-to-day operations for the STO to include fiscal functions for 22 STO budget accounts, the submittal of the biennium budget request for 9 budget accounts, human resources, IT operations, travel management, contract and purchasing management, and the administration and disbursement of the annual Tobacco Master Settlement Agreement (MSA).

The Division also assists with revenue and expenditure forecasts, reports, and financial statements due to the State Controller's Office, Department of Administration, and the Legislative Counsel Bureau. Most general inquiries from the public are also handled by the Operations Division.

## Duties

### Fiscal Functions

The Operations Division is responsible for the fiscal functions of 22 budget accounts including the preparation and submittal of 9 biennium budget requests for the State Treasurer, Prepaid Tuition Program, Millennium Scholarship Program, College Savings Program, College Savings Trust, Debt Management Program, and the Unclaimed Property Program. It also oversees the day-to-day spending, purchasing, staff travel, inventory, revenue and expenditure projections, work programs, audit requests, fiscal year processing, and reporting for these budget accounts.

The Operations Division also administers the accounting and distribution of funds relating to the Tobacco Master Settlement Agreement (MSA). State law requires 40% of the funds be allocated to the Governor Guinn Millennium Scholarship Fund and 60% to the Fund for a Healthy Nevada. Nevada received approximately $44 million in MSA funds in FY21 enabling Operations to distribute approximately $17.6 million to Millennium recipients and $26 million to the Healthy Nevada Program.

### Human Resource Functions

The Operations Division oversees Human Resources (HR) for 46 State Treasurer's Office employees including planning, recruiting and selection, evaluation of employee performance, records, and payroll processing, creating, and maintaining policies and procedures, onboarding new employees, and the day-to-day HR needs of the office.

### Contract Management

The Operations Division oversees approximately 35 active contracts for the State Treasurer's Office including the State's banking and merchant services contracts utilized by Nevada agencies.

### Information Technology

The Operations Division oversees all Information Technology (IT) functions for the State Treasurer's Office and its various programs. The Office has two designated IT staff who handle the day-to-day

help desk tickets, monitor, and administer the Office's information systems, security, hardware, software, databases, and network needs.

## Major Accomplishments

The Operations Division was established in May 2021 to create a centralized approach in performing the administrative functions for the State Treasurer's Office. This removed administrative functions from various programs allowing staff to focus on program initiatives to better serve Nevadans. The Operation Division's major accomplishments for Fiscal Year 2022 included the following efficiency initiatives: implemented an electronic signature process saving programs time and printing costs, streamlined the purchase order and travel processes, created HR onboarding packets and procedures for the Northern and Southern offices, upgraded all staff computers to Windows 11, and implemented a new IT help desk software system. The Division also piloted in the Las Vegas office a hybrid work model offering staff flexibility to work from home two days a week. Due to its success, the hybrid model will be rolled out to Carson City staff in fiscal year 2023.  In addition, the Division spoke at the annual NASACT conference presenting on fraud prevention and initiated the approval of a fraud prevention State contract benefitting all Nevada agencies by creating a secure vendor desk system to be rolled out in fiscal year 2023.

# CASH MANAGEMENT DIVISION

## Division Overview

The Cash Management Division oversees the State's banking relationships, reconciles bank transactions with state accounting records, manages the State's electronic payment acceptance program, and administers the state's check distribution program.

## Duties

### *Banking and Accounting*

Pursuant to NRS 226.110, the State Treasurer is responsible for the receipt and disbursement of public money. In addition to its main depository and controlled disbursement accounts, the Treasurer's Office has 39 bank accounts under analysis, with most of these accounts being zero balance accounts. The funds deposited into these accounts by other State agencies are transferred into the State's consolidation account on a daily basis, thus providing an efficient method for combining cash balances within one financial institution and minimizing non-invested cash balances.  The Treasurer's Office also maintains 3 depository accounts with other financial institutions in order to offer State agencies in geographically remote areas the ability to more timely deposit funds.

The Cash Management Division also allocates revenues from the lease of federal lands in Nevada. Under NRS 328, these revenues are shared between the Department of Education's Distributive School Account, county treasurers, and school districts based on the percentage of revenues collected in those various jurisdictions.

### *Merchant Services*

As manager of the State's electronic payment acceptance program, Cash Management maintains over 380 merchant accounts for 58 State agencies and with the transition to Wells Fargo Merchant Services, State agencies receive next day funding on all electronic transactions. In addition, Cash Management maintains a website for electronic payment acceptance featuring information and forms for assisting agencies through the merchant services process. In FY22, Cash Management continued to provide one-on-one training for agencies participating in the Merchant Services Program, assisting State agencies with Payment Card Industry Data Security Standards (PCI DSS), credit card reconciliation, dispute and fraud processing, best practices, and overall merchant services processes related to accepting electronic payments, such as credit and debit cards. The program also created and now maintains the State's operating manual for electronic payment acceptance that is being used by other government entities and states.

## Major Accomplishments

In FY22, the Cash Management Division saw a large increase in electronic payments due to the Covid-19 pandemic with an additional 1.6 million transactions coming into the State's accounts.  The

Treasurer's Office worked with agencies and their vendors to open an additional 12 bank accounts to accommodate the transactional growth and provide additional banking solutions and services.  This allowed customization of banking products to fit the needs of the individual agencies, improving business efficiencies.  The Merchant Services staff began to implement the new PCI DSS requirements for calendar year 2022 and NACHA requirements for micro transactions with each incoming ACH payment.

The Treasurer's Office continues to seek more efficient and safe means by encouraging the use of items such as cash vaults, remote deposit, positive pay, and ACH blocks and filters, which State agencies can use to carry out their financial transactions.

# INVESTMENT DIVISION

## Division Overview

The State Treasurer is responsible for the investment of public money. The Investment Division ("Investment") is responsible for all investment and accounting activities relating to the General Portfolio, Local Government Investment Pool (LGIP), the Permanent School Fund (PSF), the Higher Education Tuition Trust Fund, as well as oversight of the NVEST investment advisers.

## Duties

The investment of the State of Nevada's General Portfolio is a function performed by the Division in accordance with state statutes. An Investment Policy for prudent investment of State funds has been adopted to guide this process. The General Portfolio includes all State funds, excluding funds invested for the Local Government Investment Pool (LGIP), Local Government Pooled Long-Term Investment Account (NVEST), Permanent School Fund (PSF), and the Higher Education Tuition Trust Fund.

### *General Portfolio*

The State's General Portfolio is invested in U.S. Treasury and Agency securities, high quality corporate notes and supranational bonds, commercial paper, mortgaged and asset backed securities, negotiable and time certificates of deposit, and money-market funds. Securities holdings are diversified to prevent over-concentration by maturity, issuer, or security class. The Division maintains a conservative, moderately active investment strategy which provides the ability to take advantage of market opportunities as they occur by analyzing projected cash flow needs. Portfolio maturities are structured to reduce the likelihood of a forced sale of securities in any but the most severe circumstances. The Division manages the portion of the Portfolio utilized for operating funding, while a portion of the Portfolio not needed for immediate expenses is managed by two registered investment advisers, Buckhead Capital Management and Western Asset Management.

The FY22 General Portfolio's book value as of June 30, 2022, was $7.801 billion. The following chart provides a breakdown of total investments held as of the end of FY22. Total realized earnings for FY22 were $24.241 million, representing a yield of 0.61%.



## *Local Government Investment Pool*

Pursuant to NRS 355.165, the LGIP serves as an alternative program for local governments to invest cash on a voluntary basis, thus allowing for the leverage of economies of scale. LGIP is administered in a conservative manner, consistent with the prudent guidelines outlined in a LGIP-specific Investment Policy. Any local government may deposit its public monies in the pool. The LGIP reduces investment risk and increases convenience for local governments, as well as allowing for:

- Multiple accounts to be maintained for accounting purposes;
- No minimum or maximum account size;
- No limit on transaction size for deposits or withdrawals of funds; and
- No restriction on length of time proceeds can be invested.

The LGIP investment strategy incorporates the matching of maturing securities to the anticipated cash needs of the participants. Approximately 10% of the fund matures daily to ensure sufficient liquidity is available to meet both anticipated and unanticipated withdrawals. The LGIP imposes a Minimum Liquidity Requirement, which projects the cash flow needed to meet identified obligations within a rolling four-week period and which aligns maturing securities accordingly.

The following chart provides a breakdown of total investments held as of the end of June 30, 2022.



As of July 1, 2015, registered investment advisor, FHN Financial Services Mainstreet Capital Advisors (FHN), manages the LGIP Portfolio. The LGIP's book value on June 30, 2022 was $2.1 billion. The LGIP's investment objectives include safety of principal, portfolio liquidity, and market return, consistent with a conservative, short duration portfolio. The Weighted Average Maturity (WAM) of the portfolio at fiscal year-end is 125 days.

Additionally, local governments have the option to participate in a longer-term investment program within the LGIP. NVEST is an alternative investment program for local governments, the objective of which is to provide higher returns than the LGIP. The minimum account size is $5 million. NVEST participants, working with one of three registered investment advisors, can customize their portfolios based on their risk tolerances and other factors. As of June 30, 2022, the NVEST portfolios had a total book value of $36.97 million and consisted of one (1) participant.

## Collateral Pool Program

Pursuant to NRS 356.350, the State Treasurer is required to establish a program for "the monitoring of collateral of public funds". The Nevada Pooled Collateral Program offers state and local government agencies an efficient, cost effective, and safe alternative method for securing public funds. The primary objectives are to reduce risk while, at the same time, decreasing the overall collateral requirement for depositories. By centralizing the administration and reporting functions through Investment, government agencies and depositories recognize cost savings in terms of operational support and collateral efficiency.

Each financial institution is required to maintain (at a third-party repository) acceptable securities having a fair market value that is at least 102% of the amount of the aggregate uninsured ledger balances of the public money held by the depository as collateral. Participating financial institutions must report each day the amount of deposits held and the value of the corresponding pledged collateral. Any under collateralization must be rectified by the financial institution by the close of business on the day the under collateralized deposits are reported.

At the conclusion of FY22, there were 328 public entities throughout the State participating in the Collateral Pool Program, with deposits in 14 financial institutions and a daily balance on June 30, 2022 of $1.589 billion with pledged collateral of $2.125 billion, which calculates to $504 million in excess collateral.

## Permanent School Fund

The Permanent School Fund (PSF) was created to account for monies received from estates that escheat to the State, proceeds from the sale of federal lands given to the State, and fines collected under the penal laws of the State that are pledged only for education purposes under Article 11, Section 3 of the Constitution of the State of Nevada. Per NRS 355.050, the State Treasurer shall have charge of all the investments of money and the sale of all securities of the PSF. All earnings are transferred to the State Education Fund which totaled $11.796 million in FY22.

As of June 30, 2022, the book value of the fixed-income investments of the Permanent School Fund totaled $222.57 million, the public equity investments totaled $194.9 million, and the private equity book value totaled $26.51 million (excludes capital returned to NCIC since SSOF inception). The total portfolio as of June 30, 2022, totaled $443.97 million.

## Nevada Capital Investment Corporation

In 2011, the Nevada State Legislature passed Senate Bill 75, authorizing up to $50 million non-tax dollars in the Permanent School Fund to be invested in private equity investments through the Nevada Capital Investment Corporation (NCIC). Known as the Silver State Opportunities Fund (SSOF), this private equity fund focuses investments on expanding businesses located in Nevada or those which are seeking to relocate. SSOF was fully committed as of May 13, 2016. Approximately 88%, or $44.6 million, of committed capital has been drawn from the Permanent School Fund as of June 30, 2022.

The SSOF is generating a 7.2% net annual return to the State's Permanent School Fund. On a gross basis, SSOF is generating an 10.2% Internal Rate of Return (IRR). As of June 30, 2022, the NCIC has contributed $47.6 million and received $39.4 million in distributions, resulting in $8.2 million in net contributed capital.

As of June 30, 2022, 32 companies (20 of which remain active) have received investments from SSOF. This includes investments throughout the entire State as noted in the SSOF report. This is a total of $815 million (18x multiplier) invested in Nevada and its partners which stretches far beyond the $50

million capital invested via the Permanent School Fund. The Fund investments have supported 2,470 Nevada employees with an average annual wage of $97,562, which is higher than the national average wage.

## Major Accomplishments

During fiscal year 2022, the Investments Division was repositioned to devote more attention and resources to better evaluating and taking advantage of interest earning opportunities that were presented in the markets. This was done while maintaining the high quality and safety of investments required by statute and investment policy. The most important strategy was to position the portfolio to benefit from the interest rate hikes the Federal Reserve began forecasting in November of 2021. As it became clear in the spring of 2022 that the Federal Reserve would be very aggressive and consistent in raising rates through the entire year. Maturities in our internally managed funds were well-positioned to be reinvested quickly at higher rates after each Fed meeting. We will continue to pursue opportunities presented in the shape and direction of the yield curve, while maintaining safety and liquidity as the funds' primary goals.

# DEBT MANAGEMENT DIVISION

## Division Overview

Pursuant to NRS 226, the State Treasurer is directly responsible for the issuance of any debt obligation authorized on behalf of and in the name of the State, except for issuances by the Colorado River Commission, the University of Nevada System, and the Department of Business and Industry which issue various types of debt under differing levels of autonomy. The State Treasurer is also authorized to organize and facilitate statewide pooled financing programs, including lease purchases, for the benefit of the state and any political subdivisions.

## Duties

### *General Obligation Debt*

The State Treasurer is responsible for the issuance and maintenance of the following types of general obligation (GO) debt:  Capital Improvement Bonds, Municipal Bond Bank Bonds, State Revolving Fund Bonds, Historic Preservation Bonds, Natural Resources Bonds, University System Bonds, and other miscellaneous GO bonds and securities. The State requires GO bonds to be legislatively authorized and secured by that portion of the ad valorem tax revenue dedicated to the payment of GO debt to the extent other monies are not available. The State's gross GO debt as of June 30, 2022 was $1,258,830,000.

The following chart illustrates the breakout of the State's $1.26 billion Gross General Obligation Debt as of June 30, 2022.



During FY22, the Debt Management Division ("Debt Management") processed debt service payments for existing GO debt totaling approximately $188.3 million.

| Gross General Obligation Debt FY22 Debt Service Payments | | | |
|---|---|---|---|
| | **Principal** | **Interest** | **Total** |
| State Property Taxes | $117,103,000 | $41,754,549 | $158,857,549 |
| Bonds Partially Paid with Revenues Other Than Property Tax | 3,912,000 | 2,631,278 | 6,543,278 |
| Clean Water Revolving Fund | 4,595,000 | 1,578,425 | 6,173,425 |
| Safe Drinking Water Revolving Fund | 2,025,000 | 566,380 | 2,591,380 |
| Municipal Bond Bank | 3,225,000 | 2,596,212 | 5,821,212 |
| Nevada System of Higher Education | 4,115,000 | 2,403,325 | 6,518,325 |
| Colorado River Commission | 770,000 | 1,014,880 | 1,784,880 |
| Total FY22 Debt Service | $135,745,000 | $52,545,049 | $188,290,049 |

## Debt Service Reserves

Nevada's Consolidated Bond Interest and Redemption Fund (the "Bond Fund") is used to receipt the collection of the 17-cent ad-valorem property tax revenue dedicated to the payment of the principal and interest on the State's GO bonds, and to reserve monies for future GO bond debt service payments. The reserve within the Bond Fund is funded from the excess of applicable property tax revenues over the required debt service payments plus interest earnings on the Bond Fund. The Bond Fund is available to provide ready reserves to meet current debt service obligations to the extent monies are insufficient from current property tax revenues.

The State's current debt management policy has as an objective to maintain a reserve within the Bond Fund balance at the end of each fiscal year equal to at least 50% of next fiscal year's debt service payments on GO bonds (exclusive of those bonds considered to be self-supporting and paid by other available revenues). As of June 30, 2022, the unaudited reserve amount within the Bond Fund was approximately $201 million, which is equal to approximately 118% of the FY23 debt service on those general obligation bonds expected to be paid from property tax and prior to the issuance of additional 2022 bonds.

## Debt Affordability Analysis

A committee comprised of representatives from the Governor's Finance Office, the Department of Taxation, the State Treasurer's Office, and the Legislative Counsel Bureau meets at least biennially to forecast the estimated revenue to be received from its assessed property tax. Debt Management utilizes the committee's projections in the preparation of the General Obligation Debt Capacity and Affordability Report which is published each biennium. In the interim, Debt Management updates the affordability analysis after each securities issuance and as needed.

The General Obligation Debt Capacity and Affordability Report is utilized by the Governor in preparing his recommended budget. The report is then presented to the State Legislature, which relies upon the report when considering the issuance of securities during the following biennium,

determining the ad valorem tax rate for the payment of securities for the next biennium, and reviewing future debt capacity and affordability over the next ten years.

## State Debt Capacity

In addition to the General Obligation Debt Capacity and Affordability Report prepared by Debt Management, the issuance of GO bonds is also limited by the State Constitution. Article 9, Section 3 limits the aggregate principal amount of the State's outstanding GO debt to 2% of the total reported assessed valuation of the State. The limitation does not extend to debt incurred for the protection and preservation of any property or natural resources of the State, or for the purpose of obtaining the benefits thereof.

Subject to the constitutional debt limitation, the Legislature may authorize the issuance of debt for any public purpose. As of June 30, 2022, the constitutional debt limit stood at $3.34 billion. The outstanding debt subject to this limit was $1.01 billion and the remaining constitutional debt capacity was $2.33 billion.

| Constitutional Debt Limitation and Capacity[1] | | | | |
|---|---|---|---|---|
| Effective June 30 | Assessed Valuation | Debt Limitation | Outstanding Debt Subject to Limitation | Remaining Constitutional Debt Capacity |
| 2018 | $123,398,562,960 | $2,467,971,259 | $1,025,895,000 | $1,442,076,259 |
| 2019 | $134,128,343,902 | $2,682,566,878 | $988,260,000 | $1,694,306,878 |
| 2020 | $144,323,763,007 | $2,886,475,260 | $981,760,000 | $1,904,715,260 |
| 2021 | $151,219,706,042 | $3,024,394,121 | $945,445,000 | $2,078,949,121 |
| 2022 | $167,128,835,758 | $3,342,576,715 | $1,008,875,000 | $2,333,701,715 |
| [1]Estimated by State of Nevada Controller's Office | | | | |

## Municipal Bond Bank

NRS 350A.140 designates the State Treasurer as administrator of the Nevada Municipal Bond Bank. In accordance with NRS 350A.150, the amount of State securities issued to acquire municipal securities may not exceed $1.8 billion outstanding at any time.

The State's Municipal Bond Bank program was established in 1981 to assist municipalities in undertaking local projects which foster and promote the protection and preservation of the property and natural resources of the State. Without this fund, municipalities might otherwise face the prospect of prohibitive interest rates.

The Board of Finance must approve the issuance of State GO and revenue securities under the Bond Bank Act. As of June 30, 2022, the outstanding par amount of securities issued pursuant to the Act was $64,255,000.

## *Permanent School Fund Guarantee Program*

Established under NRS 387.519, the Permanent School Fund Guarantee Program (PSFG), provides a mechanism for Nevada school districts to enter into agreements with the State whereby the money in the Permanent School Fund (PSF) is used to guarantee the debt service payments on certain bonds issued by Nevada school districts.

PSFG secured bonds carry the highest possible rating of "AAA" by Moody's Investor Service and S & P Global Ratings—thus providing Nevada school districts with greater access to public credit markets and reduced borrowing costs. The State Treasurer is tasked with administering the PSFG.

Fundamental to the PSFG is the legal authorization of the PSF to guarantee school district debt, which includes ensuring timely debt service payment, coupled with strong oversight and enforcement provisions. If a district fails to make a timely payment, the State Treasurer is required to withdraw a sufficient amount of money from the PSF in order to make a timely debt service payment. The withdrawal from the PSF and payment of debt service on the bonds is considered a loan to the school district. The loan must be repaid to the State from either school district money available to pay debt service on the bonds which are PSF guaranteed, or from withholdings of state aid due to the district.

The maximum amount of principal that can be guaranteed by the State for any Nevada school district is limited to $60,000,000. Further, the total amount of bonds that can be guaranteed by the State is limited to 250% of the lower of the cost or fair market value of the assets in the PSF. Based on the current balance of the PSF, the maximum principal that can be guaranteed is more than $1.0 billion. As of June 30, 2022, $143,183,000 in bonds are guaranteed, or authorized by the State Board of Finance to be guaranteed, by the PSF.

## Major Accomplishments
### *Bond Sales*

In FY22, the Office successfully conducted two bond sales and one private placement comprised of nine series of bonds:

| BONDS ISSUED IN FY2022 | | | | | | |
|---|---|---|---|---|---|---|
| | Series | Original Amount | New Money | PV Savings | TIC | Term |
| Capital Improvement, Historic Preservation, and Refunding Bonds | 2021A | $ 118,030,000 | $ 98,235,000 | $ 3,917,900 | 1.87% | 20yrs |
| Natural Resources Bonds | 2021B | $ 12,465,000 | $ 12,465,000 | $ - | 0.39% | 3yrs |
| Open Space, Parks, and Natural Resources Bonds (Exempt) | 2021C | $ 7,340,000 | $ 7,340,000 | $ - | 1.87% | 20yrs |
| Open Space, Parks, and Natural Resources Bonds (Subject) | 2021D | $ 6,315,000 | $ 6,315,000 | $ - | 1.77% | 18yrs |
| Safe Drinking Water Revolving Fund Matching and Refunding Bonds | 2021E | $ 5,850,000 | $ 4,140,000 | $ 123,576 | 1.12% | 13yrs |
| Clean Drinking Water Revolving Fund Matching Bonds | 2021F | $ 4,560,000 | $ 4,560,000 | $ - | 0.68% | 6yrs |
| State Infrastructure Bank (Matching) | 2022A | $ 40,000,000 | $ 40,000,000 | $ - | 3.00% | 5 Yrs |
| State Infrastructure Bank (Social) | 2022B | $ 35,000,000 | $ 35,000,000 | $ - | 3.00% | 5 Yrs |
| Historic Preservation Grants | 2022C | $ 1,000,000 | $ 1,000,000 | $ - | 2.14% | 1 Yr |
| | | $ 230,560,000 | $ 209,055,000 | $ 4,041,476 | | |

The combined principal (or par value) amount of the bonds was $230,560,000. The terms of the bonds ranged from 1 year to 20 years and the true interest costs (TIC) ranged from .39% to 3.00%, which represents rates below historical averages.

## Nevada's Credit Ratings

Credit rating agencies provide an independent assessment of the relative creditworthiness of municipal securities. The rating system consists of letter grades that convey each rating agency's assessment of the ability and willingness of a borrower to repay its debt in full and on time. Many investors rely upon these letter grades as a means of assessing the likelihood of repayment.

Credit ratings issued by the rating agencies are a major factor in obtaining the lowest cost of borrowed funds in the municipal bond market. Credit rating agencies base ratings on the assessment of the credit worthiness of an issuer with respect to a specific obligation.

There are several factors that rating agencies consider in assigning credit ratings: financial strength, economic outlook, debt profile, and administration/management oversight. Rating agencies believe debt management is an important factor in evaluating issuers and assigning credit ratings, which ultimately determine the borrowing cost of funds.

At the end of FY22, the State's GO debt was rated AA+, Aa1, and AA+ respectively by the three major rating agencies: Fitch Ratings, Moody's Investors Service, and S & P Global. The State's strong "AA+" rating is just below the highest rating category of "AAA".

| Ratings | | | |
|---|---|---|---|
| | **Fitch** | **Moody's** | **S&P** |
| General Obligation | AA+ | Aa1 | AA+ |
| Safe Drinking Water Revolving Fund | AA+ | Aa1 | AAA |
| Water Pollution Control Revolving Fund | AA+ | Aa1 | AAA |
| Certificates of Participation | AA | Aa2 | AA |
| Highway Revenue (MVFT) | AA+ | Aa2 | AAA |
| Highway Revenue (IFT) | AA+ | Aa2 | AA+ |
| Permanent School Fund Guarantee | N/A | Aaa | AAA |

# UNCLAIMED PROPERTY DIVISION

## Division Overview

As of June 30, 2022, the Unclaimed Property Division ("Unclaimed Property") was safeguarding more the $1 billion in unclaimed property belonging to individuals, heirs, and businesses who have, at some point in time, resided or done business in the Silver State.

Each year, businesses and government agencies turn over tens of millions of dollars of abandoned property in the form of cash, securities, and tangible property from safe deposit boxes to Unclaimed Property. The property is held in Unclaimed Property's custody in perpetuity until it can be returned to the rightful owner or heir. Typical types of property received include stock accounts, uncashed payroll checks, utility deposits, life insurance proceeds, and refunds.

Unclaimed Property operates three primary workgroups: Claims, Holder, and Audit.
- The Claims team is responsible for receiving, reviewing, and approving or denying submitted claims. They also process, hold, and auction physical property which is received in safe deposit boxes, the proceeds of which are credited to the box owner's account. Finally, the team is responsible for receiving, processing and selling stock properties.
- The Holder team is responsible for receiving and processing reports and payments that are submitted as unclaimed property. (Businesses are referred to Holders, as the are "holding" others' property).
- The Audit team is responsible for managing contracted outside auditors, performing compliance reviews, educating Holders on compliance requirements, and assesing and collecting penalites, interest and fees for payments, reports or property that were submitted incorrectly or late.

## Duties

The unclaimed property program was created and is administered pursuant to Chapter 120A of the Nevada Revised Statues (NRS 120A), and is further clarified in Chapter 120A of the Nevada Administrative Code. NRS 120A represents a modified version of the Revised Uniform Unclaimed Property Act of 2016 (which is adopted by the Uniform Law Commission).

Unclaimed Property's statutory duties outlined in NRS 120A include:
- Facilitating reporting and receiving unclaimed property;
- Educating holders on reporting compliance requirements;
- Receiving, reviewing, and approving or denying claims submitted to recover property;
- Conducting, or contracting with others to conduct audits of Holders to determine proper reporting of unclaimed property;
- Dispositioning securities and physical property received via security sales, public auctions and/or donations to certain libraries or muesum when items are worthy of preservation;

- Notifying the public with instructions on how to search and access information relating to unclaimed property, announcing public auctions, and providing reporting information to Holders; and
- Ensuring the proper usage of unclaimed property funds which have yet to be return to rightful owners, including transfers to the Education Trust Account, Millennium Scholarship Trust Fund and the State General Fund.

## Major Accomplishments

### *Owner Claims*

Unclaimed Property paid 37,290 claims in FY22, and returned over $42 million to rightful owners. In FY22, 69.2% of all claims were paid via Unclaimed Property's online approval system, FastTrack, which represents a decrease of 2.8% from FY22, however the value of the claims not processed through the automated FastTrack process decreased from approximately $4.8 million to approximately $3.1 million. This, combined with the increased value of claims paid represents an increased number of properties and property values that claims processors were required to review.  Concerted efforts by Treasurer Conine to promote the program through social media directly correlated with the significant increase in claims values.

### *Holder Audit and Outreach Initiatives*

During FY22, the Audit team continued with initiatives implemented in the prior three years to increase awareness of reporting requirements and increase audits of business that have weak reporting histories and are at a higher risk of underreporting. Initiatives included:

- Increased the number of contracted outside audit firms from two to five. This increase allowed Unclaimed Property to broaden the audits performed on behalf of Nevada, as the additional firms include those that specialize in industries not previously audited for Nevada.
- Expanded the modified "self-audit" program which focuses on mid-sized businesses through the Unclaimed Property's outside audit partners. In the third full year of the program, 62 self-audits holder reports were submitted to division. These represent business which had not previously submitted unclaimed property.
- Increased highlighting of the Voluntary Disclosure program, which offers waivers of penalties and interest to businesses who have not previously reported or have reported incorrectly. The program continues to evolve to focus on and provide education to Holders to improve accuracy and consistency of their reporting.  The improvements made to the program have increasingly resulted in higher values reported and have resulted in 41 reports received for a total of nearly $802,000 in property received.
- Contracted audits resulted in 203 holder reports being filed and the remittance of $4.3 million in cash and 3.1 million shares of stock.

## *Holder Reporting and Collections*

The Holder team focused on promoting compliance with required online reporting and payment submissions. As a result, 97% of reports received were submitted online in FY22. Other collection results include:

- Cash receipts from holder reports amounted to nearly $83 million and security sales exceeded $19.5 million;
- Over 317 million shares of stocks were taken into custody (up from approximately 32 million shares in FY21); and
- Over 590,000 individual owner properties were reported.

# COLLEGE SAVINGS DIVISION

## Division Overview

The College Savings Division ("College Savings") administers four programs that assist Nevadans in planning for, saving for, and paying for higher education. The Division also provides administrative support to the Board of Trustees of the College Savings Plans of Nevada.

## Duties

NRS 353B governs Nevada's college savings programs and directs the State Treasurer to act as administrator. NRS 353B establishes three Nevada college savings programs: Nevada's 529 College Savings Plans, Nevada Prepaid Tuition Program, and Nevada College Kick Start. NRS 396 governs the Governor Guinn Millennium Scholarship and directs the State Treasurer to act as administrator.

### *529 College Savings Plans*

The Nevada 529 College Savings Plans are designed to assist parents and students in saving for future college expenses in tax advantaged savings accounts. The College Savings Plans operate as qualified tuition programs under Section 529 of the Internal Revenue Code. The Plans combine tax benefits and flexible features, making them a smart and convenient way to save for higher education. In 529 College Savings Accounts, earnings grow tax-deferred and are federally tax-free when used for qualified educational expenses at eligible higher education institutions. This allows savings to grow faster, providing more money for college-related expenses. The Board of Trustees of the College Savings Plans of Nevada provides fiduciary oversight of the investment managers, program managers, marketing managers, and other vendors supporting the College Savings Programs.

The College Savings Plans of Nevada consists of four direct-sold plans managed by Ascensus College Savings: SSGA Upromise 529, Vanguard 529 College Savings Plan, USAA 529 College Savings Plan, and Wealthfront 529 College Savings Plan. The State also offers one advisor-sold plan, Putnam 529 for America. Nevada's College Savings Plans are available to individuals from all fifty-states and at the end of FY22, collectively held 1,058,551 individual accounts and over $34.5 billion in assets under management (AUM). This represents a 4% increase in accounts over FY21.

The 529 College Savings Plans of Nevada vary in their structure, offerings, and risk. Plans are offered to customers throughout the United States; however, most plans provide additional benefits for Nevadans such as matching grant funds, waiver of annual account fees, and reduced required initial contributions.

The table below shows the total AUM for each plan, as well as the total number of accounts as of June 30, 2022:

|  | AUM | Total Accounts |
|---|---|---|
| **Putnam 529 for America** | $422.9MM | 17,867 |
| **Wealthfront 529 Plan** | $463.9 MM | 26,024 |
| **USAA 529 College Savings Plan** | $4,689 MM | 314,597 |
| **SSGA Upromise 529** | $1,410 MM | 129,275 |
| **Vanguard 529 Plan** | $27,334 MM | 570,788 |
| **TOTAL:** | **$34,319.80 MM** | **1,058,551** |

## *Silver State Matching Grant*

Since 2010, the Silver State Matching Grant Program has allowed qualifying Nevada families with a unique opportunity to boost their 529 college savings contributions.  It provides a matching contribution dollar-for-dollar up to $300 per year for five years, for a maximum of $1,500 per beneficiary, into a recipient's SSGA Upromise 529 Account.  The FY22 open enrollment period saw an increase in the number of approved applications. The total number of approved applications was 353, a 16% increase from last year's 304 applications that were approved during the FY21 open enrollment period.

## *The Nevada Prepaid Tuition*

The Nevada Prepaid Tuition Program ("Prepaid Tuition") enables parents, grandparents, and other family members to lock in future in-state college tuition rates at today's prices. Established in 1998, Prepaid Tuition is one of only 11 prepaid tuition programs in the country. It is fully administered by the College Savings Division, and includes the marketing of Prepaid Tuition, assisting families with enrollment, and coordinating with higher education institutions for the distribution of benefits.

Prepaid Tuition is authorized under Section 529 of the Internal Revenue Code and is designed to assist families in saving for future college tuition expenses through tax advantaged savings accounts. Prepaid Tuition plans, or contracts, may be purchased with a lump sum payment, paid monthly over five years, monthly over 10 years, or monthly until the child is ready to attend college. Contracts are transferable to other children in the family, including first cousins. Contract benefits can be used to cover the cost of tuition at Nevada System of Higher Education institutions or may be applied to help offset the cost of tuition at eligible in-state and out-of-state institutions.

Prepaid Tuition opens enrollment each year from November-April. During FY22, the Program enrolled 474 new students and the four-year university plan remained the most popular choice of plans, with 60.34% of purchasers choosing the four-year university plan for their loved one. The lump sum payment option (49.58%) exceeded the monthly payment options (27.00% extended monthly payments, 14.14% five-year payment option, and 9.28% 10-year payment option) as the most popular payment choice.

An actuarial report completed by an independent outside actuarial firm found the funded status of Prepaid Tuition as of June 30, 2021 to be 178.9%. At the conclusion of FY22, a total of 23,216 children were enrolled in Prepaid Tuition, and the Nevada Higher Education Tuition Trust Fund held assets of $356 million, an increase of 474 children and a decrease of $37.7 million, respectively, over the prior year. As of June 30, 2022, there were 3,527 students eligible to use their benefits, of which Prepaid Tuition paid out slightly over $12 million in tuition benefits, relatively the same amount (increase of 0.01%) as FY 21.

## *College Kick Start*

In Fall 2013, the Office launched the Nevada College Kick Start Program ("CKS"), which establishes an automatic $50 scholarship for all public-school kindergarten students in the State. The scholarships are established using a portion of the program manager fees paid to College Savings, not taxpayer dollars. College Kick Start scholarships are held within a master account in the SSGA Upromise 529 Plan and is invested in the age-based portfolio, which most closely matches the age of the students. Parents may also link their child's CKS scholarship to a separate SSGA UPromise 529 account. The Office acts as administrator of the Program, which includes activities such as educating parents and families about CKS and assisting families in accessing their child's scholarship via an online portal. Education and outreach efforts by College Savings include: attendance at school events, direct mail sent to new CKS members, and ongoing written and email communications sent to all participants.

CKS was codified into law after the passage of Assembly Bill 475 ("AB475") of the 79th Nevada Legislative Session. During its June 2022 Meeting, the College Savings Board of Trustees approved regulations necessary for the administration of the program.

As of June 30, 2022, there were 310,527 individual student scholarships created under the program, valued at $15.5 million.

## *Governor Guinn Millennium Scholarship*

Pursuant to NRS 396.911-945, the State Treasurer acts as administrator of the Governor Guinn Millennium Scholarship Program ("Millennium Scholarship"). Established during the 70th Nevada Legislative Session in 1999, the Millennium Scholarship provides scholarships to high achieving Nevada high schoolers for use at eligible colleges and universities located within the State.

Nevada high school seniors are automatically eligible for the award if they graduate with a diploma from a Nevada high school; have been a Nevada resident for at least two years of their high school career; graduate with a 3.25 GPA; and complete the minimum core curriculum classes. Students who do not meet the GPA requirement may substitute a qualifying score from a college entrance exam to gain eligibility. Of the graduating class of 2022, 14,861 were eligible for the scholarship, and 7,377 have acknowledged and began using the award. Funding for the Millennium Scholarship comes from appropriations, 40% of the annual Tobacco Master Settlement Agreement payments, and $7.6 million annually from the Abandoned Property Trust Account.

As administrator of the program, the Office:
- Operates the Millennium Scholarship's database (MiSL: Millennium Scholarship Ledger), which collects, stores, and maintains data on Millennium Scholars. College Savings also hosts a dedicated website allowing students to access their accounts on MiSL.
- Collects initial eligibility data from all Nevada school districts, 175 private high schools, adult education programs, and home school applicants.
- Conducts outreach efforts throughout the State at college fairs, schools, private companies, PTA meetings, and other community events to provide the latest information about the Program.
- Collaborates with representatives from each Nevada System of Higher Education (NSHE) institution, NSHE System Administration, System Computing Services, Nevada Association of School Superintendents, and the Nevada Department of Education to support the program.

## *Governor Guinn Millennium Memorial Scholarship*

Following the tragic death of former Governor Kenny C. Guinn in July 2010, at the request of former First Lady Dema Guinn, College Savings worked closely with the Guinn family to create a separate account within the Governor Guinn Millennium Scholarship Trust Fund to accept donations in his honor. Each year, the donations are used to provide scholarships to Millennium Scholars who are in their last year of college, meet the scholarship requirements and who commit to teaching in Nevada following graduation. Scholarship applications are reviewed by the selection committee and the College Saving Board selects the four winners of the scholarship.  A virtual award ceremony is organized by College Savings to congratulate the recipients and the Guinn family is invited with the

State Treasurer as the host. Historically, the scholarships were awarded to two students (one in northern Nevada and one in Southern Nevada) for $4,500 each. During the 80th Nevada Legislative Session, Senate Bill 414 ("SB414") was passed and subsequently signed by Governor Sisolak. SB414 increased the number of awards from two to four (two in northern Nevada and two in Southern Nevada), increased the award amount from $4500 to $5000, and allowed students from non-NSHE institutions to apply. These changes in eligibility and award amount were effective for the 2020 applicants and for the first time, four scholarships were awarded. In FY22, another four scholarships were awarded to one student each from UNR, Great Basin College, and two students from UNLV.

## *Student Loan Ombudsperson and College Navigator*

### **Student Loan Ombudsperson**

The Student Loan Ombudsperson is an unbiased and confidential resource who reviews the concerns of Nevada's students, families, and student loan borrowers. As defined by NRS 226.570, the Student Loan Ombudsperson shall:

- Educate current student loan borrowers on their rights and responsibilities and facilitate resolution of borrower complaints against student loan servicers;
- Educate potential borrowers by creating and administering a borrower education course and by conducting outreach to focus populations on targeted settings; and
- Provide recommendations for policy through research and analysis of data collected from Nevada borrowers, other states, and national policy organizations.

On October 6, 2021, the US Department of Education announced the Public Service Loan Forgiveness Limited Waiver, which allows federal student loan borrowers to receive credit for past periods of repayment that would otherwise not qualify for Public Service Loan Forgiveness. Due to this announcement, the Student Loan Ombudsman received calls from student loan borrowers who needed more information and guidance on the limited waiver. The Student Loan Ombudsperson provided guidance on the application process to those borrowers who met the qualifications for the Limited Waiver and provided further information on student loans to those that did not meet the qualifications. Due to the abundance of applications that the US Department of Education has received, applicants have waited months to receive updates of their applications; however, in May 2022, one of the borrowers that the Student Loan Ombudsperson assisted received forgiveness of $25,446.03. Other student loan borrowers that the Student Loan Ombudsperson has been assisting through this process are still waiting to hear back from the US Department of Education.

As part of the College Savings Division, the Student Loan Ombudsperson encourages students and families to begin planning for college expenses to secure the funding necessary to avoid student loans. The Student Loan Ombudsperson focused its efforts on providing information to students and their families on the Free Application for Federal Student Aid (FAFSA), guidance on understanding the

types of aid available through FAFSA, finding other scholarships and financial aid provided by their institutions, providing information on 529 college savings plans, and understanding student loans.

In response to the reduction of COVID-19 mandates in CY21, schools and organizations began to allow for in-person presentations again; and so, the Student Loan Ombudsperson pivoted from only virtual platforms to providing education both in-person and through virtual platforms. The Student Loan Ombudsperson also partnered with organizations for outreach efforts, including the Consumer Financial Protection Bureau who together provided a free webinar to students and families that focused on paying for college, student loans, and money management. The Consumer Financial Protection Bureau is a U.S. government agency that makes sure banks, lenders, and other financial companies treat consumers fairly. Webinars were offered through Zoom and were streamed on Facebook Live. The ombudsperson has also made herself available to NSHE institutions, and in May 2021 providing office hours at Nevada State College on the 2nd Tuesday of each month.

The Student Loan Ombudsperson stayed up to date with changes and news concerning student loans and ensured that changes were being provided to the State Treasurer Office's social media followers, such as: the extensions of federal student loan pause, PSLF limited waiver, and other news. The Student Loan Ombudsperson worked with other federal and state student loan advocates to jointly monitor the developments with federal education policies and advocates for change in the best interest of Nevada residents. The Student Loan Ombudsperson meets with other State Student Loan Advocates, and with the Federal Student Aid (FSA) and state regulators once a month.

## College Navigator

During the 80th Nevada Legislative Session, a College Savings Navigator position was created within the office. The goal of the College Navigator was to build relationships with staff and administration and provide institutions, school districts, community partners, students, and households with information on pursuing post-secondary education. The Navigator was created to foster a 'college bound' culture in Nevada by increasing awareness of the Nevada College Kick Start Program, Nevada's 529 College Savings Plans Program, the Nevada Prepaid Tuition Program, the Governor Guinn Millennium Scholarship Program, and other scholarship opportunities and financial aid options that allow Nevadans to plan for, save for, and pay for post-secondary education.

The College Savings Outreach Team within the State Treasurer's Office consists of a College Navigator, Student Loan Ombudsmen, Marketing Coordinator, Management Analyst, and Program Officer. In FY22, the College Savings Division hosted 58 virtual and 19 in-person initiatives within the State Treasurer's Office and partnered with other organizations to attend and/or co-host 88 in-person events and 16 virtual events. One of the largest projects was undertaken in collaboration with the Governor's Office. The Vax Nevada Days project awarded $1.5MM in 529 funds via a vaccine scholarship giveaway. Although the project is still ongoing, the College Navigator has assisted 115 families in opening new 529 accounts, with $1.38MM, or 92%, in funds have been.

The College Navigator also assisted with the Division's first ever March Matchness campaign; a program created by the College Savings team to assist Nevadans with saving for postsecondary education. March Matchness required Nevadans to open a new 529 Nevada sponsored account. When individuals signed up for the program through the Treasurer's Office, they were contacted by the College Navigator and given next steps to claim their matching funds. The office saw incredible success in the program, with 211 Nevadans taking advantage of the March Matchness incentive during its first year. Overall, the program helped Nevada families save over $206,000 in Nevada sponsored 529 accounts.

The College Savings Outreach Team is responsible for spearheading many of the 529 account initiatives for the State Treasurer's Office. During FY22, the Outreach Team was responsible for opening over four hundred Nevada sponsored 529 accounts totaling over $1.7 million dollars for Nevada families to assist them in saving for postsecondary education. In addition, the College Navigator assisted the Outreach Team as they created a new, statewide Financial Literacy University Program that was administered throughout the state. The Division collaborated with community partners and organizations who are experts in various financial topics such as budgeting, saving, credit, debt and investing. These workshops provide vital information and resources for Nevadans when it comes to financial literacy. This year, the Division held three Financial Literacy University workshops: one virtual event and two in-person events that were held in Las Vegas and Reno. Participants who attended the financial literacy events were given a 529 account contribution for their participation.

The College Savings Division remains committed to helping Nevadans plan for, save for, and pay for postsecondary education and will continue to implement innovative initiatives to reach Nevada families across the great state.

## *Financial Literacy*

This fiscal year, the team developed Free Virtual Financial University. The one-day events were held in Reno and Las Vegas and were geared towards families with K-12 students; but all Nevadans were invited and encouraged to attend. The Treasurer's Office worked in partnership with the University system, Andson, and Silver State Credit Union. The purpose was to teach financial techniques and provide resources to assist participants as they navigate their post-secondary journey and beyond. This includes planning, saving, and paying for major life milestones, e.g., college, buying a home, retirement and more! This six-hour seminar focused on the following topics: Budgeting and Saving, Credit and Debt, Home and Auto Insurance, Paying for College, and Retirement and Investments. All participants received lunch and a 529 incentive for attending the event.

## Major Accomplishments

This year the Division hosted a "What Do You Want to Be When you Grow Up" Art contest for K-12 students statewide. In the inaugural year, the Office received over 750 applications from students

across the state. 15 winners were selected, each of which received a scholarship award into a 529 account.

The College Savings Division continued to host several in person, virtual, and hybrid outreach events. It is the Division's goal to meet the needs of our community post-pandemic. The nimbleness of the College Savings team resulted in ongoing virtual series hosted by College Savings, including Webinar Wednesdays, during which a new college savings topic is discussed; Millennium Mondays, which covers common questions surrounding the Millennium Scholarship; and panel discussions with local community leaders, wherein the State Treasurer moderates a panel of experts on different college savings topics, or hosts conversations with Nevada leaders. The heightened online presence has allowed College Savings to reach many more Nevadans than prior years' events and does so in a format that is accessible and convenient.

Below are social media statistics from the College Savings Division's efforts in FY22:

Impressions:
- The Nevada State Treasurer's Office social channels saw an increase in impressions during FY22. The accounts received a combined 6,578,002 impressions which represents an 81.7% increase from the previous year.

- Instagram impressions increased by 27%, Twitter impressions decreased by 24.8% and Facebook impressions increased by 102.3%.

Engagements:
- The Nevada State Treasurer's Office social channels received 78,468 engagements in FY22.
- Facebook engagements increased by 11.6%.

Total Audience:
- The Nevada State Treasurer's Office social channels saw a 13% increase in total followers during FY22.  The total audience following for FY22 was 6,585.

# NEVADA ABLE SAVINGS PROGRAM

## Program Overview

The Office is responsible for administering the Nevada ABLE Savings Program ("ABLE") which allows people with disabilities to save and earn money without threatening the loss of state and federal benefit programs.

The federal Achieving a Better Life Experience (ABLE) Act was signed into law in 2014 and gave states the ability to establish tax advantaged savings programs for people with disabilities. Funds deposited into ABLE accounts can be used to help account beneficiaries pay for qualified disability expenses on tax-free basis and, in turn, help to increase an account holder's overall level of independence. Nevada currently partners with 17 states in the National ABLE Alliance to help administer ABLE. The use of a multi-state consortium helps to keep fees low for participants and reduce the overall impact on the State.

## Duties

The Nevada ABLE Savings Program is outlined in NRS 427A.889. Senate Bill 419 ("SB419") of the 79th Nevada Legislative Session codified the Nevada ABLE Program into law. Initially the Office was responsible for administration of ABLE accounts and regulatory duties of ABLE, and responsibilities for marketing and outreach to potential participants was placed with the Aging and Disabilities Division of the Department of Health and Human Services.

Assembly Bill 130 ("AB130") of the 80th Nevada Legislative Session moved responsibility for outreach and marketing of ABLE into the Office, which allows for a streamlined approach to reaching potential participants and assisting current participants with questions.

## Major Accomplishments

In FY22, the State Treasurer's Office has continued to increase awareness about the Nevada ABLE Savings Program and has continued to see an increase in accounts and assets under management. As of June 31, 2022, the ABLE program had 2,907 accounts.

The Office is excited to continue to grow ABLE, while also looking for more opportunities to increase competitive integrated employment for Nevada's disability community.

# SPECIAL PROJECTS

## Nevada Recovers Listening Tour

Throughout FY22, the Office undertook a number of special projects. For example, in response to the approximately $6.7B in funding received through the American Rescue Plan Act, the Office partnered with the Governor's office and the Legislature to design and administer the Nevada Recovers Listening Tour. The purpose of the Tour was to receive robust input and feedback from Nevadans throughout the State on how best the State could invest the incoming federal funding. Guided by the priorities and principles established in the "Every Nevadan Recovery Framework", the Listening Tour planned to hold 75 events throughout the State over 75 days, beginning in August 2021 and concluding in mid-October 2021.

Events varied in their structure and venue, with some held virtually, and others held in person. Events were held with community stakeholder groups focused on specific topic areas, such as tourism and education. Community events were also held to solicit diverse input from residents, like those held in Henderson, Boulder City, Winnemucca, and Ely. The Tour also provided presentations to local governments about the Listening Tour and the process for constituents to share feedback.

The Listening Tour exceeded expectations by hosting 121 events in 44 Nevada locales. Approximately 7,000 Nevadans attended events and provided feedback. Ultimately, the State received approximately 4,500 idea submissions and 4,300 separate survey responses.

The most common points of feedback received, and heard at nearly every event, were:

- Childcare availability. Many residents expressed concerns about the lack of childcare locations and providers. Similarly, in instances where childcare was available, oftentimes it was cost prohibitive for working families.
- Health access. Many Listening Tour participants discussed challenges with the lack of available and qualified medical providers and specialists. Many participants also expressed concerns regarding a lack of mental health support and services not only for adults, but also children.
- Broadband services. During nearly every Listening Tour event, a comment was made regarding internet service for Nevadans. The feedback ranged from issues with being able to secure internet service in rural communities, to lack of continued access for low-income communities. Similar feedback indicated that telehealth and online services were helpful; however, many senior citizens lack the experience to properly use the technology to utilize these services, thus rendering them inaccessible to certain groups.

The Nevada Recovers Listening Tour collected robust and varied information from Nevadans across the State. The feedback and input received from participants represents a holistic, statewide needs assessment highlighting the true needs of the State's residents. The data collected informs and

supports not just ARPA decisions, but also helps prioritize government decisions at all levels of policy making.

## Transforming Opportunities for Toddlers and Students (TOTS) Grant

The Transforming Opportunities for Toddlers and Students (TOTS) Grant Program was launched by the State Treasurer's Office to support children with disabilities who faced disparate impacts from the COVID-19 pandemic and its associated economic impacts by allowing a more equitable recovery, building resiliency, and increasing opportunities for advancement after facing setbacks caused by the COVID-19 Pandemic.

Initially launched with $5,000,000 in funding from the American Rescue Plan Act, eligible children with disabilities were eligible to receive grants of $5,000 to use for expenses such as education, housing, transportation, employment training and support, assistive technology, personal support services, healthcare costs, financial management, and other qualified disability expenses.

Being that assistance programs could potentially jeopardize an individual's ability to qualify and/or maintain eligibility for benefits like Medicaid, Supplemental Security Income (SSI) and Social Security Disability Income (SSDI); grant funds were deposited directly into an ABLE Account to help the child and their family to pay necessary expenses or to enable the child to begin saving in a meaningful way.

As of June 30, 2022, the Treasurer's Office had disbursed $5,000,000 in grants to 1,000 Nevada children with disabilities. The Office continues to work through the additional $7,000,000 in funding that was approved by the Interim Finance Committee to fund additional grants through the program.

Nevada State Treasurer
Annual Report – Fiscal Year 2022

## ORGANIZATIONAL CHART



# ZACH CONINE BIOGRAPHY

Zach Conine currently serves as Nevada's 23rd State Treasurer. Elected on November 6th, 2018, Zach knows that responsible financial management is the key to ensuring long-term growth for the State. As Treasurer, Zach leads a team of 45 professionals that are responsible for investing the State's and many local governments' money, financing community assets and facilities, processing payments for public agencies, and collecting and returning unclaimed property. Additionally, Zach is responsible for Nevada College Savings Plans and administration of numerous scholarship programs and other services that help Nevadans's plan, save, and pay for post-secondary education.

In addition to the daily management of the State Treasurer's Office, Zach serves as a member of the State Board of Finance, the Executive Branch Audit Committee, and the Board of Trustees of the College Savings Plans of Nevada, and the State Infrastructure Bank, of which he serves as chair.

In his first year as Treasurer, the State has received two bond rating increases, the first since 2006; generated the highest investment returns for the State since the recession of 2008; and returned the largest amount of unclaimed property back to Nevadans since the inception of the State's Unclaimed Property Program.

Prior to serving as State Treasurer, Zach built a successful business career in the gaming, finance, and consulting sectors. Over the course of his career, Zach has been committed to creating economic opportunities for local businesses and working families. As co-founder of a consulting business, he has helped dozens of small and medium sized businesses expand, increase efficiencies, and decrease expenses. In doing so, he assisted in the creation and preservation of more than 3,000 jobs in Nevada.

Zach graduated with a B.A. from Cornell University's School of Hotel Administration and holds a J.D. from the from UNLV's William S. Boyd School of Law. He and his wife Layke are happily raising their daughter Ruby, twin sons Rutherford and Theodore, and two dogs, Democracy and Liberty.

Biographies

# SENIOR STAFF BIOGRAPHIES

## Chief of Staff
### Kirsten Van Ry

Kirsten Van Ry currently serves as the Chief of Staff for the State Treasurer's Office. Born and raised in Nevada, Kirsten holds baccalaureate degrees in mathematics and political science and a law degree from William S. Boyd School of Law. Prior to joining the office, Kirsten served as the Deputy Chief of Staff under former Nevada Lieutenant Governor Mark Hutchison. Kirsten's previous positions include experience in legislative and community relations in Las Vegas and Carson City.

## Chief Deputy Treasurer
### Tara Hagan

Tara Hagan serves as the Chief Deputy Treasurer for the State Treasurer's Office. Tara joined the Office in June 2012 as Deputy Treasurer - Finance. Her responsibilities as Chief Deputy Treasurer include working closely with the Debt Management, Investment Management, and Cash Management divisions, including assisting with investment and contract responsibilities related to the Nevada College Savings Plans. Tara previously served nearly five years as the Executive Director of the Nevada Deferred Compensation Program, where she was responsible for managing the daily operations. Prior to this position, Tara was the Regional Manager for Voya Financial Services (formerly ING Financial Services) where she was responsible for the relationship management of several government defined contribution plans in California and Nevada. Tara holds a Bachelor of Arts degree in journalism and political science from the University of Iowa.

## Chief Policy Deputy
### Erik Jimenez

Erik Jimenez currently serves as the Chief Policy Deputy in the State Treasurer's office. In this role, Erik works on a variety of projects that range from infrastructure financing to increasing financial independence for marginalized communities. During the COVID-19 pandemic, he also helped administer the largest small business assistance program in Nevada history. Erik has previously represented various gaming, health care, education, energy, and transportation clients in front of the Nevada Legislature, and has also worked to enact numerous disability reforms in Nevada. Erik holds a bachelor's degree in Political Science and a master's degree in Public Administration and Policy from the University of Nevada Reno. Erik also serves on numerous government and non-profit boards, including serving as the Chair of the Advisory Committee for the Nevada Office of Minority Health and Equity, and was appointed by Governor Steve Sisolak to serve on the Nevada Statewide Independent Living Council.

## Senior Deputy for Operations
### *Amber Law*

Amber Law is a Certified Public Manager and has served in government finance since 2005. Prior to being appointed as the Senior Deputy Treasurer in 2021, Amber was the Deputy Treasurer of Cash Management and Merchant Services since 2016. Amber was raised in Nevada and is passionate about serving the great Silver State. She is trained in Lean Six Sigma and Kaizen and enjoys applying these principles to her civil service work. Amber oversees operations for the State Treasurer's Office including Human Resources, IT, Budget, and Contract Management.

## Deputy Treasurer – Cash Management
### *Tami Simpson*

Tami Simpson began working in the Treasurer's Office in October of 2011 in the Cash Management Division. With over 15 years of project management experience, she specializes in process improvement and the implementation of best practices, policies & procedures. From 2016 to 2018 Tami helped develop the Merchant Service Program by creating an Education and Outreach Program and a standardized Operating Manual for all participating State agencies. Tami's duties include managing the Cash Management Division which oversees the State's banking relationships, the reconciliation of bank transactions with state accounting records, the e-payment Merchant Services Program, and administers the state's Check Distribution Program.

## Deputy Treasurer – College Savings
### *Tya Mathis-Coleman*

Tya serves as the organization's Deputy Treasurer of College Savings. In this position her primary focus is on the education initiatives administered by the State Treasurer's Office. Tya is a passionate servant leader who is committed to public education. Most recently Tya served as the Director of Recruitment for the Clark County School District. Tya is a native of Nevada and a proud product of the Clark County School District and the Nevada System of Higher Education. Tya strongly believes that together we can impact our community one child at a time. As the Deputy Treasurer of College Savings, Tya is responsible for ensuring all College Savings programs are effectively and efficiently managed. The Deputy Treasurer oversees administration, marketing, and execution of all programs, and guides and supports College Savings staff and vendors. Additionally, the Deputy Treasurer develops and maintains various community partnerships that advance College Savings goals.

## Deputy Treasurer – Debt Management
### *Jeff Landerfelt*

Jeff accepted the Deputy Treasurer of Debt Management position in February 2021. In this role, he will manage the issuance of State securities, rating agency relations, investor relations, and the administration of the Consolidated Bond Interest and Redemption Fund budgets. The Debt Management Division is responsible for collection and payment of various State obligations, post

issuance compliance of State securities with federal and State securities law and reconciliation of the State's debt portfolio accounting transactions. During fifteen years of State service, Jeff has held various audit, analyst, and management positions with the Gaming Control Board, the Secretary of State's Office, the Public Utilities Commission, and most recently, as an Audit Manager with the Division of Internal Audits. Previously, Jeff held various operations management and audit positions over twenty years in the ground transportation and heavy-weight air cargo industries. He is a U.S. Air Force veteran and holds undergraduate and graduate business degrees from California State University, Sacramento, and University of Oregon, respectively.

## Deputy Treasurer – Investments
### *Steven Hale*

Steven Hale serves as the agency's Deputy Treasurer for Investments. He is responsible for management and supervision of the investment activities conducted through and for the Treasurer's Office, including the state's $7.5 billion General Portfolio and the $2.1 billion Local Government Investment Pool, among others. He has a broad range of investment management experience in both the private and government sectors, including fixed income research, portfolio management and private investments. Steven received his Bachelor's degree in Economics from Brandeis University and MBA in Finance from Columbia University.

## Deputy Treasurer – Unclaimed Property
### *Vacant*

# Financial Section

## UNCLAIMED PROPERTY

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2022 and June 30, 2021

| | 2022 | | 2021 |
|---|---:|---|---:|
| **Revenues** | | | |
| Unclaimed Property Receipts | | | |
| Utility Companies | $ - | 1 | $ - |
| Insurance Companies | - | 2 | - |
| Financial Institutions | 353,696 | 3 | 425,905 |
| Security Sales & Dividends | 20,456,564 | 4 | 17,890,595 |
| Local Governments | 19,807 | 5 | 18,088 |
| Other State Governments | - | 6 | - |
| Other Businesses | 79,636,627 | 7 | 71,157,725 |
| Audit Proceeds | 5,270,306 | 8 | 6,288,756 |
| Direct Payment From FDIC | - | 9 | - |
| Miscellaneous Sales | 2,725 | 20 | 3,480 |
| Penalties, Interest and Other | 3,022,745 | 10 | 2,969,733 |
| Total Revenues | 108,762,470 | | 98,754,282 |
| | | | |
| **Expenditures** | | | |
| Payments to Claimants | 42,076,532 | 11 | 40,728,480 |
| Payments FDIC Claimants | 1,449,406 | 12 | 8,200,370 |
| Personnel Costs | 936,494 | 13 | 947,974 |
| Contractual Services | 760,768 | 14 | 1,362,056 |
| Operating Costs | 218,395 | 15 | 205,236 |
| Advertising and Public Relations | 110,659 | 16 | 122,080 |
| Total Expenditures | 45,552,254 | | 51,566,196 |
| | | | |
| **Other Financing Sources (Uses)** | | | |
| Transfer to General Fund | (56,059,921) | 17 | (47,672,493) |
| Transfer to Educational Trust Fund | - | 18 | (115,963) |
| Transfer to Gov. Guinn Scholarship Fund | (7,600,000) | 19 | (7,600,000) |
| Total Other Financing Sources (Uses) | (63,659,921) | | (55,388,456) |
| | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | (449,705) | | (8,200,369) |
| | | | |
| Beginning Balance, July 1 | 1,449,406 | | 8,200,369 |
| Ending Balance, June 30 | $ 999,701 | | $ (0) |

Cash Basis – Unaudited

# MILLENNIUM SCHOLARSHIP TRUST FUND
Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2022 and June 30, 2021

| Revenues | | 2022 | | | 2021 |
|---|---|---|---|---|---|
| Tobacco Settlement Income | $ | 17,672,537 | 1 | $ | 17,265,319 |
| Appropriation | | - | 11 | | 42,000,000 |
| Interest Income | | 230,040 | 12 | | 97,836 |
| Prior Year Correction | | - | 13 | | 12,018 |
| Refunds | | - | 14 | | - |
| Total Revenues | | 17,902,577 | | | 59,375,173 |
| | | | | | |
| Expenditures | | | | | |
| Scholarship Payments | | 38,780,748 | 3 | | 44,260,392 |
| Personnel | | 249,193 | 5 | | 243,321 |
| Travel | | 219 | 6 | | - |
| Administrative | | 134,682 | 7 | | 124,126 |
| Total Expenditures | | 39,164,842 | | | 44,627,838 |
| | | | | | |
| Other Financing Sources (Uses) | | | | | |
| Transfer from College Savings Endowment Account | | - | 4 | | (2,000,000) |
| Transfer from Treasurer | | 384,094 | 8 | | 367,446 |
| Transfer from Unclaimed Property | | 7,600,000 | 2 | | 7,600,000 |
| Total Other Financing Sources (Uses) | | 7,984,094 | | | 5,967,446 |
| | | | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | | (13,278,170) | | | 20,714,780 |
| | | | | | |
| Beginning Balance, July 1 | | 43,598,469 | 9 | | 22,883,688 |
| Ending Balance, June 30 | $ | 30,320,299 | 10 | $ | 43,598,468 |

Cash Basis – Unaudited

# PREPAID TUITION TRUST FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2022 and June 30, 2021

| | | 2022 | | | 2021 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Participant Contributions | $ | 13,238,793 | 1 | $ | 14,057,311 |
| Application Fees | | 28,402 | 2 | | 50,300 |
| Administrative Charges | | 26,500 | 3 | | 25,500 |
| Interest Income | | 5,035,600 | 4 | | 37,188 |
| Investment Gain (Loss) | | 15,343,398 | 5 | | 11,045,950 |
| Total Revenues | | 33,672,692 | | | 25,216,249 |
| | | | | | |
| **Expenditures** | | | | | |
| Tuition Payments | | 12,034,687 | 6 | | 12,033,406 |
| Personnel Costs | | 245,901 | 7 | | 226,941 |
| Travel | | 636 | 8 | | - |
| Operating Costs | | 434,762 | 9 | | 476,613 |
| Contract Cancellation Refunds | | 3,458,938 | 10 | | 2,759,120 |
| Contract Rollover Payments | | 48,863 | 11 | | 257,824 |
| Total Expenditures | | 16,223,789 | | | 15,753,904 |
| | | | | | |
| **Other Financing Sources (Uses)** | | | | | |
| Transfer from College Savings Endowment Account | | | 12 | | - |
| Transfer from College Savings to Pay Operating | | 681,300 | 13 | | 703,554 |
| Total Other Financing Sources (Uses) | | 681,300 | | | 703,554 |
| | | | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | | 18,130,204 | | | 10,165,899 |
| | | | | | |
| Beginning Balance, July 1 | | 238,604,541 | 14 | | 228,438,641 |
| Prior Period Adjustment | | | | | - |
| Ending Balance, June 30 | $ | 256,734,745 | | $ | 238,604,540 |

Cash Basis – Unaudited

## COLLEGE SAVINGS

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2022 and June 30, 2021

| Revenues | | 2022 | | | 2021 |
|---|---|---|---|---|---|
| Investment Management Fees | $ | 5,989,335 | 1 | $ | 5,553,290 |
| Gifts and Donations | | - | 2 | | - |
| Noncash Revenues | | 548,064 | 3 | | 501,810 |
| Settlement Income | | - | | | - |
| Interest Income | | 107,676 | 4 | | 62,775 |
| Cost Allocation/Fund Transfers | | 1,623,048 | 5 | | 2,933,708 |
| Total Revenues | | 8,268,123 | | | 9,051,583 |
| **Expenditures** | | | | | |
| Personnel | | 402,320 | 6 | | 388,800 |
| Operating | | 1,222,674 | 7 | | 2,547,169 |
| In-Kind Marketing | | | 8 | | 501,810 |
| Total Expenditures | | 1,624,994 | | | 3,437,779 |
| **Other Financing Sources (Uses)** | | | | | |
| Administrative Transfers | | | | | |
| College Savings | | 1,623,048 | 9 | | 2,933,708 |
| Millennium Scholarship | | 384,094 | 10 | | 367,446 |
| Prepaid Tuition | | 681,300 | 11 | | 703,554 |
| Transfer to Prepaid Tuition Trust Fund | | | 12 | | |
| College Kick Start | | | 13 | | |
| Cost Allocation | | | 14 | | - |
| Settlement Expenses | | | 15 | | |
| Total Other Financing Sources (Uses) | | 2,688,442 | | | 4,004,708 |
| Excess of revenues and other financing sources over expenditures and other financing uses | | 9,331,571 | | | 1,609,096 |
| Beginning Balance, July 1 | | 12,115,997 | 16 | | 10,506,901 |
| Ending Balance, June 30 | $ | 21,447,568 | | $ | 12,115,997 |

Cash Basis – Unaudited

## CONSOLIDATED BOND INTEREST & REDEMPTION FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2022 and June 30, 2021

| | 2022 | | 2021 |
|---|---|---|---|
| **Revenues** | | | |
| Taxes | | | |
| Real Property | 172,208,278 | 1 | 163,062,428 |
| Personal Property | 19,926,143 | 1 | 17,374,074 |
| Centrally Assessed Property | 13,007,000 | 1 | 12,465,811 |
| | 205,141,421 | | 192,902,313 |
| Other | | | |
| Lease Purchase Building Rent | 6,830,028 | 2 | 6,838,514 |
| Interest Income | 1,352,178 | 3 | 1,012,387 |
| | 8,182,206 | | 7,850,901 |
| Total Revenues | 213,323,627 | | 200,753,214 |
| | | | |
| **Expenditures** | | | |
| Personnel | 387,373 | 5 | 341,726 |
| Statewide Cost Allocation (SWCAP) | - | 6 | 3,069 |
| Professional Services | 1,061,495 | 7 | 965,839 |
| SIB Operating Expenses | 8,219 | 7.1 | |
| Trust Agent Fees | 24,722 | 7 | 24,722 |
| | 1,481,809 | | 1,335,356 |
| Debt Service | | | |
| Bond Principal Redemption | 137,215,000 | 8 | 148,124,000 |
| Bond Interest Expense | 50,645,367 | 9 | 54,423,655 |
| | 187,860,367 | | 202,547,655 |
| Total Expenditures | 189,342,176 | | 203,883,011 |
| | | | |
| **Other Financing Sources (Uses)** | | | |
| Transfers from State Agencies | 12,985,710 | 10 | 13,232,373 |
| Dept of Cons. & Natural Res. - Arbitrage | | | |
| US Treasury - Build America Bonds Subsidy | | 11 | |
| State Treasurer's Assessment | 155,575 | 12 | 250,055 |

Cash Basis – Unaudited

18

| | | | |
|---|---|---|---|
| Bond Proceeds for Cost of Issuance | 1,063,745 | | 944,302 |
| Transfer to GF (AB3)- Budget Reduction | | | (9,000,000) |
| Total Other Financing Sources (Uses) | 14,205,030 | | 5,184,979 |
| | | | |
| Excess of revenues and other financing sources | | | |
| over expenditures and other financing uses | 38,186,481 | | 2,055,182 |
| | | | |
| Beginning Balance, July 1 | 162,579,163 | 1082 | 155,840,505 |
| Balance Forward Prior Year from other accounts | | 9999 | - |
| | | | |
| Post Closing Adjustment | | | 4,683,476 |
| Ending Balance, June 30 | 200,765,644 | $ | 162,579,163 |

Cash Basis – Unaudited

## MUNICIPAL BOND BANK BOND INTEREST & REDEMPTION FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2022 and June 30, 2021

|  | 2022 |  | 2021 |
|---|---|---|---|
| **Revenues** |  |  |  |
| Receipts from municipalities-Interest | $ 2,596,212 | 1 | $ 3,047,237 |
| Receipts from municipalities-Principal | 3,225,000 | 9 | 4,615,000 |
| Other |  |  |  |
| Interest Income | 1,644 | 2 | 2,208 |
| Reimbursement of Expenses |  | 3 | - |
| Total Revenues | 5,822,856 |  | 7,664,445 |
|  |  |  |  |
| **Expenditures** |  |  |  |
| Administrative Costs |  | 4 | - |
| Transfer to Administration | - | 8 | 8,874 |
| Trust Agent Fees |  | 5 | - |
|  | - |  | 8,874 |
| Debt Service |  |  |  |
| Bond Principal Redemption | 3,225,000 | 6 | 4,615,000 |
| Bond Interest Expense | 2,596,213 | 7 | 3,047,237 |
|  | 5,821,213 |  | 7,662,237 |
| Total Expenditures | 5,821,212.50 |  | 7,671,111 |
|  |  |  |  |
| **Other Financing Sources (Uses)** |  |  |  |
| Reversion to General Fund |  |  | - |
| Total Other Financing Sources (Uses) | - |  | - |
|  |  |  |  |
| Excess of revenues and other financing sources |  |  |  |
| over expenditures and other financing uses | 1,644 |  | (6,666) |
|  |  |  |  |
| Beginning Balance, July 1 | - |  | 6,666 |
| Ending Balance, June 30 | $ 1,644 |  | $ 0 |

odd # years balance reverts to General Fund
even # years balances forward to the following year or pursuant to NRS 350A.190 2(d)
money reverted to General Fund and closed with zero balance

Cash Basis – Unaudited

## FUND FOR HEALTHY NEVADA

Statement of Revenues, Expenditures and Changes in Fund Balance

For the Fiscal Years Ended June 30, 2022 and June 30, 2021

| | 2022 | | 2021 |
|---|---|---|---|
| **Revenues** | $ | | $ |
| Tobacco Settlement Income | 26,508,805 | 1 | 25,897,978 |
| Interest Income | 197,114 | 2 | 181,228 |
| Appropriations | - | | - |
| Refund of Unused Grant Money | - | 3 | 13,633 |
| Transfer From Healthdivision | 2,163,230 | 1 8 | 1,900,903 |
| Total Revenues | 28,869,149 | | 27,993,742 |
| | | | |
| **Expenditures** | | | |
| Operating | 67,889 | 4 | 58,748 |
| Total Expenditures | 67,889 | | 58,748 |
| | | | |
| **Other Financing Sources (Uses)** | | | |
| Transfer to Department of Health and Human Services | | | |
| Administrative Services | 644,086 | 1 9 | 660,968 |
| Senior RX Program | 262,643 | 5 | 375,482 |
| Children & Disabled Persons | 6,537,511 | 6 | 6,498,891 |
| Aging Services | 6,318,356 | 7 | 5,404,471 |
| Disability RX | - | 8 | - |
| Differential Response | 1,350,000 | 9 | 1,263,559 |
| Child & Adolescent Services * | 2,276,716 | 1 0 | 2,302,918 |
| Autism | - | 1 1 | 1,049,576 |
| Family Resource Center | 1,624,173 | 1 2 | 1,608,089 |

Cash Basis – Unaudited

| | | | |
|---|---|---|---|
| Consumer Health Asst | 308,018 | 14 | 353,675 |
| Tobacco Cessation | 966,192 | 15 | 902,046 |
| Public and Behavioral Health | 2,566,051 | 16 | 969,204 |
| Transfer to Millennium Scholarship | - | | - |
| Transfer to GF (AB3) - Budget Reduction | - | | 16,851,440 |
| Total Other Financing Sources (Uses) | 22,853,746 | | 38,240,319 |
| Excess of revenues and other financing sources | | | |
| over expenditures and other financing uses | 5,947,514 | | (10,305,325) |
| Beginning Balance, July 1 | 29,488,093 | 17 | 39,793,420 |
| Prior Year Adjustment | 515,677 | | 515,675 |
| Ending Balance, June 30 | $ 35,951,284 | | $ 30,003,770 |

Cash Basis – Unaudited



# Annual Report

Office of State Treasurer Zach Conine

| Fiscal Year 2021 | July 1, 2020 – June 30, 2021 |



**Zach Conine**
*State Treasurer*

STATE OF NEVADA

OFFICE OF THE STATE TREASURER

December 17, 2021

Dear Governor Sisolak and Members of the Nevada Legislature:

Enclosed please find a copy of the Nevada State Treasurer's Office Fiscal Year 2021 Annual Report as required pursuant to NRS 226.120(2).

In Fiscal Year 2021, the State Treasurer's Office continued its work of effectively and efficiently serving Nevadans. Notably, the Office worked on a handful of special projects aimed specifically at assisting Nevadans with the devastating financial impacts of the COVID-19 Pandemic. For example, the Office worked in coordination with the Governor's Office of Economic Development to establish and administer two grant programs, which provided approximately $110MM in financial support for Nevada's small businesses. Similarly, the Office expanded a special pilot program administered in partnership with the Department of Employment, Training, and Rehabilitation (DETR), wherein the Unclaimed Property Division returned over $2.3MM in lost property to Nevada's unemployment insurance claimants.

Later in the fiscal year, an Operations Division was established within the Office to consolidate the day-to-day activities such as IT, contracts, budgeting, HR, and travel. The creation of the Operations Division allowed the remaining five divisions to devote their full attention to the work at hand.

Outlined within this report are the multitude of ways in which the Office served Nevada's constituents, State agencies, local governments, and more. The successes of the year would not have been possible without the hard work and tireless dedication of the State Treasurer's Office staff. Through their efforts, we have consistently provided a high level of customer service, and I couldn't be more proud to work with them every day.

Thank you for the opportunity to share more about the Treasurer's Office. Please do not hesitate to contact me should you need additional information or further clarification on any of the information provided in this report.

Sincerely,

Zach Conine
Nevada State Treasurer

# TABLE OF CONTENTS

**OVERVIEW** ...............................................................................................................4

**OPERATIONS DIVISION** ......................................................................................5
    Division Overview ...............................................................................................5
    Duties ..................................................................................................................5
    Major Accomplishments .....................................................................................6
**CASH MANAGEMENT DIVISION** .......................................................................7
    Division Overview ...............................................................................................7
    Duties ..................................................................................................................7
    Major Accomplishments .....................................................................................7
**INVESTMENT DIVISION** .....................................................................................9
    Division Overview ...............................................................................................9
    Duties ..................................................................................................................9
    Major Accomplishments .....................................................................................13
**DEBT MANAGEMENT DIVISION** .......................................................................14
    Division Overview ...............................................................................................14
    Duties ..................................................................................................................14
    Major Accomplishments .....................................................................................17
**UNCLAIMED PROPERTY DIVISION** ..................................................................19
    Division Overview ...............................................................................................19
    Duties ..................................................................................................................19
    Major Accomplishments .....................................................................................20
**COLLEGE SAVINGS DIVISION** ..........................................................................21
    Division Overview ...............................................................................................21
    Duties ..................................................................................................................21
    Major Accomplishments .....................................................................................27
**NEVADA ABLE SAVINGS PROGRAM** ...............................................................29
    Division Overview ...............................................................................................29
    Duties ..................................................................................................................29
    Major Accomplishments .....................................................................................29

**SPECIAL PROJECTS** .............................................................................................30

**ORGANIZATION CHART** ....................................................................................33

**ZACH CONINE BIOGRAPHY** ..............................................................................34

**SENIOR STAFF BIOGRAPHIES** ..........................................................................35

**FINANCIAL SECTION** ..........................................................................................38

# OVERVIEW

Pursuant to the Nevada Constitution and Nevada Revised Statutes, the State Treasurer's Office (STO) is responsible for a number of state functions. Broadly, these responsibilities fall under one of six working groups, or Divisions, within the STO. The six Divisions of the STO are:

## Operations

The Operations Division is responsible for managing the STO budget accounts, Tobacco Master Settlement Agreement (MSA), contracts and purchasing, human resources, IT, and day-to-day operations for the STO.

## Cash Management

The Cash Management Division is responsible for managing the State's banking relationships, reconciling bank transactions with State accounting records, managing the State's electronic payments, and administering the State's check distribution program.

## Investment

The Investment Division is responsible for the investment of all public money, and the accounting of the General Portfolio, Local Government Investment Pool, and the Permanent School Fund.

## Debt Management

The Debt Management Division is responsible for the issuance of debt obligations authorized on behalf of and in the name of the State (with limited exceptions), as well as the organization and facilitation of statewide pooled financing programs.

## Unclaimed Property

The Unclaimed Property Division is responsible for receiving and safeguarding abandoned property due to Nevadans. The Division also processes and approves claims made by Nevadans for the return of their property.

## College Savings

The College Savings Division is responsible for administering various college savings programs throughout the State, including: the five nationwide 529 College Savings Plans, Nevada Prepaid Tuition Program, Nevada College Kick Start Program, and Governor Guinn Millennium Scholarship Program. The Division is also responsible for the Student Loan Ombudsman Program, in addition to maintaining a comprehensive scholarship database, and administering 529 matching grant programs.

## OPERATIONS DIVISION

### Division Overview

The Operations Division oversees the day-to-day operations for the STO to include fiscal functions for 21 STO budget accounts, the submittal of the biennium budget requests, human resources, IT operations, travel management, contract and purchasing management, and the administration and disbursement of the annual Tobacco Master Settlement Agreement (MSA).

The Division also assists with revenue and expenditure forecasts, reports, and financial statements due to the State Controller's Office, Department of Administration, and the Legislative Counsel Bureau. Most general inquiries from the public are also handled by the Operations Division.

### Duties

#### Fiscal Functions

The Operations Division is responsible for the fiscal functions of 21 budget accounts including the preparation and submittal of 6 biennium budget requests for the State Treasurer, Prepaid Tuition Program, Millennium Scholarship Program, College Savings Program, College Savings Trust, and the Unclaimed Property Program. It also oversees the day-to-day spending, purchasing, staff travel, inventory, revenue and expenditure projections, work programs, audit requests, fiscal year processing, and reporting for these budget accounts.

The Operations Division also administers the accounting and distribution of funds relating to the Tobacco Master Settlement Agreement (MSA). State law requires 40% of the funds be allocated to the Governor Guinn Millennium Scholarship Fund and 60% to the Fund for a Healthy Nevada. Nevada received approximately $43 million in MSA funds in FY21 enabling Operations to distribute approximately $17 million to Millennium recipients and $25 million to the Healthy Nevada Program.

#### Human Resource Functions

The Operations Division oversees Human Resources (HR) for 45 State Treasurer's Office employees including planning, recruiting and selection, evaluation of employee performance, records, and payroll processing, creating, and maintaining policies and procedures, onboarding new employees, and the day-to-day HR needs of the office.

#### Contract Management

The Operations Division oversees approximately 35 active contracts for the State Treasurer's Office including the State's banking and merchant services contracts utilized by Nevada agencies.

#### Information Technology

The Operations Division oversees all Information Technology (IT) functions for the State Treasurer's Office and its various programs. The office has two designated IT staff who handle the day-to-day

help desk tickets, monitor, and administer the Office's information systems, security, hardware, software, databases, and network needs.

## Major Accomplishments

The Operations Division was established in May 2021 to create a centralized approach in performing the administrative functions for the State Treasurer's Office. Although the new Division was created two months before the fiscal year end, during that time, the Office benefited from faster and more efficient processing times. Removing administrative functions from various programs allowed staff to focus on program initiatives to better serve Nevadans.

# CASH MANAGEMENT DIVISION

## Division Overview

The Cash Management Division oversees the State's banking relationships, reconciles bank transactions with state accounting records, manages the State's electronic payment acceptance program, and administers the state's check distribution program.

## Duties

### Banking and Accounting

Pursuant to NRS 226.110, the State Treasurer is responsible for the receipt and disbursement of public money. In addition to its main depository and controlled disbursement accounts, the Treasurer's Office has 39 bank accounts under analysis, with most of these accounts being zero balance accounts. The funds deposited into these accounts by other State agencies are transferred into the State's consolidation account on a daily basis, thus providing an efficient method for combining cash balances within one financial institution and minimizing non-invested cash balances. The Treasurer's Office also maintains three depository accounts with other financial institutions in order to offer State agencies in geographically remote areas the ability to more timely deposit funds.

The Cash Management Division also allocates revenues from the lease of federal lands in Nevada. Under NRS 328, these revenues are shared between the Department of Education's Distributive School Account, county treasurers, and school districts based on the percentage of revenues collected in those various jurisdictions.

### Merchant Services

As manager of the State's electronic payment acceptance program, Cash Management maintains over 380 merchant accounts for 58 State agencies and with the transition to Wells Fargo Merchant Services, State agencies receive next day funding on all electronic transactions. In addition, Cash Management maintains a website for electronic payment acceptance featuring information and forms for assisting agencies through the merchant services process. In FY21, Cash Management continued the Merchant Services Education and Outreach Program online assisting State agencies with Payment Card Industry Data Security Standards (PCI DSS), credit card reconciliation, and overall merchant services processes related to accepting electronic payments, such as credit and debit cards. The program also created the first best practice and operating manual for electronic payment acceptance that is being used by other government entities and states.

## Major Accomplishments

In FY21, the Cash Management Division's newly created Electronic Treasury site assisted Nevada agencies during the COVID-19 pandemic with a variety of banking and Merchant Services needs including online bank supply ordering, desk top deposit scanner information and access forms, education and outreach presentations, quarterly newsletters and links to helpful accounting policies

and procedures. In addition, the Division continued the combined online Cash Management and Merchant Services Education and Outreach Program that agencies could attend live via Teams or listen to a recorded presentation at their convenience.

The Treasurer's Office continues to seek more efficient and safe means by encouraging the use of items such as cash vaults, remote deposit, positive pay, and ACH blocks and filters, which State agencies can use to carry out their financial transactions.

# INVESTMENT DIVISION

## Division Overview

The State Treasurer is responsible for the investment of public money. The Investment Division ("Investment") is responsible for all investment and accounting activities relating to the General Portfolio, Local Government Investment Pool (LGIP), the Permanent School Fund (PSF), the Higher Education Tuition Trust Fund, as well as oversight of the NVEST investment advisers.

## Duties

The investment of the State of Nevada's General Portfolio is a function performed by the Division in accordance with state statutes. An Investment Policy for prudent investment of State funds has been adopted to guide this process. The General Portfolio includes all State funds, excluding funds invested for the Local Government Investment Pool (LGIP), Local Government Pooled Long-Term Investment Account (NVEST), Permanent School Fund (PSF), and the Higher Education Tuition Trust Fund.

### *General Portfolio*

The State's General Portfolio is invested in U.S. Treasury and Agency securities, high quality corporate notes and supranational bonds, commercial paper, mortgaged and asset backed securities, negotiable and time certificates of deposit, and money-market funds. Securities holdings are diversified to prevent over-concentration by maturity, issuer, or security class. The Division maintains a conservative, moderately active investment strategy which provides the ability to take advantage of market opportunities as they occur by analyzing projected cash flow needs. Portfolio maturities are structured to reduce the likelihood of a forced sale of securities in any but the most severe circumstances. The Division manages the portion of the Portfolio utilized for operating funding, while a portion of the Portfolio not needed for immediate expenses is managed by two registered investment advisers, Buckhead Capital Management and Western Asset Management.

The FY21 General Portfolio's book value as of June 30, 2021, was $6.943 billion. The following chart provides a breakdown of total investments held as of the end of FY21. Total realized earnings for FY21 were $21.372 million, representing a yield of 0.62%.



## *Local Government Investment Pool*

Pursuant to NRS 355.165, the LGIP serves as an alternative program for local governments to invest cash on a voluntary basis, thus allowing for the leverage of economies of scale. LGIP is administered in a conservative manner, consistent with the prudent guidelines outlined in a LGIP-specific Investment Policy. Any local government may deposit its public monies in the pool. The LGIP reduces investment risk and increases convenience for local governments, as well as allowing for:

- Multiple accounts to be maintained for accounting purposes;
- No minimum or maximum account size;
- No limit on transaction size for deposits or withdrawals of funds; and
- No restriction on length of time proceeds can be invested.

The LGIP investment strategy incorporates the matching of maturing securities to the anticipated cash needs of the participants. Approximately 10% of the fund matures daily to ensure sufficient liquidity is available to meet both anticipated and unanticipated withdrawals. The LGIP imposes a Minimum Liquidity Requirement, which projects the cash flow needed to meet identified obligations within a rolling four-week period and which aligns maturing securities accordingly.

The following chart provides a breakdown of total investments held as of the end of June 30, 2021.



As of July 1, 2015, registered investment advisor, FHN Financial Services Mainstreet Capital Advisors (FHN), manages the LGIP Portfolio. The LGIP's book value on June 30, 2021 was $2.1 billion. The LGIP's investment objectives include safety of principal, portfolio liquidity, and market return, consistent with a conservative, short duration portfolio. The Weighted Average Maturity (WAM) of the portfolio at fiscal year-end is 142 days.

Additionally, local governments have the option to participate in a longer-term investment program within the LGIP. NVEST is an alternative investment program for local governments, the objective of which is to provide higher returns than the LGIP. The minimum account size is $5 million. NVEST participants, working with one of three registered investment advisors, can customize their portfolios based on their risk tolerances and other factors. As of June 30, 2021, the NVEST portfolios had a total book value of $4.87 million and consisted of one (1) participant.

## *Collateral Pool Program*

Pursuant to NRS 356.350, the State Treasurer is required to establish a program for "the monitoring of collateral of public funds". The Nevada Pooled Collateral Program offers state and local government agencies an efficient, cost effective, and safe alternative method for securing public funds. The primary objectives are to reduce risk while, at the same time, decreasing the overall collateral requirement for depositories. By centralizing the administration and reporting functions through Investment, government agencies and depositories recognize cost savings in terms of operational support and collateral efficiency.

Each financial institution is required to maintain (at a third-party repository) acceptable securities having a fair market value that is at least 102% of the amount of the aggregate uninsured ledger

balances of the public money held by the depository as collateral. Participating financial institutions must report each day the amount of deposits held and the value of the corresponding pledged collateral. Any under collateralization must be rectified by the financial institution by the close of business on the day the under collateralized deposits are reported.

At the conclusion of FY21, there were 327 public entities throughout the State participating in the Collateral Pool Program, with deposits in 14 financial institutions and a daily balance on June 30, 2021, of $1.588 billion with pledged collateral of $2.107 billion, which calculates to $487 million in excess collateral.

## Permanent School Fund

The Permanent School Fund (PSF) was created to account for monies received from estates that escheat to the State, proceeds from the sale of federal lands given to the State, and fines collected under the penal laws of the State that are pledged only for education purposes under Article 11, Section 3 of the Constitution of the State of Nevada. Per NRS 355.050, the State Treasurer shall have charge of all the investments of money and the sale of all securities of the PSF. All earnings are transferred to the State Education Fund which totaled $9.134 million in FY21.

As of June 30, 2021, the book value of the fixed-income investments of the Permanent School Fund totaled $217.57 million, the public equity investments totaled $229.53 million, and the private equity book value totaled $23.028 million (excludes capital returned to NCIC since SSOF inception). The total portfolio as of June 30, 2021, totaled $493.51 million.

## Nevada Capital Investment Corporation

In 2011, the Nevada State Legislature passed Senate Bill 75, authorizing up to $50 million non-tax dollars in the Permanent School Fund to be invested in private equity investments through the Nevada Capital Investment Corporation (NCIC). Known as the Silver State Opportunities Fund (SSOF), this private equity fund focuses investments on expanding businesses located in Nevada or those which are seeking to relocate. SSOF was fully committed as of May 13, 2016. Approximately 88%, or $44.6 million, of committed capital has been drawn from the Permanent School Fund as of June 30, 2021.

The SSOF is generating a 7.5% net annual return to the State's Permanent School Fund. On a gross basis, SSOF is generating an 10.7% Internal Rate of Return (IRR). As of June 30, 2021, the NCIC has contributed $47.1 million and received $35.6 million in distributions, resulting in $11.5 million in net contributed capital.

As of June 30, 2021, 32 companies (20 of which remain active) have received investments from SSOF. This includes investments throughout the entire State as noted in the SSOF report. This is a total of $815 million (18x multiplier) invested in Nevada and its partners which stretches far beyond the $50 million capital invested via the Permanent School Fund. The Fund investments have supported 2,470 Nevada employees with an average annual wage of $83,878, which is higher than the national average wage.

## Major Accomplishments

During the 81st Legislative Session in 2021, the State Treasurer sponsored Senate Bill 68 which was passed in the Legislature and signed into law by Governor Sisolak. In part, the bill allows the State Treasurer to transfer up to $75 million from the Permanent School Fund to the Nevada Capital Investment Corporation which is an increase from the prior $50 million transfer. This increase will generate additional funding for public schools via increases in earnings transferred to the State Education Fund.

# DEBT MANAGEMENT DIVISION

## Division Overview

Pursuant to NRS 226, the State Treasurer is directly responsible for the issuance of any debt obligation authorized on behalf of and in the name of the State, except for issuances by the Colorado River Commission, the University of Nevada System, and the Department of Business and Industry which issue various types of debt under differing levels of autonomy. The State Treasurer is also authorized to organize and facilitate statewide pooled financing programs, including lease purchases, for the benefit of the state and any political subdivisions.

## Duties

### *General Obligation Debt*

The State Treasurer is responsible for the issuance and maintenance of the following types of general obligation (GO) debt: Capital Improvement Bonds, Municipal Bond Bank Bonds, State Revolving Fund Bonds, Historic Preservation Bonds, Natural Resources Bonds, University System Bonds, and other miscellaneous GO bonds and securities. The State requires GO bonds to be legislatively authorized and secured by that portion of the ad valorem tax revenue dedicated to the payment of GO debt to the extent other monies are not available. The State's gross GO debt as of June 30, 2021 was $1,210,570,000.

The following chart illustrates the breakout of the State's $1.21 billion Gross General Obligation Debt as of June 30, 2021.



During FY21, the Debt Management Division ("Debt Management") processed debt service payments for existing GO debt totaling approximately $210.16 million.

| Gross General Obligation Debt FY21 Debt Service Payments | | | |
|---|---|---|---|
| | **Principal** | **Interest** | **Total** |
| State Property Taxes | $128,898,000 | $45,308,427 | $174,206,427 |
| Aggregate Bonds Paid with Revenues Other Than Property Tax | 3,722,000 | 2,778,494 | 6,500,494 |
| Clean Water Revolving Fund | 8,195,000 | 1,879,575 | 10,074,575 |
| Safe Drinking Water Revolving Fund | 2,690,000 | 715,688 | 3,405,688 |
| Municipal Bond Bank | 4,615,000 | 3,047,237 | 7,662,237 |
| Nevada System of Higher Education | 3,915,000 | 2,604,075 | 6,519,075 |
| Colorado River Commission | 755,000 | 1,033,573 | 1,788,573 |
| Total FY21 Debt Service | $152,790,000 | $57,367,068 | $210,157,068 |

## Debt Service Reserves

Nevada's Consolidated Bond Interest and Redemption Fund (the "Bond Fund") is used to receipt the collection of the 17-cent ad-valorem property tax revenue dedicated to the payment of the principal and interest on the State's GO bonds, and to reserve monies for future GO bond debt service payments. The reserve within the Bond Fund is funded from the excess of applicable property tax revenues over the required debt service payments plus interest earnings on the Bond Fund. The Bond Fund is available to provide ready reserves to meet current debt service obligations to the extent monies are insufficient from current property tax revenues.

The State's current debt management policy has as an objective to maintain a reserve within the Bond Fund balance at the end of each fiscal year equal to at least 50% of next fiscal year's debt service payments on GO bonds (exclusive of those bonds considered to be self-supporting and paid by other available revenues). As of June 30, 2021, the unaudited reserve amount within the Bond Fund was approximately $158 million, which is equal to approximately 101% of the FY22 debt service on those general obligation bonds expected to be paid from property tax and prior to the issuance of additional 2021 bonds.

## Debt Affordability Analysis

A committee comprised of representatives from the Governor's Finance Office, the Department of Taxation, the State Treasurer's Office, and the Legislative Counsel Bureau meets at least biennially to forecast the estimated revenue to be received from its assessed property tax. Debt Management utilizes the committee's projections in the preparation of the General Obligation Debt Capacity and Affordability Report which is published each biennium. In the interim, Debt Management updates the affordability analysis after each securities issuance and as needed.

The General Obligation Debt Capacity and Affordability Report is utilized by the Governor in preparing his recommended budget. The report is then presented to the State Legislature, which relies upon the report when considering the issuance of securities during the following biennium,

determining the ad valorem tax rate for the payment of securities for the next biennium, and reviewing future debt capacity and affordability over the next ten years.

## State Debt Capacity

In addition to the General Obligation Debt Capacity and Affordability Report prepared by Debt Management, the issuance of GO bonds is also limited by the State Constitution. Article 9, Section 3 limits the aggregate principal amount of the State's outstanding GO debt to 2% of the total reported assessed valuation of the State. The limitation does not extend to debt incurred for the protection and preservation of any property or natural resources of the State, or for the purpose of obtaining the benefits thereof.

Subject to the constitutional debt limitation, the Legislature may authorize the issuance of debt for any public purpose. As of June 30, 2021, the constitutional debt limit stood at $3.02 billion. The outstanding debt subject to this limit was $945.44 million and the remaining constitutional debt capacity was $2.08 billion.

| Constitutional Debt Limitation and Capacity[1] | | | | |
|---|---|---|---|---|
| Effective June 30 | Assessed Valuation | Debt Limitation | Outstanding Debt Subject to Limitation | Remaining Constitutional Debt Capacity |
| 2017 | $114,727,736,818 | $2,294,554,736 | $1,034,015,000 | $1,260,539,736 |
| 2018 | $123,398,562,960 | $2,467,971,259 | $1,025,895,000 | $1,442,076,259 |
| 2019 | $134,128,343,902 | $2,682,566,878 | $988,260,000 | $1,694,306,878 |
| 2020 | $144,323,763,007 | $2,886,475,260 | $981,760,000 | $1,904,715,260 |
| 2021 | $151,219,706,042 | $3,024,394,121 | $945,445,000 | $2,078,949,121 |
| [1]Estimated by State of Nevada Controller's Office | | | | |

## Municipal Bond Bank

NRS 350A.140 designates the State Treasurer as administrator of the Nevada Municipal Bond Bank. In accordance with NRS 350A.150, the amount of State securities issued to acquire municipal securities may not exceed $1.8 billion outstanding at any time.

The State's Municipal Bond Bank program was established in 1981 to assist municipalities in undertaking local projects which foster and promote the protection and preservation of the property and natural resources of the State. Without this fund, municipalities might otherwise face the prospect of prohibitive interest rates.

The Board of Finance must approve the issuance of State GO and revenue securities under the Bond Bank Act. As of June 30, 2021, the outstanding par amount of securities issued pursuant to the Act was $79,065,000.

## *Permanent School Fund Guarantee Program*

Established under NRS 387.519, the Permanent School Fund Guarantee Program (PSFG), provides a mechanism for Nevada school districts to enter into agreements with the State whereby the money in the Permanent School Fund (PSF) is used to guarantee the debt service payments on certain bonds issued by Nevada school districts.

PSFG secured bonds carry the highest possible rating of "AAA" by Moody's Investor Service and S & P Global Ratings—thus providing Nevada school districts with greater access to public credit markets and reduced borrowing costs. The State Treasurer is tasked with administering the PSFG.

Fundamental to the PSFG is the legal authorization of the PSF to guarantee school district debt, which includes ensuring timely debt service payment, coupled with strong oversight and enforcement provisions. If a district fails to make a timely payment, the State Treasurer is required to withdraw a sufficient amount of money from the PSF in order to make a timely debt service payment. The withdrawal from the PSF and payment of debt service on the bonds is considered a loan to the school district. The loan must be repaid to the State from either school district money available to pay debt service on the bonds which are PSF guaranteed or from withholdings of state aid due to the district.

The maximum amount of principal that can be guaranteed by the State for any Nevada school district is limited to $60,000,000. Further, the total amount of bonds that can be guaranteed by the State is limited to 250% of the lower of the cost or fair market value of the assets in the PSF. Based on the current balance of the PSF, the maximum principal that can be guaranteed is more than $1.0 billion. As of June 30, 2021, $139,904,400 in bonds had been guaranteed, or authorized by the State Board of Finance to be guaranteed, by the PSF.

## Major Accomplishments
### *Bond Sales*

In FY21, the Office successfully conducted one bond sale comprised of two series of bonds:

| BONDS ISSUED IN FY2021 | | | | | | |
|---|---|---|---|---|---|---|
| | Series | Original Amount | New Money | PV Savings | TIC | Term |
| Highway Improvement Revenue (MVFT) Bonds | 2020A | $ 89,585,000 | $ 89,585,000 | $ - | 1.56% | 20yrs |
| Highway Improvement Revenue (IFT) Bonds | 2020B | 53,895,000 | $ 53,895,000 | $ - | 1.75% | 20yrs |
| Capital Improvement, Historic Preservation, and Refunding Bonds | 2020A | 103,825,000 | $ 90,450,000 | $3,460,705 | 1.78% | 18yrs |
| Natural Resources and Refunding Bonds | 2020B | 2,750,000 | $ 1,280,000 | $ 510,596 | 1.63% | 14yrs |
| | | | | | | |
| | | $ 250,055,000 | $235,210,000 | $3,971,301 | | |

The combined principal (or par value) amount of the bonds was $250,055,000. The terms of the bonds ranged from 14 years to 20 years and the true interest costs (TIC) ranged from 1.56% to 1.78%, which represents rates below historical averages.

## *Nevada's Credit Ratings*

Credit rating agencies provide an independent assessment of the relative creditworthiness of municipal securities. The rating system consists of letter grades that convey each company's assessment of the ability and willingness of a borrower to repay its debt in full and on time. Many investors rely upon these letter grades as a means of assessing the likelihood of repayment.

Credit ratings issued by the rating agencies are a major factor in obtaining the lowest cost of borrowed funds in the municipal bond market. Credit rating agencies base ratings on the assessment of the credit worthiness of an issuer with respect to a specific obligation.

There are several factors that rating agencies consider in assigning credit ratings: financial, economic, debt, and administration/management. Rating agencies believe debt management is an important factor in evaluating issuers and assigning credit ratings, which ultimately determine the borrowing cost of funds.

At the end of FY21, the State's GO debt was rated AA+, Aa1, and AA+ respectively by the three major rating agencies: Fitch Ratings, Moody's Investors Service, and S & P Global. The State's strong "AA" rating is just below the highest rating category of "AAA".

| Ratings | | | |
|---|---|---|---|
| | **Fitch** | **Moody's** | **S&P** |
| General Obligation | AA+ | Aa1 | AA+ |
| Safe Drinking Water Revolving Fund | AA+ | Aa1 | AAA |
| Water Pollution Control Revolving Fund | AA+ | Aa1 | AAA |
| Certificates of Participation | AA | Aa2 | AA |
| Highway Revenue (MVFT) | AA+ | Aa2 | AAA |
| Highway Revenue (IFT) | AA+ | Aa2 | AA+ |
| Permanent School Fund Guarantee | N/A | Aaa | AAA |

# UNCLAIMED PROPERTY DIVISION

## Division Overview

The  Unclaimed Property Division ("Unclaimed Property") currently safeguards more the $942.9 million in unclaimed property belonging to individuals, heirs, and businesses who have, at some point in time, resided or did business in the Silver State.

Each year, businesses and government agencies turn over tens of millions of dollars of abandoned property in the form of cash, securities, and tangible property from safe deposit boxes to Unclaimed Property. The property is held in Unclaimed Property's custody in perpetuity until it can be returned to the rightful owner or heir. Typical types of property received include stock accounts, uncashed payroll checks, utility deposits, life insurance proceeds, and refunds.

Unclaimed Property operates three primary workgroups: Claims, Holder, and Audit.
- The Claims team is responsible for receiving, reviewing, and approving or denying submitted claims. They also process, hold, and auction physical property which is received in safe deposit boxes, the proceeds of which are credited to the box owner's account.
- The Holder team is responsible for receiving and processing reports and payments that are submitted as unclaimed property. (Businesses are referred to Holders, as the are "holding" others' property).
- The Audit team is responsbile for managing contracted outside auditors, performing compliance reviews, and assesing and collecting penalites and interest for reports or property that were submitted incorrectly or late.

## Duties

The unclaimed property program was created and is administered pursuant to Chapter 120A of the Nevada Revised Statues (NRS 120A), and is further clarified in Chapter 120A of the Nevada Administrative Code. NRS 120A represents a modified version of the Revised Uniform Unclaimed Property Act of 2016 (which is adopted by the Uniform Law Commission).  Changes to NRS 120A were recently made through the passage of Senate Bill 71 (SB71) of the 81st Nevada Legislative Session.  These revisions have not yet been codified into NRS 120A.

Unclaimed Property's statutory duties outlined in NRS 120A include:
- Facilitating reporting and receiving unclaimed property;
- Receiving, reviewing, and approving or denying claims submitted to recover property;
- Conducting, or contracting with others to conduct audits of Holders to determine proper reporting of unclaimed property;
- Dispositioning securities and physical property received via security sales, public auctions and/or donations to certain libraries or mueseum when items are worthy of preservation;
- Notifying the public with instructions on how to search and access information relating to unclaimed property, announcing public auctions, and providing reporting information to Holders; and

- Ensuring the proper usage of unclaimed property funds which have yet to be return to rightful owners, including transfers to the Education Trust Account, Millennium Scholarship Trust Fund and the State General Fund.

## Major Accomplishments

### *Owner Claims*

Unclaimed Property paid 54,776 claims in FY21, an increase of 42% from FY20. Unclaimed Property returned $40.8 million to rightful owners. In FY21, 72.5% of all claims were paid via Unclaimed Property's online approval system, FastTrack, which represents a decrease of 2.5% from FY21, however due to the increase in total claims, the number of FastTrack approved claims increase by more than 13,000. This continued upward trend demonstrates that more claimants are able to easily file their claims online, and that the public acceptance and awareness of the legitimacy of unclaimed programs continues to increase.  Concerted efforts by Treasurer Conine to promote the program through social media directly correlated with the significant increase in claims.

### *Holder Audit and Outreach Initiatives*

During FY21 the Audit team continued with initiatives implemented in the prior two years to increase awareness of reporting requirements and increase audits of business that have weak reporting histories and are at a higher risk of underreporting. Initiatives included:

- Increased the number of contracted outside audit firms from two to five. This increase allowed Unclaimed Property to broaden the audits performed on behalf of Nevada, as the additional firms include those that specialize in industries not previously audited for Nevada.
- Expanded the modified "self-audit" program which focuses on mid-sized businesses through the Unclaimed Property's outside audit partners. In the second full year of the program, 116 self-audits holder reports were submitted to division. These represent business which had not previously submitted unclaimed property.
- Increased highlighting of the Voluntary Disclosure program, which offers waivers of penalties and interest to businesses who have not previously reported or have reported incorrectly. The program continues to evolve to focus on and provide education to Holders to improve accuracy and consistency of their reporting.
- Contracted audits resulted in 211 holder reports being filed and the remittance of $6.1 million in cash and 1.2 million shares of stock.

### *Holder Reporting and Collections*

The Holder team focused on promoting compliance with required online reporting and payment submissions. As a result, 98% of reports received were submitted online in FY21. Other collection results include:

- Cash receipts from holder reports exceeded $75 million and security sales exceeded $17.2 million;
- Over 32 million shares of stocks were taken into custody; and
- Over 582,000 individual owner properties were reported.

# COLLEGE SAVINGS DIVISION

## Division Overview

The College Savings Division ("College Savings") administers four programs that assist Nevadans in planning for, saving for, and paying for higher education. The Division also provides administrative support to the Board of Trustees of the College Savings Plans of Nevada.

## Duties

NRS 353B governs Nevada's college savings programs and directs the State Treasurer to act as administrator. NRS 353B establishes three Nevada college savings programs: Nevada's 529 College Savings Plans, Nevada Prepaid Tuition Program, and Nevada College Kick Start. NRS 396 governs the Governor Guinn Millennium Scholarship and directs the State Treasurer to act as administrator.

### *529 College Savings Plans*

The Nevada 529 College Savings Plans are designed to assist parents and students in saving for future college expenses in tax advantaged savings accounts. The College Savings Plans operate as qualified tuition programs under Section 529 of the Internal Revenue Code. The Plans combine tax benefits and flexible features, making them a smart and convenient way to save for higher education. In 529 College Savings Accounts, earnings grow tax-deferred and are federally tax-free when used for qualified educational expenses at eligible higher education institutions. This allows savings to grow faster, providing more money for college-related expenses. The Board of Trustees of the College Savings Plans of Nevada provides fiduciary oversight of the investment managers, program managers, marketing managers and other vendors supporting the College Savings Programs.

The College Savings Plans of Nevada consists of four direct-sold plans managed by Ascensus College Savings: SSGA Upromise 529, Vanguard 529 College Savings Plan, USAA 529 College Savings Plan, and Wealthfront 529 College Savings Plan. The State also offers one advisor-sold plan, Putnam 529 for America. Nevada's College Savings Plans are available to individuals from all fifty-states and at the end of FY20, collectively held 1,014,198 individual accounts and over $37.5 billion in assets under management (AUM). This represents a 4.11% increase in accounts and a 22.4% increase in AUM over FY20.

The 529 College Savings Plans of Nevada vary in their structure, offerings, and risk. Plans are offered to customers throughout the United States; however, most plans provide additional benefits for Nevadans such as matching grant funds, waiver of annual account fees, and reduced required initial contributions.

The table below shows the total AUM for each plan, as well as the total number of accounts as of June 30, 2021:

|  | AUM | Total Accounts |
|---|---|---|
| **Putnam 529 for America** | $479.1 MM | 18,634 |
| **Wealthfront 529 Plan** | $454.9 MM | 23,494 |
| **USAA 529 College Savings Plan** | $5,135 MM | 314,564 |
| **SSGA Upromise 529** | $1,642 MM | 133,669 |
| **Vanguard 529 Plan** | $29,767 MM | 523,837 |
| **TOTAL:** | **$37,478 MM** | **1,014,198** |

## *Silver State Matching Grant*

Since 2010, the Silver State Matching Grant Program has allowed qualifying Nevada families with a unique opportunity to boost their 529 college savings contributions. It provides a matching contribution dollar-for-dollar up to $300 per year for five years, for a maximum of $1,500 per beneficiary, into a recipient's SSGA Upromise 529 Account. Due to the Covid Pandemic, the 2020 open enrollment period saw a decline in enrollment. The total number of approved applications was 304, a 36% decrease from last year's 438 applications from the 2019 enrollment period.

## *The Nevada Prepaid Tuition*

The Nevada Prepaid Tuition Program ("Prepaid Tuition") enables parents, grandparents, and other family members to lock in future in-state college tuition rates at today's prices. Established in 1998, Prepaid Tuition is one of only 11 prepaid tuition programs in the country. It is fully administered by

the College Savings Division, and includes the marketing of Prepaid Tuition, assisting families with enrollment, and coordinating with higher education institutions for the distribution of benefits.

Prepaid Tuition is authorized under Section 529 of the Internal Revenue Code and is designed to assist families in saving for future college tuition expenses through tax advantaged savings accounts. Prepaid Tuition plans, or contracts, may be purchased with a lump sum payment, paid monthly over five years, monthly over 10 years, or monthly until the child is ready to attend college. Contracts are transferable to other children in the family, including first cousins. Contract benefits can be used to cover the cost of tuition at Nevada System of Higher Education institutions or may be applied to help offset the cost of tuition at eligible in-state and out-of-state institutions.

Prepaid Tuition opens enrollment each year from November-April. During FY21, the Program enrolled 503 new students and the four-year university plan remained the most popular choice of plans, with 61.63% of purchasers choosing the four-year university plan for their loved one. The lump sum payment option (46.25%) exceeded the monthly payment options (25.84% extended payments, 15.90% five-year payment option, and 11.73% 10-year payment option) as the most popular payment choice.

An actuarial report completed by an independent outside auditing firm found the funded status of Prepaid Tuition as of June 30, 2021 to be 178.9%. At the conclusion of FY21, a total of 22,742 children were enrolled in Prepaid Tuition, and the Nevada Higher Education Tuition Trust Fund held assets of $393.7 million, an increase of 503 children and $81.5 million, respectively, over the prior year. As of June 30, 2021, there were 3,451 students eligible to use their benefits, of which Prepaid Tuition paid out over $12 million in tuition benefits, an increase of roughly 0.28% from FY20.

## *College Kick Start*

In Fall 2013, the Office launched the Nevada College Kick Start Program ("CKS"), which establishes an automatic $50 scholarship for all public-school kindergarten students in the State. The scholarships are established using a portion of the program manager fees paid to College Savings, not taxpayer dollars. College Kick Start scholarships are held within a master account in the SSGA Upromise 529 Plan which is invested in the age-based portfolio which most closely matches the age of the students. Parents may also link their child's CKS scholarship to a separate SSGA UPromise 529 account. The Office acts as administrator of the Program, which includes activities such as educating parents and families about CKS and assisting families in accessing their child's scholarship via an online portal. Education and outreach efforts by College Savings include attendance at school events, direct mail sent to new CKS members, and ongoing written and email communications sent to all participants.

CKS was codified into law after the passage of Assembly Bill 475 ("AB475") of the 79th Nevada Legislative Session. Provisions of AB475 require parents to claim a child's account by the time the child enters 5th grade. College Savings is working to finalize regulations establishing the process for parents to claim their child's scholarship.

As of October 18, 2021, there were 277,014 individual student scholarships created under the program with funding totaling just over $13.8 million.

## *Governor Guinn Millennium Scholarship*

Pursuant to NRS 396.911-945, the State Treasurer acts as administrator of the Governor Guinn Millennium Scholarship Program ("Millennium Scholarship"). Established during the 70th Nevada Legislative Session in 1999, the Millennium Scholarship provides scholarships to high achieving Nevada high schoolers for use at eligible colleges and universities located within the State.

Nevada high school seniors are automatically eligible for the award if they graduate with a diploma from a Nevada high school; have been a Nevada resident for at least two years of their high school career; graduate with a 3.25 GPA; and complete the minimum core curriculum classes. Students who do not meet the GPA requirement may substitute a qualifying score from a college entrance exam to gain eligibility. Of the graduating class of 2021, 15,435 were eligible for the scholarship, and 7,563 have acknowledged and began using the award. Funding for the Millennium Scholarship comes from appropriations, 40% of the annual Tobacco Master Settlement Agreement payments, and $7.6 million annually from the Abandoned Property Trust Account.

As administrator of the program, the Office:

- Operates the Millennium Scholarship's database (MiSL: Millennium Scholarship Ledger), which collects, stores, and maintains data on Millennium Scholars. College Savings also hosts a dedicated website allowing students to access their accounts on MiSL.
- Collects initial eligibility data from all Nevada school districts, 50 private high schools, adult education programs, and home school applicants.
- Conducts outreach efforts throughout the State at college fairs, schools, private companies, PTA meetings, and other community events to provide the latest information about the Program.
- Collaborates with representatives from each Nevada System of Higher Education (NSHE) institution, NSHE System Administration, System Computing Services, Nevada Association of School Superintendents, and the Nevada Department of Education to support the program.

## *Governor Guinn Millennium Memorial Scholarship*

Following the tragic death of former Governor Kenny C. Guinn in July 2010, at the request of former First Lady Dema Guinn, College Savings worked closely with the Guinn family to create a separate account within the Governor Guinn Millennium Scholarship Trust Fund to accept donations in his honor. Each year, the donations are used to provide scholarships to Millennium Scholars who are in their last year of college, meet the scholarship requirements and who commit to teaching in Nevada following graduation. Scholarship applications are reviewed by the selection committee and the College Saving Board selects the four winners of the scholarship. A virtual award ceremony is organized by College Savings to congratulate the recipients and the Guinn family is invited with the State Treasurer as the host. Historically, the scholarships were awarded to two students (one in

northern Nevada and one in Southern Nevada) for $4,500 each. During the 80th Nevada Legislative Session, Senate Bill 414 ("SB414") was passed and subsequently signed by Governor Sisolak. SB414 increased the number of awards from two to four (two in northern Nevada and two in Southern Nevada), increased the award amount from $4500 to $5000, and allowed students from non-NSHE institutions to apply. These changes in eligibility and award amount were effective for the 2020 applicants and for the first time, four scholarships were awarded. In Fall 2021, another four scholarships were awarded to one student each from UNR, UNLV, Nevada State College and Great Basin College.

## Student Loan Ombudsperson and College Navigator

### Student Loan Ombudsperson

Assembly Bill 383 of the 80th Nevada Legislative Session created a Student Loan Ombudsperson within College Savings. The bill was sponsored by Speaker of the Assembly, Jason Frierson, and received unanimous support from both the Senate and the Assembly. The Office took a proactive role during the Legislative Session in advocating for the passage of the bill and the creation of the program and committed to funding the position through the College Savings Endowment Account.

Effective January 1, 2020, the Student Loan Ombudsperson provides three general areas of assistance to Nevadans:

1. Educate current student loan borrowers on their rights and responsibilities and facilitate resolution of borrower complaints against student loan servicers.

2. Educate potential borrowers by creating and administering a borrower education course and by conducting outreach to focus populations on targeted settings; and

3. Provide recommendations for policy through research and analysis of data collected from Nevada borrowers, other states, and national policy organizations.

With Nevada having the highest rate of defaulted student loans, the Student Loan Ombudsperson focused its efforts on educating parents and high school students on the different ways to finance a higher education before taking out student loans. Due to the COVID-19 pandemic, efforts to reach high school students and their families were transitioned to the virtual world. The Student Loan Ombudsperson collaborated with other organizations to provide educations in both English and Spanish that focused on the different types of financial aid available, but also on understanding student loans and how they should always be considered as a last option.

Throughout the pandemic, the Student Loan Ombudsperson was readily available to help parents and students with questions concerning FAFSA and finding scholarships, but also assisted student loan borrowers with questions concerning their loans and any benefits associated with federal student loans, such as the Public Service Loan Forgiveness (PSLF). In January 2021, one of the student loan borrowers that the Student Loan Ombudsperson was assisting was granted full forgiveness of their

student loan which was over $100,000. The Student Loan Ombudsperson also introduced the PSLF program to a local teacher and helped her start the PSLF process after the teacher had only received partial forgiveness of $5,000 in 2012 through the Teacher Forgiveness program.

The Student Loan Ombudsperson meets every two months with other states' student loan ombudspersons and advocates to collaborate on creating and sending letters to the Department of Education that have championed for student borrower relief at the federal level. During Fiscal Year 2021, the Student Loan Ombudsman collaborated and signed on to a letter that asked for expansions and extension of the CARES Act Relief to All Federal Loan Borrowers.

## College Navigator

During the 80th Nevada Legislative Session, a College Savings Navigator position was created within the Office. The goal of the College Navigator was to build relationships with staff and administration and provide institutions, school districts, community partners, and students and households information on pursuing post-secondary education. The Navigator was created to foster a 'college bound' culture in Nevada by increasing awareness of the Nevada College Kick Start Program, Nevada's 529 College Savings Plans Program, the Nevada Prepaid Tuition Program, the Governor Guinn Millennium Scholarship Program, and other scholarship opportunities and financial aid options that allow Nevadans to plan for, save for, and pay for post-secondary education.

The College Navigator was hired at the start of the calendar year and was initially tasked with connecting with K-12 students, school administrators, parents & community partners. In February 2020, the College Navigator planned and carried out a 5-day rural Northern Nevada trip. The purpose of this 5-day journey was to reach out to rural Nevadans and educate them on how the Office can assist students and parents when it comes to attending post-secondary institutions. The 5-day rural excursion was a huge success as the Navigator visited six different high schools, three elementary schools and two educational community fairs. At the conclusion of the trip, the data showed that over 8,500 individuals attended various events and the College Navigator directly interacted with over 3,100 individuals.

Due to the COVID-19 Pandemic, additional travel and in-person events for the year were cancelled. However, the Office and the College Navigator adjusted to ensure that Nevadans still had the opportunity to learn about the services and programs the Office offers. The Office utilized virtual platforms to reach K-12 students, school administrators, parents, and community partners. From the onset of the pandemic and onwards, the Office conducted events, such as webinars, Q&A sessions, and trainings primarily through Zoom.

From July 2020 through June 2021, the College Savings division interacted with over 1,223 participants through zoom webinars. Each webinar was recorded and later posted on social media platforms. Facebook video views from the webinars & videos posted garnered over 33,018 views during that time frame.

The College Navigator was unable to attend in person events most of this fiscal year but held multiple virtual workshops with community organizations such as Boys & Girls Club of Las Vegas & Reno, GEAR-UP program & Trio programs statewide. The College Navigator also virtually attend Nevada High schools discussing the importance and value of post-secondary education and all the tools and resources available through the Nevada Treasurer's Office.

## *Financial Literacy*

This fiscal year the team focused on the development of a Free Virtual Financial University. The one-day event will be geared towards K-12 parents, but all Nevadans are invited and encouraged to attend. The University will be in partnership with Andson and Silver State Credit Union. The purpose is to learn financial techniques that will assist participants on their journey in planning, saving, and paying for major life milestones, i.e., college, buying a home, retirement and more! This six-hour seminar will focus on the following topics: Budgeting and Saving, Credit and Debt, Home and Auto Insurance, Paying for College and Retirement and Investments. All participants will receive lunch and a 529 Incentive for attending the event.

## Major Accomplishments

This year, the Division prepared for an inaugural "What Do You Want to Be When you Grow Up" Art contest for pre-K through 12th grade students statewide. The contest will select 15 winners, each of whom will receive a scholarship award into a 529 account.

The College Savings Division continues to host several in person, virtual and hybrid outreach events. It is our goal to meet the needs of our community post pandemic. The nimbleness of the College Savings team resulted in ongoing virtual series hosted by College Savings including Webinar Wednesdays, during which a new college savings topic is discussed; Millennium Mondays, which covers common questions surrounding the Millennium Scholarship; and panel discussions with local community leaders, wherein the State Treasurer moderates a panel of experts on different college savings topics or hosts conversations with Nevada leaders. The heightened online presence has allowed College Savings to reach many more Nevadans than prior years events and does so in a format that is accessible and convenient.

**Here are some social media statistics from FY21:**

**Impressions:**

- The Nevada State Treasurer's Office social channels saw an increase in impressions during FY21. The accounts received a combined **3,450,837 impressions** which represents a **67% increase** from the previous year.

- Instagram impressions **increased by 1,345%**, Twitter impressions **increased by 148%** and Facebook impressions **increased by 29%.**

**Engagements:**

- The Nevada State Treasurer's Office social channels received **71,175 engagements** which resulted in an **11% increase** from the year prior.

- Instagram engagements **increased by 139%** and Twitter engagements **increased by 77%.**

**Total Audience:**

- The Nevada State Treasurer's Office social channels saw a **22% increase** in total followers during FY 21. Instagram saw the largest increase with **656 new followers** during this time period.

# NEVADA ABLE SAVINGS PROGRAM

## Program Overview

The Office is responsible for administering the Nevada ABLE Savings Program ("ABLE") which allows people with disabilities to save and earn money without threatening the loss of state and federal benefit programs.

The federal Achieving a Better Life Experience (ABLE) Act was signed into law in 2014 and gave states the ability to establish tax advantaged savings programs for people with disabilities. Funds deposited into ABLE accounts can be used to help account beneficiaries pay for qualified disability expenses on tax-free basis and, in turn, help to increase an account holder's overall level of independence. Nevada currently partners with 17 states in the National ABLE Alliance to help administer ABLE. The use of a multi-state consortium helps to keep fees low for participants and reduce the overall impact on the State.

## Duties

ABLE is outlined in NRS 427A.889. Senate Bill 419 ("SB419") of the 79th Nevada Legislative Session codified the Nevada ABLE Program into law. Initially the Office was responsible for administration of ABLE accounts and regulatory duties of ABLE, and responsibilities for marketing and outreach to potential participants was placed with the Aging and Disabilities Division of the Department of Health and Human Services.

Assembly Bill 130 ("AB130") of the 80th Nevada Legislative Session moved responsibility for outreach and marketing of ABLE into the Office, which allows for a streamlined approach to reaching potential participants and assisting current participants with questions.

## Major Accomplishments

The change in statute provided by AB130 allowed the Office to provide a concerted and targeted approach to reaching people in the disability community and their families and raising awareness about ABLE. In FY21, ABLE experienced an increase in accounts and assets under management. On June 31, 2021, the ABLE program had 2,022 accounts, with assets totaling $10,476,858.

The Office is excited to continue to grow ABLE, while also looking for more opportunities to increase competitive integrated employment for Nevada's disability community.

## SPECIAL PROJECTS

Throughout FY21, in response to the devastating effects of the COVID-19 Pandemic, the Office undertook a handful of special programs and projects to assist Nevadans who had been hit hardest.

### Unclaimed Property / Unemployment Claimants

At the beginning of the Pandemic, the State Treasurer's Office (STO) connected with the Department of Employment, Training, and Rehabilitation ("DETR") to establish a Memorandum of Understanding to share information regarding Nevadans who had filed for unemployment insurance ("UI"). The UI claimant list provided by DETR was cross-referenced against the STO Unclaimed Property database to determine if the State was holding any unclaimed property for UI claimants. If a match between lists was found, a letter was mailed to the claimant indicating that the State was holding onto lost money of theirs. This initiative resulted in 14,088 letters being sent directly to UI claimants notifying them that the State was holding money in their names and providing them direction on how to claim it. As a result of these efforts, 2,396 claims were paid totaling $2,332,906.11 in unclaimed property going back into the hands of its rightful owners.

### Small Business Support

In addition to matching unclaimed property with unemployment claimants, the STO was instrumental in supporting small businesses. The Office worked closely with the Governor's Office of Economic Development ("GOED") to administer a Commercial Rental Assistance grant program ("CRAG"), as well as the Pandemic Emergency Technical Support ("PETS") grant program. Collectively, these two grant Programs amounted to ~$110MM in assistance to Nevada's small businesses.

#### *Commercial Rental Assistance Grant*

During the Summer of 2020, the STO worked directly with GOED to create and design a grant program to aid Nevada businesses in costs associated with commercial rental payments. In September 2020, the Commercial Rental Assistance Grant ("CRAG") Program began accepting applications from eligible Nevada entities. The Program was aimed at supporting Nevada small businesses and non-profits who employed 50 or fewer full-time employees and who had lost 30% or more in revenues as a result of the COVID-19 Pandemic. The Program paid up to $10,000 directly to an eligible applicant's landlord for past-due or future rent payments. The STO administered the CRAG Program throughout the fall and winter of 2020. CRAG wrapped operations in December of 2020 and ultimately covered rental payments for 772 Nevada small businesses and non-profits, totaling $7,122,687.34.

#### *The Pandemic Emergency Technical Support Grant*

Following the CRAG Program, the STO worked with GOED to create another small business assistance program, the Pandemic Emergency Technical Support ("PETS") Grant. PETS provided grants to eligible small businesses, non-profits organizations, arts and culture organizations, and local Chamber of Commerce impacted by the COVID-19 pandemic to assist those entities with lost

revenues and operational support funds. The Program was intended to be flexible and ensure that eligible businesses, non-profits, and other entities could adequately respond to the COVID-19 pandemic, safely reopen, and continue their operations.

The PETS program went live in October of 2020 with a tremendous response, receiving 13,548 applications within the span of 4 days.

PETS funding prioritized applications that were received from entities that fell under one or more of the following categories:

- Disadvantaged businesses (women, minority, veteran, and disability-owned);
- Bars, pubs, taverns, breweries, and wineries;
- Arts and culture organizations;
- Chambers of commerce; and
- Non-profit organizations

Grant funds could be used for a number of eligible expenses, such as:

- PPE
- Payroll
- Inventory
- Retrofitting costs necessary due to COVID-19
- Other operational costs.

PETS wrapped operations in July of 2021 and ultimately provided $102MM in grants to 9,382 Nevada small businesses and non-profit entities, which represents the largest small business program in the history of the State. Of the total awardees, 6,575 were classified as a disadvantaged business.

## Every Nevadan Recovery Framework

On March 11, 2021, President Biden signed the American Rescue Plan Act ("ARPA") into law. The legislation provides nearly $2T in aid to state and local governments, programs, and services, and directly to citizens to aid in the recovery from the COVID-19 Pandemic. Through the ARPA, the State of Nevada is expected to receive approximately $6.7B in aid through 112 federal grant and aid programs.

In response to the passage of ARPA and the influx of funding into the State, in April 2021, in coordination with Legislative leadership and the STO, Governor Sisolak released the "Every Nevadan Recovery Framework" ("ENRF"). The ENRF outlines the State's mission and vision in allocating and spending the billions of dollars the State will receive through the ARP.

The ENRF serves as the foundation for prioritizing the expenditure of discretionary ARPA funds on the direct needs of residents, their families, and our communities to continue assistance with the negative impacts of the pandemic while also building a strong and stable foundation for a post-

pandemic child-and-family-centered Nevada. Under the ENRF, ideas for spending are optimized under the following prioritization bands:

- Basic Needs: Nevadans' health and safety, access to basic necessities, and strengthening safety nets will be at the core of recovery efforts.
- Community: Strengthening resources for community support and educational access will be key to aiding Nevadans.
- Economy: A strong economy is essential for recovery and will include assistance for workers and small businesses.
- Quality of Life: Improve the quality of life for all Nevadans, including our seniors and multi-generational families, by ensuring access to services and opportunities that build healthy, resilient communities.

These efforts are further organized into seven prioritized categories of strategic enhancement, allowing subject-matter experts, and interested stakeholders to engage and ideas to be compared more effectively:

1. Increasing access to healthcare and community-based services
2. Strengthening Public Education
3. Supporting Disadvantaged Communities
4. Strengthening Nevada's Workforce, Supporting Small Businesses and Revitalizing the State's Economy
5. Investing in Infrastructure
6. Modernizing and Enhancing State Government Services
7. Addressing Budget Shortfalls

The ENRF sets forth an unambiguous method for administration and oversight of ARPA direct and programmatic specific funding, which is imperative to ensure that Nevada's share of ARPA funding is used in the most impactful way possible.

The full text of the Every Nevadan Recovery Framework can be viewed, here: https://nvhealthresponse.nv.gov/wp-content/uploads/2021/04/Every-Nevadan-Recovery-Framework_final.pdf.

Nevada State Treasurer
Annual Report – Fiscal Year 2021

## ORGANIZATIONAL CHART

Office of the State Treasurer
**ORGANIZATION**



# ZACH CONINE BIOGRAPHY

Zach Conine currently serves as Nevada's 23rd State Treasurer. Elected on November 6th, 2018, Zach knows that responsible financial management is the key to ensuring long-term growth for the State. As Treasurer, Zach leads a team of more than 45 professionals that are responsible for investing the State's and many local governments' money, financing community assets and facilities, processing payments for public agencies, and collecting and returning unclaimed property. Additionally, Zach is responsible for Nevada College Savings Plans and administration of numerous scholarship programs and other services that help Nevadans's plan, save, and pay for post-secondary education.

In addition to the daily management of the State Treasurer's Office, Zach serves as a member of the State Board of Finance, the Executive Branch Audit Committee, and the Board of Trustees of the College Savings Plans of Nevada, of which he serves as chair. Zach is also working to launch a first of its kind pilot program to bank the State's marijuana industry and improve public safety.

In his first year as Treasurer, the State has received two bond rating increases, the first since 2006; generated the highest investment returns for the State since the recession of 2008; and returned the largest amount of unclaimed property back to Nevadans since the inception of the State's Unclaimed Property Program.

Prior to serving as State Treasurer, Zach built a successful business career in the gaming, finance, and consulting sectors. Over the course of his career, Zach has been committed to creating economic opportunities for local businesses and working families. As co-founder of a consulting business, he has helped dozens of small and medium sized businesses expand, increase efficiencies, and decrease expenses. In doing so, he assisted in the creation and preservation of more than 3,000 jobs in Nevada.

Zach graduated with a B.A. from Cornell University's School of Hotel Administration and holds a J.D. from the from UNLV's William S. Boyd School of Law. He and his wife Layke are happily raising their daughter Ruby, twin sons Rutherford and Theodore, and two dogs, Democracy and Liberty.

Biographies

# SENIOR STAFF BIOGRAPHIES

## Chief of Staff
### *Kirsten Van Ry*

Kirsten Van Ry currently serves as the Chief of Staff for the State Treasurer's Office. Born and raised in Nevada, Kirsten holds a baccalaureate degree in political science from the University of Nevada, Las Vegas, and a law degree from William S. Boyd School of Law. Prior to joining the office, Kirsten served as the Deputy Chief of Staff under former Nevada Lieutenant Governor Mark Hutchison. Kirsten's previous positions include experience in legislative and community relations in Las Vegas and Carson City.

## Chief Deputy Treasurer
### *Tara Hagan*

Tara Hagan serves as the Chief Deputy Treasurer for the State Treasurer's Office. Tara joined the Office in June 2012 as Deputy Treasurer - Finance. Her responsibilities as Chief Deputy Treasurer include working closely with the Debt Management, Investment Management, and Cash Management divisions, including assisting with investment and contract responsibilities related to the Nevada College Savings Plans. Tara previously served nearly five years as the Executive Director of the Nevada Deferred Compensation Program, where she was responsible for managing the daily operations. Prior to this position, Tara was the Regional Manager for Voya Financial Services (formerly ING Financial Services) where she was responsible for the relationship management of several government defined contribution plans in California and Nevada. Tara holds a Bachelor of Arts degree in journalism and political science from the University of Iowa.

## Chief Policy Deputy
### *Erik Jimenez*

Erik Jimenez currently serves as the Chief Policy Deputy in the State Treasurer's office. In this role, Erik works on a variety of projects that range from infrastructure financing to increasing financial independence for marginalized communities. During the COVID-19 pandemic, he also helped administer the largest small business assistance program in Nevada history. Erik has previously represented various gaming, health care, education, energy, and transportation clients in front of the Nevada Legislature, and has also worked to enact numerous disability reforms in Nevada. Erik holds a bachelor's degree in Political Science and a master's degree in Public Administration and Policy from the University of Nevada Reno. Erik also serves on numerous government and non-profit boards, including serving as the Chair of the Advisory Committee for the Nevada Office of Minority Health and Equity, and was appointed by Governor Steve Sisolak to serve on the Nevada Statewide Independent Living Council.

## Senior Deputy for Operations
### *Amber Law*

Amber Law is a Certified Public Manager and has served in government finance since 2005. Prior to being appointed as the Senior Deputy Treasurer in 2021, Amber was the Deputy Treasurer of Cash Management and Merchant Services since 2016. Amber was raised in Nevada and is passionate about serving the great Silver State. She is trained in Lean Six Sigma and Kaizen and enjoys applying these principles to her civil service work. Amber oversees operations for the State Treasurer's Office including Human Resources, IT, Budget, and Contract Management.

## Deputy Treasurer – Cash Management
### *Tami Simpson*

Tami Simpson began working in the Treasurer's Office in October of 2011 in the Cash Management Division. With over 15 years of project management experience, she specializes in process improvement and the implementation of best practices, policies & procedures. From 2016 to 2018 Tami helped develop the Merchant Service Program by creating an Education and Outreach Program and a standardized Operating Manual for all participating State agencies. Tami's duties include managing the Cash Management Division which oversees the State's banking relationships, the reconciliation of bank transactions with state accounting records, the e-payment Merchant Services Program, and administers the state's Check Distribution Program.

## Deputy Treasurer – College Savings
### *Tya Mathis-Coleman*

Tya serves as the organization's Deputy Treasurer of College Savings. In this position her primary focus is on the education initiatives administered by the State Treasurer's Office. Tya is a passionate servant leader who is committed to public education. Most recently Tya served as the Director of Recruitment for the Clark County School District. Tya is a native of Nevada and a proud product of the Clark County School District and the Nevada System of Higher Education. Tya strongly believes that together we can impact our community one child at a time. As the Deputy Treasurer of College Savings, Tya is responsible for ensuring all College Savings programs are effectively and efficiently managed. The Deputy Treasurer oversees administration, marketing, and execution of all programs, and guides and supports College Savings staff and vendors. Additionally, the Deputy Treasurer develops and maintains various community partnerships that advance College Savings goals.

## Deputy Treasurer – Debt Management
### *Jeff Landerfelt*

Jeff accepted the Deputy Treasurer of Debt Management position in February 2021. In this role, he will manage the issuance of State securities, rating agency relations, investor relations, and the administration of the Consolidated Bond Interest and Redemption Fund budgets. The Debt Management Division is responsible for collection and payment of various State obligations, post

issuance compliance of State securities with federal and State securities law and reconciliation of the State's debt portfolio accounting transactions. During fifteen years of State service, Jeff has held various audit, analyst, and management positions with the Gaming Control Board, the Secretary of State's Office, the Public Utilities Commission, and most recently, as an Audit Manager with the Division of Internal Audits. Previously, Jeff held various operations management and audit positions over twenty years in the ground transportation and heavy-weight air cargo industries. He is a U.S. Air Force veteran and holds undergraduate and graduate business degrees from California State University, Sacramento, and University of Oregon, respectively.

## Deputy Treasurer – Investments
### *Kimberly Shafer*

Kimberly Shafer serves as the agency's Deputy Treasurer for Investments. Kim is responsible for management of the investment activities conducted through and for the Treasurer's Office, including the state's $2.1 billion General Portfolio, $581 million Local Government Investment Pool, and the $308 million Permanent School Fund, among others. Before joining the Treasurer's Office in March 2016, Kim has worked for the Controller's Office, the Legislative Counsel Bureau's Audit Division, and the Treasurer's Office as the Deputy Treasurer for Cash Management. Kim received her Bachelors of Science degree in 1998 from Sonoma State University. Prior to working for the State, Kim was employed by a public accounting firm in Reno. She is a Certified Public Accountant. Kim lives in Dayton with her husband, Rick, and her two sons.

## Deputy Treasurer – Unclaimed Property
### *Linda Tobin*

Linda Tobin serves as the Office's Deputy Treasurer of Unclaimed Property. Linda is a graduate from UNLV and is both a Certified Public Accountant and Certified Public Manager. Linda manages the state's Unclaimed Property program which is responsible for collecting unclaimed property from businesses across the country due to Nevadan's and then working to return these funds back to the rightful owner. Linda has worked for the State of Nevada for more than 21 years, including spending her first 20 years of state service with the Nevada Gaming Control Board.

# Financial Section

## UNCLAIMED PROPERTY
Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2021 and June 30, 2020

| | 2021 | | 2020 |
|---|---|---|---|
| **Revenues** | | | |
| Unclaimed Property Receipts | | | |
| Utility Companies | $ - | 1 | $ - |
| Insurance Companies | - | 2 | - |
| Financial Institutions | 425,905 | 3 | 537,077 |
| Security Sales & Dividends | 17,890,595 | 4 | 11,392,160 |
| Local Governments | 18,088 | 5 | 17,849 |
| Other State Governments | - | 6 | - |
| Other Businesses | 71,157,725 | 7 | 66,484,164 |
| Audit Proceeds | 6,288,756 | 8 | 6,382,797 |
| Direct Payment From FDIC | - | 9 | 49,521 |
| Miscellaneous Sales | 3,480 | 20 | 1,600 |
| Penalties, Interest and Other | 2,969,733 | 10 | 2,316,157 |
| Total Revenues | 98,754,282 | | 87,181,325 |
| | | | |
| **Expenditures** | | | |
| Payments to Claimants | 40,728,480 | 11 | 45,910,759 |
| Payments FDIC Claimants | 8,200,370 | 12 | 754,303 |
| Personnel Costs | 947,974 | 13 | 964,889 |
| Contractual Services | 1,362,056 | 14 | 1,093,350 |
| Operating Costs | 205,236 | 15 | 174,267 |
| Advertising and Public Relations | 122,080 | 16 | 110,715 |
| Total Expenditures | 51,566,195 | | 49,008,282 |
| | | | |
| **Other Financing Sources (Uses)** | | | |
| Transfer to General Fund | (47,672,493) | 17 | (31,198,989) |
| Transfer to Educational Trust Fund | (115,963) | 18 | (78,836) |
| Transfer to Gov. Guinn Scholarship Fund | (7,600,000) | 19 | (7,600,000) |
| Total Other Financing Sources (Uses) | (55,388,456) | | (38,877,825) |
| | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | (8,200,370) | | (704,782) |
| | | | |
| Beginning Balance, July 1 | 10,527,088 | | 11,231,870 |
| Ending Balance, June 30 | $ 2,326,719 | | $ 10,527,088 |

Cash Basis – Unaudited

# MILLENNIUM SCHOLARSHIP TRUST FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2021 and June 30, 2020

| | | 2021 | | | 2020 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Tobacco Settlement Income | $ | 17,265,319 | 1 | $ | 15,360,519 |
| Appropriation | | 42,000,000 | 11 | | - |
| Interest Income | | 97,836 | 12 | | 451,927 |
| Prior Year Correction | | 12,018 | 13 | | - |
| Refunds | | - | 14 | | - |
| Total Revenues | | 59,375,172 | | | 15,812,445 |
| | | | | | |
| **Expenditures** | | | | | |
| Scholarship Payments | | 44,260,392 | 3 | | 38,729,697 |
| Personnel | | 243,321 | 5 | | 204,155 |
| Travel | | - | 6 | | 1,461 |
| Administrative | | 124,126 | 7 | | 155,326 |
| Total Expenditures | | 44,627,838 | | | 39,090,638 |
| | | | | | |
| **Other Financing Sources (Uses)** | | | | | |
| Transfer to GF (AB3)- Budget Reduction | | (2,000,000) | 15 | | - |
| Transfer from College Savings Endowment Account | | - | 4 | | - |
| Transfer from Treasurer | | 367,446 | 8 | | 360,941 |
| Transfer from Unclaimed Property | | 7,600,000 | 2 | | 7,600,000 |
| Total Other Financing Sources (Uses) | | 5,967,446 | | | 7,960,941 |
| | | | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | | 20,714,780 | | | (15,317,252) |
| | | | | | |
| Beginning Balance, July 1 | | 22,883,688 | 9 | | 38,200,939 |
| Ending Balance, June 30 | $ | 43,598,468 | 10 | $ | 22,883,687 |

Cash Basis – Unaudited

# PREPAID TUITION TRUST FUND

### Statement of Revenues, Expenditures and Changes in Fund Balance
### For the Fiscal Years Ended June 30, 2021 and June 30, 2020

| Revenues | | 2021 | | | 2020 |
|---|---|---|---|---|---|
| Participant Contributions | $ | 14,057,311 | 1 | $ | 13,591,170 |
| Application Fees | | 50,300 | 2 | | 52,300 |
| Administrative Charges | | 25,500 | 3 | | 25,100 |
| Interest Income | | 37,188 | 4 | | 84,687 |
| Investment Gain (Loss) | | 11,045,950 | 5 | | 12,089,267 |
| Total Revenues | | 25,216,249 | | | 25,842,524 |
| | | | | | |
| Expenditures | | | | | |
| Tuition Payments | | 12,033,406 | 6 | | 11,999,639 |
| Personnel Costs | | 226,941 | 7 | | 212,704 |
| Travel | | - | 8 | | 120 |
| Operating Costs | | 476,613 | 9 | | 580,868 |
| Contract Cancellation Refunds | | 2,759,120 | 10 | | 2,796,172 |
| Contract Rollover Payments | | 257,824 | 11 | | 165,344 |
| Total Expenditures | | 15,753,904 | | | 15,754,847 |
| | | | | | |
| Other Financing Sources (Uses) | | | | | |
| Transfer from College Savings Endowment Account | | - | 12 | | - |
| Transfer from College Savings to Pay Operating | | 703,554 | 13 | | 793,692 |
| Total Other Financing Sources (Uses) | | 703,554 | | | 793,692 |
| | | | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | | 10,165,899 | | | 10,881,369 |
| | | | | | |
| Beginning Balance, July 1 | | 228,438,641 | 14 | | 217,557,272 |
| Prior Period Adjustment | | - | | | - |
| Ending Balance, June 30 | $ | 238,604,540 | | $ | 228,438,641 |

Cash Basis – Unaudited

# COLLEGE SAVINGS

Statement of Revenues, Expenditures and Changes in Fund Balance

For the Fiscal Years Ended June 30, 2021 and June 30, 2020

| | | 2021 | | | 2020 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Investment Management Fees | $ | 5,553,290 | 1 | $ | 5,645,505 |
| Gifts and Donations | | - | 2 | | - |
| Noncash Revenues | | 501,810 | 3 | | 413,664 |
| Settlement Income | | - | | | - |
| Interest Income | | 62,775 | 4 | | 165,783 |
| Cost Allocation/Fund Transfers | | 2,933,708 | 5 | | 2,754,535 |
| Total Revenues | | 9,051,584 | | | 8,979,486 |
| | | | | | |
| **Expenditures** | | | | | |
| Personnel | | 388,800 | 6 | | 311,560 |
| Operating | | 2,547,169 | 7 | | 2,448,180 |
| In-Kind Marketing | | 501,810 | 8 | | 413,664 |
| Total Expenditures | | 3,437,779 | | | 3,173,404 |
| | | | | | |
| **Other Financing Sources (Uses)** | | | | | |
| Administrative Transfers | | | | | |
| College Savings | | 2,933,708 | 9 | | 2,754,535 |
| Millennium Scholarship | | 367,446 | 10 | | 360,941 |
| Prepaid Tuition | | 703,554 | 11 | | 793,692 |
| Transfer to Prepaid Tuition Trust Fund | | | 12 | | |
| College Kick Start | | | 13 | | |
| Cost Allocation | | - | 14 | | - |
| Settlement Expenses | | | 15 | | |
| Total Other Financing Sources (Uses) | | 4,004,709 | | | 3,909,168 |
| | | | | | |
| Excess of revenues and other financing sources | | | | | |
| over expenditures and other financing uses | | 1,609,096 | | | 1,896,914 |
| | | | | | |
| Beginning Balance, July 1 | | 10,506,901 | 16 | | 8,609,987 |
| Ending Balance, June 30 | $ | 12,115,996 | | $ | 10,506,901 |

Cash Basis – Unaudited

# CONSOLIDATED BOND INTEREST & REDEMPTION FUND
### Statement of Revenues, Expenditures and Changes in Fund Balance
### For the Fiscal Years Ended June 30, 2021 and June 30, 2020

**Revenues**

| | | 2021 | | 2020 |
|---|---|---|---|---|
| Taxes | | | | |
| | Real Property | 160,694,183 | 1 | 147,554,779 |
| | Personal Property | 18,752,969 | 1 | 18,021,973 |
| | Centrally Assessed Property | 13,455,161 | 1 | 10,869,776 |
| | | 192,902,313 | | 176,446,528 |
| Other | | | | |
| | Lease Purchase Building Rent | 6,838,514 | 2 | 6,835,984 |
| | Interest Income | 1,012,387 | 3 | 3,323,907 |
| | Excess Escrow Funds | - | 4 | - |
| | | 7,850,901 | | 10,159,891 |
| Total Revenues | | 200,753,214 | | 186,606,420 |

**Expenditures**

| | 2021 | | 2020 |
|---|---|---|---|
| Personnel | 341,726 | 5 | 323,543 |
| Statewide Cost Allocation (SWCAP) | 3,069 | 16 | 21,897 |
| Operating | - | 6 | - |
| Professional Services | 1,016,028 | 17 | 637,767 |
| CIP Construction Contracts | | | |
| COP Projects | | | |
| Refunds | | | |
| Arbitrage | | | |
| Insurance | - | | |
| Trust Agent Fees | 24,722 | 7 | 24,822 |
| | 1,385,545 | | 1,008,030 |
| Debt Service | | | |
| Bond Principal Redemption | 148,124,000 | 8 | 132,940,000 |

Cash Basis – Unaudited

| | | |
|---|---|---|
| Bond Interest Expense | 54,423,655 [9] | 57,305,899 |
| | 202,547,655 | 190,245,899 |
| Total Expenditures | 203,933,200 | 191,253,929 |
| **Other Financing Sources (Uses)** | | |
| Transfers from State Agencies | 13,232,372 [10] | 14,347,740 |
| Special Higher Ed Capital | 6,519,075 | 6,520,075 |
| University System | - | - |
| Wildlife Division | 1,225,225 | 1,226,375 |
| Capital Projects Fund | - | - |
| DCNR-Conservation | 53,743 | - |
| NDOT | 4,149,468 | 4,148,190 |
| Colorado River Commission | - | 1,218,416 |
| Environmental Protection Department of Information Technology Corrections | 665,357 | 665,357 |
| General Fund | - | - |
| CRF | 50,189 | - |
| DMV | 563,020 | 562,851 |
| Combined Receipts from many agencies | 6,296 | 6,475 |
| Dept of Cons. & Natural Res. - Arbitrage | | |
| US Treasury - Build America Bonds Subsidy | - [11] | 635,587 |
| State Treasurer's Assessment | 250,055 [12] | 191,355 |
| Transfers-out | | |
| Transfer to UCCSN | - [13] | - |
| Transfer to Local Government | | |
| Transfer to Public Works Board | - | - |
| Net Proceeds from Refunding | [14] | |
| Net Prior Year Refunds/Expenditures | - [15] | - |

Cash Basis – Unaudited

Nevada State Treasurer
Annual Report – Fiscal Year 2021

| | | | |
|---|---|---|---|
| Bond Proceeds for Cost of Issuance | 944,302 | 18 | 620,222 |
| Transfer to GF (AB3)- Budget Reduction | (9,000,000) | 19 | - |
| Total Other Financing Sources (Uses) | 5,426,729 | | 15,794,904 |
| Excess of revenues and other financing sources | | | |
| over expenditures and other financing uses | 2,246,744 | | 11,147,395 |
| Beginning Balance, July 1 | 155,840,505 | 108 2 999 | 144,693,110 |
| Balance Forward Prior Year from other accounts | - | 9 | - |
| Prior Period Adjustment | - | | - |
| Ending Balance, June 30 | 158,087,248 | | $ 155,840,505 |

Cash Basis – Unaudited

# MUNICIPAL BOND BANK BOND INTEREST & REDEMPTION FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2021 and June 30, 2020

|  | 2021 |  | 2020 |
|---|---|---|---|
| **Revenues** |  |  |  |
| Receipts from municipalities-Interest | $ 3,047,237 | 1 | $ 3,256,787 |
| Receipts from municipalities-Principal | 4,615,000 | 9 | 4,405,000 |
| Other |  |  |  |
| Interest Income | 2,208 | 2 | 6,666 |
| Reimbursement of Expenses | - | 3 | - |
| Total Revenues | 7,664,445 |  | 7,668,453 |
|  |  |  |  |
| **Expenditures** |  |  |  |
| Administrative Costs | - | 4 | - |
| Transfer to Administration | 8,874 | 8 | - |
| Trust Agent Fees | - | 5 | - |
|  | 8,874 |  | - |
| Debt Service |  |  |  |
| Bond Principal Redemption | 4,615,000 | 6 | 4,405,000 |
| Bond Interest Expense | 3,047,237 | 7 | 3,256,787 |
|  | 7,662,237 |  | 7,661,787 |
| Total Expenditures | 7,671,110.99 |  | 7,661,787 |
|  |  |  |  |
| **Other Financing Sources (Uses)** |  |  |  |
| Reversion to General Fund | - |  | - |
| Total Other Financing Sources (Uses) | - |  | - |
|  |  |  |  |
| Excess of revenues and other financing sources |  |  |  |
| over expenditures and other financing uses | (6,666) |  | 6,666 |
|  |  |  |  |
| Beginning Balance, July 1 | 6,666 |  | - |
| Ending Balance, June 30 | $ - |  | $ 6,666 |

odd # years balance reverts to General Fund
even # years balances forward to the following year or pursuant to NRS 350A.190 2(d)
money reverted to General Fund and closed with zero balance

Cash Basis – Unaudited

# FUND FOR HEALTHY NEVADA

Statement of Revenues, Expenditures and Changes in Fund Balance

For the Fiscal Years Ended June 30, 2021 and June 30, 2020

| Revenues | 2021 | | 2020 |
|---|---|---|---|
| Tobacco Settlement Income | $25,897,978 | 1 | $23,040,778 |
| Interest Income | 181,228 | 2 | 668,663 |
| Appropriations | - | | - |
| Refund of Unused Grant Money | 13,633 | 3 | 2,514 |
| Transfer From Health Division | 1,900,903 | 18 | 1,089,517 |
| Total Revenues | 27,993,741 | | 24,801,472 |

| Expenditures | | | |
|---|---|---|---|
| Operating | 58,748 | 4 | 62,820 |
| Total Expenditures | 58,748 | | 62,820 |

Other Financing Sources (Uses)

Transfer to Department of Health and Human Services

| | 2021 | | 2020 |
|---|---|---|---|
| Administrative Services | 660,968 | 19 | 669,565 |
| ADSD RX Program | 375,482 | 5 | 1,133,139 |
| Children & Disabled Persons | 6,498,891 | 6 | 6,410,046 |
| Aging Services | 5,404,471 | 7 | 5,855,473 |
| Disability RX | - | 8 | - |
| Differential Response | 1,263,559 | 9 | 1,260,275 |
| Child & Adolescent Services * | 2,302,918 | 10 | 2,302,918 |
| Autism | 1,049,576 | 11 | 2,870,000 |
| Family Resource Center | 1,608,089 | 12 | 1,669,664 |

Cash Basis – Unaudited

| | | | |
|---|---|---|---|
| Consumer Health Asst | 353,675 | 14 | 350,344 |
| Tobacco Cessation | 902,046 | 15 | 912,357 |
| Public and Behavioral Health | 969,204 | 16 | 1,303,906 |
| Transfer to Millennium Scholarship | | | - |
| Transfer to GF (AB3)- Budget Reduction | 16,851,440 | 19 | - |
| Total Other Financing Sources (Uses) | 38,240,320 | | 24,737,687 |
| Excess of revenues and other financing sources | | | |
| over expenditures and other financing uses | (10,305,327) | | 965 |
| Beginning Balance, July 1 | 39,793,420 * | 17 | 39,276,779 |
| Prior Year Adjustment | 515,675 | | |
| Ending Balance, June 30 | $30,003,768 | | $39,277,744 * |

\* GFO adjustment: Funds transferred from BA1031 and BA3260 of $515,674.62 to BA 1090 in FY21 beginning Balance, not posted in FY20

Cash Basis – Unaudited



# Annual Report

Office of State Treasurer Zach Conine

| Fiscal Year 2020 | July 1, 2019 – June 30, 2020 |

**Zach Conine**

*State Treasurer*



STATE OF NEVADA

OFFICE OF THE STATE TREASURER

December 11, 2020

Dear Governor Sisolak and Members of the Nevada Legislature:

Enclosed please find a copy of the Nevada State Treasurer's Office Fiscal Year 2020 Annual Report as required pursuant to NRS 226.120(2).

It has been a pleasure to serve as Nevada's State Treasurer since January 7, 2019. This year has brought many challenges to Nevada and the Treasurer's Office, but also many incredible opportunities and accomplishments. The five divisions of the State Treasurer's Office have worked tirelessly to serve Nevadans, both in response to COVID-19 and in the regular course of business.

Of note, through a special pilot program the Office administered in partnership with the Department of Employment, Training, and Rehabilitation (DETR), the Unclaimed Property Division returned over $300,000 (as of June 30, 2020) to Nevada unemployment insurance claimants negatively affected by the pandemic. The Investment Division had another impressive year and distributed just under $58 million in interest returns to State agencies during a time it was so desperately needed. The Cash Management Division has been working with agencies to encourage more safe and efficient means of handling financial transactions. The Debt Management Division has continued to ensure the State is on solid financial ground by borrowing at the lowest interest rate in recent history. The College Savings Division has been working to increase educational opportunities for all Nevadans by refining marketing and messaging and encouraging families to attend virtual events and webinars.

None of these successes would have been possible without the hard work and dedication of the State Treasurer's Office staff. Through their efforts, we have consistently provided a high level of customer service in assisting members of the public and other state agencies, while simultaneously addressing the financial effects of the pandemic head on.

Thank you for the opportunity to share more about the Treasurer's Office. Please do not hesitate to contact me should you need additional information or further clarification on any of the information provided in this report.

Sincerely,

Zach Conine
Nevada State Treasurer

## TABLE OF CONTENTS

**OVERVIEW** ................................................................................................................ **4**

**CASH MANAGEMENT DIVISION** ............................................................................. **5**
Division Overview ............................................................................................... 5
Duties.................................................................................................................... 5
Major Accomplishments ..................................................................................... 6

**INVESTMENT DIVISION** ........................................................................................... **7**
Division Overview ............................................................................................... 7
Duties.................................................................................................................... 7
Major Accomplishments ..................................................................................... 11

**DEBT MANAGEMENT DIVISION** ............................................................................ **12**
Division Overview ............................................................................................... 12
Duties.................................................................................................................... 12
Major Accomplishments ..................................................................................... 15

**UNCLAIMED PROPERTY DIVISION** ....................................................................... **17**
Division Overview ............................................................................................... 17
Duties.................................................................................................................... 17
Major Accomplishments ..................................................................................... 18

**COLLEGE SAVINGS DIVISION** ............................................................................... **19**
Division Overview ............................................................................................... 19
Duties.................................................................................................................... 19
Major Accomplishments ..................................................................................... 25

**NEVADA ABLE SAVINGS PROGRAM** ................................................................... **26**
Program Overview ............................................................................................... 26
Duties.................................................................................................................... 26
Major Accomplishments ..................................................................................... 26

**ORGANIZATIONAL CHART** ..................................................................................... **27**

**ZACH CONINE BIOGRAPHY** ................................................................................... **28**

**SENIOR STAFF BIOGRAPHIES** ............................................................................... **29**

Financial Section ................................................................................................. 32

## OVERVIEW

Pursuant to the Nevada Constitution and Nevada Revised Statutes, the State Treasurer's Office ("Office") is responsible for a number of state functions. Broadly, these responsibilities fall under one of five working groups, or Divisions, within the Office. The five Divisions of the Office are:

## Cash Management

The Cash Management Division is responsible for managing the State's banking relationships, reconciling bank transactions with State accounting records, managing the State's electronic payments, and administering the State's check distribution program.

## Investment

The Investment Division is responsible for the investment of all public money, and the accounting of the General Portfolio, Local Government Investment Pool, and the Permanent School Fund.

## Debt Management

The Debt Management Division is responsible for the issuance of debt obligations authorized on behalf of and in the name of the State (with limited exceptions), as well as the organization and facilitation of statewide pooled financing programs.

## Unclaimed Property

The Unclaimed Property Division is responsible for receiving and safeguarding abandoned property due to Nevadans. The Division also processes and approves claims made by Nevadans for the return of their property.

## College Savings

The College Savings Division is responsible for administering various college savings programs throughout the State, including: the five nationwide 529 College Savings Plans, Nevada Prepaid Tuition Program, Nevada College Kick Start Program, and Governor Guinn Millennium Scholarship Program. The Division is also responsible for the Student Loan Ombudsman Program, in addition to maintaining a comprehensive scholarship database, and administering 529 matching grant programs.

# CASH MANAGEMENT DIVISION

## Division Overview

The Cash Management Division oversees the State's banking relationships, reconciles bank transactions with state accounting records, manages the State's electronic payment acceptance program, and administers the State's check distribution program.

The Division assists with accounting and administrative duties within the Treasurer's Office, including day-to-day budget processes; biennial budget requests; purchasing and contract management; revenue forecasts; and reports and financial statements due to the Controller's Office, Department of Administration, and the Legislative Counsel Bureau. Most general inquiries from the public are also handled by the Cash Management Division.

## Duties

### *Banking and Accounting*

Pursuant to NRS 226.110, the State Treasurer is responsible for the receipt and disbursement of public money. In addition to its main depository and controlled disbursement accounts, the Treasurer's Office has 31 bank accounts under analysis, with most of these accounts being zero balance accounts. The funds deposited into these accounts by other State agencies are transferred into the State's consolidation account on a daily basis, thus providing an efficient method for combining cash balances within one financial institution and minimizing non-invested cash balances. The Treasurer's Office also maintains three depository accounts with other financial institutions in order to offer State agencies in geographically remote areas the ability to more timely deposit funds.

Cash Management personnel are responsible for the accounting and distribution of funds relating to the Tobacco Master Settlement Agreement (MSA). State law requires 40% of the funds be allocated to the Governor Guinn Millennium Scholarship Fund and 60% to the Fund for a Healthy Nevada. Nevada received approximately $39 million in MSA funds in FY20 enabling Cash Management to distribute approximately $15 million to Millennium recipients and $23 million to the Healthy Nevada program.

The Cash Management Division also allocates revenues from the lease of federal lands in Nevada. Under NRS 328, these revenues are shared between the Department of Education's Distributive School Account, county treasurers, and school districts based on the percentage of revenues collected in those various jurisdictions.

### *Merchant Services*

As manager of the State's electronic payment acceptance program, Cash Management maintains 287 merchant accounts for 55 State agencies and, with the transition to Wells Fargo Merchant Services, State agencies receive next day funding on all electronic transactions. In addition, Cash Management

maintains a website for electronic payment acceptance featuring information and forms for assisting agencies through the merchant services process. In FY20, Cash Management continued the Merchant Services Education and Outreach Program assisting State agencies with Payment Card Industry Data Security Standards (PCI DSS), credit card reconciliation, and overall merchant services processes related to accepting electronic payments, such as credit and debit cards. The Program also created the first best practice and operating manual for electronic payment acceptance that is being used by other government entities and states.

## Major Accomplishments

In FY20, the Cash Management Division created a new Electronic Treasury site to assist Nevada agencies with a variety of banking and Merchant Services needs, including online bank supply ordering, desktop deposit scanner information and access forms, education and outreach presentations, quarterly newsletters and links to helpful accounting policies and procedures. In addition, the Division created the first ever combined Cash Management and Merchant Services Education and Outreach Program that was attended by over a hundred State employees.

The Treasurer's Office continues to seek more efficient and safe means by encouraging the use of items such as cash vaults, remote deposit, positive pay, and ACH blocks and filters, which State agencies can use to carry out their financial transactions.

Nevada State Treasurer
Annual Report – Fiscal Year 2020

# INVESTMENT DIVISION

## Division Overview

The State Treasurer is responsible for the investment of public money. The Investment Division ("Investment") is responsible for all investment and accounting activities relating to the General Portfolio, Local Government Investment Pool (LGIP), and the Permanent School Fund (PSF), as well as oversight of the NVEST investment advisers.

## Duties

The investment of the State of Nevada's General Portfolio is a function performed by Investment in accordance with state statutes. An Investment Policy for prudent investment of State funds has been adopted to guide this process. The General Portfolio includes all State funds, excluding funds invested for the Local Government Investment Pool (LGIP), Local Government Pooled Long-Term Investment Account (NVEST), Permanent School Fund (PSF), and the Higher Education Tuition Trust Fund.

### *General Portfolio*

The State's General Portfolio is invested in U.S. Treasury and Agency securities, high quality corporate notes, commercial paper, negotiable and time certificates of deposit, municipal bonds, money-market funds, and securities guaranteed 100% by the US government such as Small Business Administration (SBA) pools. Securities holdings are diversified to prevent over-concentration by maturity, issuer, or security class. Investment maintains a conservative, moderately-active investment strategy. This provides the ability to take advantage of market opportunities as they occur by analyzing projected cash flow needs. Portfolio maturities are structured to reduce the likelihood of a forced sale of securities in any but the most severe circumstances.

The FY20 General Portfolio's book value as of June 30, 2020 was $3.601 billion. The following chart provides a breakdown of total investments held as of the end of FY20. Total realized earnings for FY20 were $57,897,785, representing a yield of 1.88%.



**Performance of General Portfolio vs. Benchmark**

As of June 30, 2020, the yield on the General Portfolio was 0.837%. A customized benchmark has been created using a combination of the three-month T-bill and two-year treasury notes. A three-month rolling average of this benchmark for this period was 0.14% with an average maturity of 218 days. The average maturity of the State's operating portfolio was 0.83 years, or 303 days.



*Local Government Investment Pool*

Pursuant to NRS 355.165, the LGIP serves as an alternative program for local governments to invest cash on a voluntary basis, thus allowing for the leverage of economies of scale. Investment administers the LGIP in a conservative manner, consistent with the prudent guidelines outlined in a LGIP-specific Investment Policy. Any local government may deposit its public monies in the pool. The LGIP reduces investment risk and increases convenience for local governments, as well as allowing for:

- Multiple accounts to be maintained for accounting purposes;
- No minimum or maximum account size;
- No limit on transaction size for deposits or withdrawals of funds; and
- No restriction on length of time proceeds can be invested.

The LGIP investment strategy incorporates the matching of maturing securities to the anticipated cash needs of the participants. Approximately 10% of the fund matures daily to ensure sufficient liquidity is available to meet both anticipated and unanticipated withdrawals. The LGIP imposes a Minimum Liquidity Requirement, which projects the cash flow needed to meet identified obligations within a rolling four-week period and which aligns maturing securities accordingly.

Nevada State Treasurer
Annual Report – Fiscal Year 2020

The following chart provides a breakdown of total investments held as of the end of June 30, 2020.



**Performance vs. Benchmark**

As of July 1, 2015, registered investment advisor, FHN Financial Services Mainstreet Capital Advisors (FHN), manages the LGIP Portfolio. FHN created a custom blended benchmark to assess performance in the LGIP*. As of the end of FY20, the LGIP was outperforming this benchmark by 69 basis points. There were 88 LGIP members at the close of FY20 comprised of cities, counties, school districts, and various special districts across the State. The LGIP's book value on June 30, 2020 was $1,750,610,514. The LGIP's investment objectives include safety of principal, portfolio liquidity, and market return, consistent with a conservative, short duration portfolio. The Weighted Average Maturity (WAM) of the portfolio at fiscal year-end is 130 days.

Additionally, local governments have the option to participate in a longer-term investment program within the LGIP. NVEST is an alternative investment program for local governments, the objective of which is to provide higher returns than the LGIP. The minimum account size is $5 million. NVEST participants, working with one of three registered investment advisors, can customize their portfolios based on their risk tolerances and other factors. During late FY15, a request for proposal was issued to select managers for the NVEST program. The firms chosen were Atlanta Capital, Government Portfolio Advisors and Chicago Equity Partners. As of June 30, 2020, the NVEST portfolios had a total book value of $40,423,827.38 and consisted of 2 participants.

*Benchmark is a 3-month rolling weighted average of 20% Dealer Commercial Paper 90-Day Index, 60% Agency Discount Note 6-Month Index, and 20% Morgan Stanley Institutional Liquidity Government Portfolio Fund.

## Collateral Pool Program

Pursuant to NRS 356.350, the State Treasurer is required to establish a program for "the monitoring of collateral of public funds". The Nevada Pooled Collateral Program offers state and local government agencies an efficient, cost effective, and safe alternative method for securing public funds. The primary objectives are to reduce risk while, at the same time, decreasing the overall collateral requirement for depositories. By centralizing the administration and reporting functions through Investment, government agencies and depositories recognize cost savings in terms of operational support and collateral efficiency.

Each financial institution is required to maintain (at a third-party repository) acceptable securities having a fair market value that is at least 102% of the amount of the aggregate uninsured ledger balances of the public money held by the depository as collateral. Participating financial institutions must report each day the amount of deposits held and the value of the corresponding pledged collateral. Any under collateralization must be rectified by the financial institution by the close of business on the day the under collateralized deposits are reported.

At the conclusion of FY20, there were 307 public entities throughout the State participating in the Collateral Pool Program, with deposits in 14 financial institutions and a daily balance on June 30, 2020 of $1.550 billion with pledged collateral of $1.891 billion, which calculates to $310 million in excess collateral.

## Permanent School Fund

The Permanent School Fund was created to account for monies received from estates that escheat to the State, proceeds from the sale of federal lands given to the State, and fines collected under the penal laws of the State that are pledged only for education purposes under Article 11, Section 3 of the Constitution of the State of Nevada. Per NRS 355.050, the State Treasurer shall have charge of all the investments of money and the sale of all securities of the State Permanent School Fund. All earnings on the Fund's assets are apportioned among several Nevada school districts.

As of June 30, 2020, the book value of the fixed-income investments of the Permanent School Fund totaled $190,977,320, the public equity investments totaled $139,269,000 and the private equity book value totaled $23,686,965 (excludes capital returned to NCIC since SSOF inception). The total portfolio as of June 30, 2020 totaled $353,933,285.

## Nevada Capital Investment Corporation

In 2011, the Nevada State Legislature passed Senate Bill 75, authorizing up to $50 million non-tax dollars in the Permanent School Fund to be invested in private equity investments through the Nevada Capital Investment Corporation (NCIC). Known as the Silver State Opportunities Fund (SSOF), this private equity fund focuses investments on expanding businesses located in Nevada or those which are seeking to relocate. In FY20, SSOF was fully committed as of May 13, 2016. Approximately

88%, or $44.6 million, of committed capital has been drawn from the Permanent School Fund as of June 30, 2020.

The SSOF is generating a 6.5% net annual return to the State's Permanent School Fund. On a gross basis, SSOF is generating an 9.7% Internal Rate of Return (IRR). As of June 30, 2020, the NCIC has contributed $44.6 million and received $32.3 million in distributions, resulting in $12.3 million in net contributed capital. The performance is driven by yield-producing fund investments and the Fund's co-investments are expected to contribute future positive value to the Fund.

As of June 30, 2020, 32 companies have received investments from SSOF. This includes investments throughout the entire State as noted in the SSOF report. This is a total of $717 million (16x multiplier) invested in Nevada and its partners which stretches far beyond the $50 million capital invested via the Permanent School Fund. The Fund investments have supported 2,470 Nevada employees with an average annual wage of $83,878, which is higher than the national average wage.

## Major Accomplishments

### *Interest Distributions*

In FY20, Investment worked to return $57,897,785 in interest distributions to State agencies. Investment returned an average of $14,474,446 to agencies each quarter in FY20, for an average calculated rate of return of 1.88%.

This return was slightly lower than the previous year. Total interest distributions for the four previous fiscal years are illustrated below:

- FY17 = $19,288,094
- FY18 = $34,861,867
- FY19 = $60,157,006
- FY20 = $57,897,785

Investments is excited to continue to distribute significant interest earnings to state agencies going forward.

# DEBT MANAGEMENT DIVISION

## Division Overview

Pursuant to NRS 226, the State Treasurer is directly responsible for the issuance of any debt obligation authorized on behalf of and in the name of the State, except for issuances by the Colorado River Commission, the University of Nevada System of Higher Education, and the Department of Business and Industry which issue various types of debt under differing levels of autonomy. The State Treasurer is also authorized to organize and facilitate statewide pooled financing programs, including lease purchases, for the benefit of the state and any political subdivisions.

## Duties

### General Obligation Debt

The State Treasurer is responsible for the issuance and maintenance of the following types of general obligation (GO) debt: Capital Improvement Bonds, Municipal Bond Bank Bonds, State Revolving Fund Bonds, Historic Preservation Bonds, Natural Resources Bonds, University System Bonds, and other miscellaneous GO bonds and securities. The State requires GO bonds to be legislatively authorized and secured by that portion of the ad valorem tax revenue dedicated to the payment of GO debt to the extent other monies are not available. The State's gross GO debt as of June 30, 2020 was $1,283,145,000.

The following chart illustrates the breakout of the State's $1.28 billion Gross General Obligation Debt as of June 30, 2020.



During FY20, the Debt Management Division ("Debt Management") processed debt service payments for existing GO debt totaling approximately $205.33 million.

| Gross General Obligation Debt FY20 Debt Service Payments | | | |
|---|---|---|---|
| | **Principal** | **Interest** | **Total** |
| State Property Taxes | $121,231,000 | $48,049,007 | $169,280,007 |
| Aggregate Bonds Paid with Revenues Other Than Property Tax | 3,869,000 | 2,628,065 | 6,497,065 |
| Clean Water Revolving Fund | 8,065,000 | 1,071,264 | 9,136,264 |
| Safe Drinking Water Revolving Fund | 2,655,000 | 571,617 | 3,226,617 |
| Municipal Bond Bank | 4,405,000 | 3,256,787 | 7,661,787 |
| Nevada System of Higher Education | 3,725,000 | 2,795,075 | 6,520,075 |
| Colorado River Commission | 1,915,000 | 1,093,256 | 3,008,256 |
| Total FY20 Debt Service | $145,865,000 | $59,465,072 | $205,330,072 |

## Debt Service Reserves

Nevada's Consolidated Bond Interest and Redemption Fund (the "Bond Fund") is used to receipt the collection of the 17-cent ad-valorem property tax revenue dedicated to the payment of the principal and interest on the State's GO bonds, and to reserve monies for future GO bond debt service payments. The reserve within the Bond Fund is funded from the excess of applicable property tax revenues over the required debt service payments plus interest earnings on the Bond Fund. The Bond Fund is available to provide ready reserves to meet current debt service obligations to the extent monies are insufficient from current property tax revenues.

The State's current debt management policy has as an objective to maintain a reserve within the Bond Fund balance at the end of each fiscal year equal to at least 50% of next fiscal year's debt service payments on GO bonds (exclusive of those bonds considered to be self-supporting and paid by other available revenues). As of June 30, 2020, the unaudited reserve amount within the Bond Fund was approximately $155 million, which is equal to approximately 91% of the FY21 debt service on those general obligation bonds expected to be paid from property tax and prior to the issuance of additional 2020 bonds.

## Debt Affordability Analysis

A committee comprised of representatives from the Governor's Finance Office, the Department of Taxation, the State Treasurer's Office, and the Legislative Counsel Bureau meets at least biennially to forecast the estimated revenue to be received from its assessed property tax. Debt Management utilizes the committee's projections in the preparation of the General Obligation Debt Capacity and Affordability Report which is published each biennium. In the interim, Debt Management updates the affordability analysis after each securities issuance and as needed.

The General Obligation Debt Capacity and Affordability Report is utilized by the Governor in preparing his recommended budget. The report is then presented to the State Legislature, which relies upon the report when considering the issuance of securities during the following biennium, determining

the ad valorem tax rate for the payment of securities for the next biennium, and reviewing future debt capacity and affordability over the next ten years.

## State Debt Capacity

In addition to the General Obligation Debt Capacity and Affordability Report prepared by Debt Management, the issuance of GO bonds is also limited by the State Constitution. Article 9, Section 3 limits the aggregate principal amount of the State's outstanding GO debt to 2% of the total reported assessed valuation of the State. The limitation does not extend to debt incurred for the protection and preservation of any property or natural resources of the State, or for the purpose of obtaining the benefits thereof.

Subject to the constitutional debt limitation, the Legislature may authorize the issuance of debt for any public purpose. As of June 30, 2020, the constitutional debt limit stood at $2.89 billion. The outstanding debt subject to this limit was $981.76 million and the remaining constitutional debt capacity was $1.91 billion.

| Constitutional Debt Limitation and Capacity[1] | | | | |
|---|---|---|---|---|
| Effective June 30 | Assessed Valuation | Debt Limitation | Outstanding Debt Subject to Limitation | Remaining Constitutional Debt Capacity |
| 2016 | $108,331,564,829 | $2,166,631,297 | $1,082,845,000 | $1,083,786,297 |
| 2017 | $114,727,736,818 | $2,294,554,736 | $1,034,015,000 | $1,260,539,736 |
| 2018 | $123,398,562,960 | $2,467,971,259 | $1,025,895,000 | $1,442,076,259 |
| 2019 | $134,128,343,902 | $2,682,566,878 | $988,260,000 | $1,694,306,878 |
| 2020 | $144,323,763,007 | $2,886,475,260 | $981,760,000 | $1,904,715,260 |
| [1]Estimated by State of Nevada Controller's Office | | | | |

## Municipal Bond Bank

NRS 350A.140 designates the State Treasurer as administrator of the Nevada Municipal Bond Bank. In accordance with NRS 350A.150, the amount of State securities issued to acquire municipal securities may not exceed $1.8 billion outstanding at any time.

The State's Municipal Bond Bank program was established in 1981 to assist municipalities in undertaking local projects which foster and promote the protection and preservation of the property and natural resources of the State. Without this fund, municipalities might otherwise face the prospect of prohibitive interest rates.

The Board of Finance must approve the issuance of State GO and revenue securities under the Bond Bank Act. As of June 30, 2020, the outstanding par amount of securities issued pursuant to the Act was $83,680,000.

## Permanent School Fund Guarantee Program

Established under NRS 387.519, the Permanent School Fund Guarantee Program (PSFG), provides a mechanism for Nevada school districts to enter into agreements with the State whereby the money in the Permanent School Fund (PSF) is used to guarantee the debt service payments on certain bonds issued by Nevada school districts.

PSFG secured bonds carry the highest possible rating of "AAA" by Moody's Investor Service and S & P Global Ratings—thus providing Nevada school districts with greater access to public credit markets and reduced borrowing costs. The State Treasurer is tasked with administering the PSFG.

Fundamental to the PSFG is the legal authorization of the PSF to guarantee school district debt, which includes ensuring timely debt service payment, coupled with strong oversight and enforcement provisions. If a district fails to make a timely payment, the State Treasurer is required to withdraw a sufficient amount of money from the PSF in order to make a timely debt service payment. The withdrawal from the PSF and payment of debt service on the bonds is considered a loan to the school district. The loan must be repaid to the State from either school district money available to pay debt service on the bonds which are PSF guaranteed or from withholdings of state aid due to the district.

The maximum amount of principal that can be guaranteed by the State for any Nevada school district is limited to $40,000,000. Further, the total amount of bonds that can be guaranteed by the State is limited to 250% of the lower of the cost or fair market value of the assets in the PSF. Based on the current balance of the PSF, the maximum principal that can be guaranteed is more than $800 million. As of June 30, 2020, $156,403,400 in bonds had been guaranteed, or authorized by the State Board of Finance to be guaranteed, by the PSF.

## Major Accomplishments

### Bond Sales

In FY20, the Office successfully conducted one bond sale comprised of five series of bonds:

| BONDS ISSUED IN FY2020 | | | | | | |
|---|---|---|---|---|---|---|
| | Series | Original Amount | New Money | PV Savings | TIC | Term |
| Capital Improvement and Refunding Bonds | 2019A | $ 154,995,000 | $ 111,070,000 | $ 6,690,674 | 2.07% | 20yrs |
| Natural Resources Bonds | 2019B | $ 5,175,000 | $ 5,175,000 | $ - | 1.20% | 2yrs |
| Safe Drinking Water Revolving Fund Matching Bonds | 2019C | $ 5,360,000 | $ 5,360,000 | $ - | 1.24% | 5yrs |
| Clean Water Revolving Fund Matching Bonds | 2019D | $ 5,375,000 | $ 5,375,000 | $ - | 1.35% | 8yrs |
| Clean Water Revolving Fund Leveraged Bonds | 2019E | $ 25,445,000 | $ 25,445,000 | $ - | 2.00% | 15yrs |
| | | $ 196,350,000 | $ 152,425,000 | $ 6,690,674 | | |

The combined principal (or par value) amount of the bonds was $196,350,000. The terms of the bonds ranged from 2 years to 20 years and the true interest costs (TIC) ranged from 1.20% to 2.07%, which represents rates below historical averages.

## *Nevada's Credit Ratings*

Credit rating agencies provide an independent assessment of the relative creditworthiness of municipal securities. The rating system consists of letter grades that convey each company's assessment of the ability and willingness of a borrower to repay its debt in full and on time. Many investors rely upon these letter grades as a means of assessing the likelihood of repayment.

Credit ratings issued by the rating agencies are a major factor in obtaining the lowest cost of borrowed funds in the municipal bond market. Credit rating agencies base ratings on the assessment of the credit worthiness of an issuer with respect to a specific obligation.

There are several factors that rating agencies consider in assigning credit ratings: financial, economic, debt, and administration/management. Rating agencies believe debt management is an important factor in evaluating issuers and assigning credit ratings, which ultimately determine the borrowing cost of funds.

At the end of FY20, the State's GO debt was rated AA+, Aa1, and AA+ respectively by the three major rating agencies: Fitch Ratings, Moody's Investors Service, and S & P Global. The State's strong "AA" rating is just below the highest rating category of "AAA".

| Ratings | | | |
|---|---|---|---|
| | **Fitch** | **Moody's** | **S&P** |
| General Obligation | AA+ | Aa1 | AA+ |
| Safe Drinking Water Revolving Fund | AA+ | Aa1 | AAA |
| Water Pollution Control Revolving Fund | AA+ | Aa1 | AAA |
| Lease Revenue Certificates of Participation | AA | Aa2 | AA |
| Highway Improvement Revenue Bonds (MVFT) | AA+ | Aa2 | AAA |
| Permanent School Fund Guarantee | N/A | Aaa | AAA |

## UNCLAIMED PROPERTY DIVISION

### Division Overview

The Unclaimed Property Division ("Unclaimed Property") currently safeguards more the $894.3 million in unclaimed property belonging to individuals, heirs, and businesses who have, at some point in time, resided or did business in the Silver State.

Each year, businesses and government agencies turn over tens of millions of dollars of abandoned property in the form of cash, securities, and tangible property from safe deposit boxes to Unclaimed Property. The property is held in Unclaimed Property's custody in perpetuity until it can be returned to the rightful owner or heir. Typical types of property received include stock accounts, uncashed payroll checks, utility deposits, life insurance proceeds, and refunds.

Unclaimed Property operates three primary workgroups: Claims, Holder, and Audit.
- The Claims team is responsible for receiving, reviewing, and approving or denying submitted claims. They also process, hold, and auction physical property which is received in safe deposit boxes, the proceeds of which are credited to the box owner's account.
- The Holder team is responsible for receiving and processing reports and payments that are submitted as unclaimed property. (Businesses are referred to Holders, as the are "holding" others' property).
- The Audit team is responsbile for managing contracted outside auditors, performing compliance reviews, and assesing and collecting penalites and interest for reports or property that were submitted incorrectly or late.

### Duties

The unclaimed property program was created and is administered pursuant to Chapter 120A of the Nevada Revised Statues (NRS 120A), and is further clarified in Chapter 120A of the Nevada Administrative Code. NRS 120A represents a modified version of the Uniform Unclaimed Property Act (which is adopted by the Uniform Law Commission). NRS 120A was recently updated through the passage of Senate Bill 44 (SB44) of the 80th Nevada Legislative Session. These revisions have been codified into NRS 120A.

Unclaimed Property's statutory duties outlined in NRS 120A include:
- Facilitating reporting and receiving unclaimed property;
- Receiving, reviewing, and approving or denying claims submitted to recover property;
- Conducting, or contracting with others to conduct audits of Holders to determine proper reporting of unclaimed property;
- Dispositioning securities and physical property received via security sales, public auctions and/or donations to certain libraries or muesum when items are worthy of preservation;
- Notifying the public with instructions on how to search and access information relating to unclaimed property, announcing public auctions, and providing reporting information to Holders; and

- Ensuring the proper usage of unclaimed property funds which have yet to be return to rightful owners, including transfers to the Education Trust Account, Millennium Scholarship Trust Fund and the State General Fund.

## Major Accomplishments

### Owner Claims

Unclaimed Property paid 38,368 claims in FY20, an increase of 34% from FY19. Unclaimed Property returned a record high $46 million to rightful owners, an increase of more than 6% over FY19. In FY20, 70% of all claims were paid via Unclaimed Property's online approval system, FastTrack, which represents a decrease of 2% from FY19; however due to the increase in total claims, the number of FastTrack approved claims increased by more than 4,400. This continued upward trend demonstrates that more claimants are able to easily file their claims online, and that the public acceptance and awareness of the legitimacy of unclaimed property programs continues to increase.

### Holder Audit and Outreach Initiatives

During FY20, the Audit team continued with initiatives implemented in FY19  to increase awareness of reporting requirements and increase audits of business that have weak reporting histories and are at a higher risk of underreporting. Initiatives included:

- Increased the number of contracted outside audit firms from two to five. This increase allows Unclaimed Property to broaden the audits performed on behalf of Nevada, as the new firms include those that specialize in industries not previously audited for Nevada.
- Implemented a modified "self-audit" program focusing on mid-sized businesses through the Unclaimed Property's outside audit partners. In the second year of the program, more than 400 self-audits have been initiated for businesses who have not previously reported to Nevada.
- Increased highlighting of the Voluntary Disclosure program, which offers waivers of penalties and interest to businesses who have not previously reported or have reported incorrectly. The program continues to evolve to focus on and provide education to Holders to improve accuracy and consistency of their reporting.

### Holder Reporting and Collections

The Holder team focused on promoting compliance with required online reporting and payment submissions. As a result, 78% of reports received were submitted online in FY20. Other collection results include:

- Cash receipts from holder reports exceeded $71 million and security sales exceeded $10.8 million;
- Over 1 billion shares of stocks were taken into custody; and
- Over 782,000 individual owner properties were reported.

# COLLEGE SAVINGS DIVISION

## Division Overview

The College Savings Division ("College Savings") administers various programs that assist Nevadans in planning for, saving for, and paying for higher education. The Division also provides administrative support to the Board of Trustees of the College Savings Plans of Nevada.

## Duties

NRS 353B governs Nevada's college savings programs and directs the State Treasurer to act as administrator. NRS 353B establishes three Nevada college savings programs: Nevada's 529 College Savings Plans, Nevada Prepaid Tuition Program, and Nevada College Kick Start. NRS 396 governs the Governor Guinn Millennium Scholarship and directs the State Treasurer to act as administrator. NRS 226 establishes the Student Loan Ombudsman Program, and the Scholarship Database, which are housed within the State Treasurer's Office and overseen by the College Savings Division.

### 529 College Savings Plans

The Nevada 529 College Savings Plans are designed to assist parents and students in saving for future college expenses in tax advantaged savings accounts. The College Savings Plans operate as qualified tuition programs under Section 529 of the Internal Revenue Code. The Plans combine tax benefits and flexible features, making them a smart and convenient way to save for higher education. In 529 College Savings Accounts, earnings grow tax-deferred and are federally tax-free when used for qualified educational expenses at eligible higher education institutions. This allows savings to grow faster, providing more money for college-related expenses. The Board of Trustees of the College Savings Plans of Nevada provides fiduciary oversight of the investment managers, program managers, marketing managers and other vendors supporting the College Savings Programs.

The College Savings Plans of Nevada consists of four direct-sold plans managed by Ascensus College Savings: SSGA Upromise 529, Vanguard 529 College Savings Plan, USAA 529 College Savings Plan, and Wealthfront 529 College Savings Plan. The State also offers one advisor-sold plan, Putnam 529 for America. Nevada's College Savings Plans are available to individuals from all fifty-states and at the end of FY20, collectively held 972,585 individual accounts and over $29.1 billion in assets under management (AUM). This represents a 4.5% increase in accounts and an 9% increase in AUM over FY19.

The 529 College Savings Plans of Nevada vary in their structure, offerings, and risk. Plans are offered to customers throughout the United States; however, most plans provide additional benefits for Nevadans such as matching grant funds, waiver of annual account fees, and reduced required initial contributions.

The table below shows the total AUM for each plan, as well as the total number of accounts as of June 30, 2020:

|  | **AUM** | **Total Accounts** |
|---|---|---|
| **Putnam 529 for America** | $434.3 MM | 19,168 |
| **Wealthfront 529 Plan** | $283.9 MM | 20,070 |
| **USAA 529 College Savings Plan** | $4,263 MM | 315,479 |
| **SSGA Upromise 529** | $1,482 MM | 138,227 |
| **Vanguard 529 Plan** | $22,682 MM | 479,641 |
| **TOTAL:** | **$29,145 MM** | **972,585** |

## *Silver State Matching Grant*

Since 2010, the Silver State Matching Grant Program has allowed qualifying Nevada families a unique opportunity to boost their 529 college savings contributions. The Program provides a matching contribution dollar-for-dollar up to $300 per year for five years, for a maximum of $1,500 per beneficiary into a recipient's SSGA Upromise 529 Account. The 2019 open enrollment period saw a record year, with a total of 438 approved applications, a 32% increase from last year's 332 applications approved during the 2018 enrollment period.

## *The Nevada Prepaid Tuition*

The Nevada Prepaid Tuition Program ("Prepaid Tuition") enables parents, grandparents, and other family members to lock in future in-state college tuition rates at today's prices. Established in 1998, Prepaid Tuition is one of only 11 prepaid tuition programs in the country. It is fully administered by the College Savings Division, and includes the marketing of Prepaid Tuition, assisting families with enrollment, and coordinating with higher education institutions for the distribution of benefits.

Prepaid Tuition is authorized under Section 529 of the Internal Revenue Code and is designed to assist families in saving for future college tuition expenses. Prepaid Tuition plans, or contracts, may be purchased with a lump sum payment, paid monthly over five years, monthly over 10 years, or monthly until the child is ready to attend college. Contracts are transferable to other children in the family, including first cousins. Contract benefits can be used to cover the cost of tuition at Nevada System of Higher Education institutions or may be applied to help offset the cost of tuition at eligible in-state and out-of-state institutions.

Prepaid Tuition opens enrollment each year from November through March. In FY20, the Program enrolled 524 new students and the four-year university plan remained the most popular choice of plans, with 65.65% of purchasers choosing the four-year university plan for their loved one. The lump sum payment option (40.84%) exceeded the monthly payment options (26.91% extended payments, 20.99% five-year payment option, and 11.26% 10-year payment option) as the most popular payment choice.

An actuarial report completed by an independent outside auditing firm found the funded status of Prepaid Tuition as of June 30, 2020 to be 165.7%. At the conclusion of FY20, a total of 22,239 children were enrolled in Prepaid Tuition, and the Nevada Higher Education Tuition Trust Fund held assets of $312.2 million, an increase of 524 children and $11.5 million, respectively, over the prior year. As of June 30, 2020, there were 3,408 students eligible to use their benefits, of which Prepaid Tuition paid out over $11.9 million in tuition benefits, an increase of roughly 5.57% from FY19.

## College Kick Start

In Fall 2013, the Office launched the Nevada College Kick Start Program ("CKS"), which establishes an automatic $50 scholarship for all public-school kindergarten students in the State. The scholarships are created using a portion of the program manager fees paid to College Savings, not taxpayer dollars. College Kick Start scholarships are held within a master account in the SSGA Upromise 529 Plan which is invested in the age-based portfolio which most closely matches the age of the students. Parents may also link their child's CKS scholarship to a separate SSGA UPromise 529 account. The Office acts as administrator of the Program, which includes activities such as educating parents and families about CKS and assisting families in accessing their child's scholarship via an online portal. Education and outreach efforts by College Savings include attendance at school events, direct mail sent to new CKS members, and ongoing written and email communications sent to all participants.

CKS was codified into law after the passage of Assembly Bill 475 ("AB475") of the 79th Nevada Legislative Session. Provisions of AB475 require parents to claim a child's account by the time the child enters 5th grade. College Savings is working to finalize regulations establishing the process for parents to claim their child's scholarship.

As of June 30, 2020, there were 208,951 individual student scholarships created under CKS with funding totaling just over $12.3 million.

## *Governor Guinn Millennium Scholarship*

Pursuant to NRS 396.911-945, the State Treasurer acts as administrator of the Governor Guinn Millennium Scholarship Program ("Millennium Scholarship"). Established during the 70th Nevada Legislative Session in 1999, the Millennium Scholarship provides scholarships to high achieving Nevada high schoolers for use at eligible colleges and universities located within the State.

Nevada high school seniors are automatically eligible for the award if they graduate with a diploma from a Nevada high school; have been a Nevada resident for at least two years of their high school career; graduate with a 3.25 GPA; and complete the minimum core curriculum classes. Students who do not meet the GPA requirement may substitute a qualifying score from a college entrance exam to gain eligibility. Of the graduating class of 2020, 15,721 were eligible for the scholarship, and 9,055 have acknowledged and began using the award. Funding for the Millennium Scholarship comes from appropriations, 40% of the annual Tobacco Master Settlement Agreement payments, and $7.6 million annually from the Abandoned Property Trust Account.

As administrator of the program, the Office:

- Operates the Millennium Scholarship's database (MiSL: Millennium Scholarship Ledger), which collects, stores, and maintains data on Millennium Scholars. College Savings also hosts a dedicated website allowing students to access their accounts on MiSL.
- Collects initial eligibility data from all Nevada school districts, 50 private high schools, adult education programs, and home school applicants.
- Conducts outreach efforts throughout the State at college fairs, schools, private companies, PTA meetings, and other community events to provide the latest information about the Program.
- Collaborates with representatives from each Nevada System of Higher Education (NSHE) institution, NSHE System Administration, System Computing Services, Nevada Association of School Superintendents, and the Nevada Department of Education to support the program.

## *Governor Guinn Millennium Memorial Scholarship*

Following the tragic death of former Governor Kenny C. Guinn in July 2010, at the request of former First Lady Dema Guinn, College Savings worked closely with the Guinn family to create a separate account within the Governor Guinn Millennium Scholarship Trust Fund to accept donations in his honor. Each year, the donations are used to provide scholarships to Millennium Scholars who are in their last year of college and who commit to teaching in Nevada following graduation. Historically, the scholarships were awarded to two students (one in northern Nevada and one in Southern Nevada) for $4,500 each. During the 80th Nevada Legislative Session, Senate Bill 414 ("SB414") was passed and subsequently signed by Governor Sisolak. SB414 increased the number of awards from two to four (two in northern Nevada and two in Southern Nevada), increased the award amount from $4500 to $5000, and allowed students from non-NSHE institutions to apply. These changes in eligibility and award amount were effective for 2020 applicants and for the first time, four scholarships were awarded.

## Student Loan Ombudsperson and College Navigator

**Student Loan Ombudsperson**

Assembly Bill 383 of the 80th Nevada Legislative Session created a Student Loan Ombudsperson within College Savings. The bill was sponsored by Speaker of the Assembly, Jason Frierson, and received unanimous support from both the Senate and the Assembly. The Office took a proactive role during the Legislative Session in advocating for the passage of the bill and the creation of the program and committed to funding the position through the College Savings Endowment Account.

Effective January 1, 2020, the Student Loan Ombudsperson provides three general areas of assistance to Nevadans:

1. Educate current student loan borrowers on their rights and responsibilities and facilitate resolution of borrower complaints against student loan servicers;
2. Educate potential borrowers by creating and administering a borrower education course and by conducting outreach to focus populations in targeted settings; and
3. Provide recommendations for policy through research and analysis of data collected from Nevada borrowers, other states, and national policy organizations.

With Nevada having the highest rate of defaulted student loans, the Student Loan Ombudsperson focused its efforts on educating parents and high school students on the different ways to finance a higher education before taking out student loans. The presentations focused on the importance of applying for FAFSA, scholarships, and grants, but also on understanding student loan terms, understanding the difference between federal and private student loans, and the benefits/cons related to each. Although the presentations were conducted in person at the beginning of the calendar year, they were quickly transitioned to virtual due to the COVID-19 pandemic.

The initiation of the program took a lot of time, planning, and organizing. The Student Loan Ombudsperson not only created educational content, but also created forms and documents that give the Ombudsperson the ability to better assist Nevada residents, such as a third-party authorization form, privacy release form, intake form, and limited assistance form. Throughout the pandemic, the Student Loan Ombudsperson was readily available to help parents and students with questions concerning FAFSA and scholarships, but also assisted student loan borrowers with questions concerning their loans and any benefits associated with federal student loans, such as the Public Service Loan Forgiveness (PSLF).

The Student Loan Ombudsperson meets every two months with other states' ombudspersons, who have collaborated to create and send letters to Secretary DeVos that have championed for student borrower relief at the federal level. The first letter was sent in March 2020 and requested changes for borrowers who are permanently and totally disabled. Two other letters were sent after the close of the fiscal year. The Ombudsperson also conducted a Spanish radio interview that reached approximately 8,000 listeners. The Ombudsperson has also partnered with non-profit organizations

and conducted virtual educational presentations using Zoom and Facebook Live that have reached thousands of Nevadans.

**College Navigator**

During the 80th Nevada Legislative Session, a College Savings Navigator position was created within the Office. The goal of the College Navigator was to build relationships with staff and administration and provide institutions, school districts, community partners, and students and households information on pursuing post-secondary education. The Navigator was created in order to foster a 'college bound' culture in Nevada by increasing awareness of the Nevada College Kick Start Program, Nevada's 529 College Savings Plans Program, the Nevada Prepaid Tuition Program, the Governor Guinn Millennium Scholarship Program, and other scholarship opportunities and financial aid options that allow Nevadans to plan for, save for, and pay for post-secondary education.

The College Navigator was hired at the start of the calendar year and was initially tasked to connect with K-12 students, school administrators, parents, and community partners. In February 2020, the College Navigator planned and carried out a 5-day rural Northern Nevada trip. The purpose of this 5-day journey was to connect with rural Nevadans and educate them on how the Office can assist students and parents when it comes to attending post-secondary institutions. The 5-day rural excursion was a huge success as the Navigator visited six different high schools, three elementary schools and two educational community fairs. At the conclusion of the trip, the data showed that over 8,500 individuals attended various events and the College Navigator directly interacted with over 3,100 individuals.

Due to the COVID-19 Pandemic, additional travel and in-person events for the year were cancelled. However, the Office and the College Navigator adjusted to ensure that Nevadans still had the opportunity to learn about the services and programs the Office offers. The Office utilized virtual platforms to reach K-12 students, school administrators, parents, and community partners. From the onset of the pandemic and onwards, the Office conducted events such as webinars, Q&A sessions, and trainings primarily through Zoom. One notable webinar event was held on National 529 Day, May 29, 2020, in which the College Savings team presented valuable information on 529s, scholarships, FAFSA, and student loans. A total of 156 people tuned in for this special event.

## *Financial Literacy*

Towards the end of FY20, College Savings hired four contract vendors to conduct specialized work on financial literacy throughout the State. Namely, to research and gather input from families regarding the barriers and challenges they face when planning and paying for higher education; to draft targeted content guides on important student loan information and general college costs in Nevada; and to host events with families, students, teachers, school administrators and other student advocates (such as coaches and religious leaders) to educate them on how to plan, save, and pay for

higher education. Given the effects of the COVID-19 Pandemic, work with these partners will continue into FY21 and focus on virtual sessions rather than in-person as originally planned.

## Major Accomplishments

In FY20, Governor Guinn Millennium Scholarship award letters for the incoming class of 2020 were sent out one month earlier than in previous years, which allowed students to better plan and budget for their upcoming entrance to higher education.

In response to the COVID-19 Pandemic, College Savings quickly reorganized and replanned all outreach and planned events to virtual webinars, meetings, and panel events. The nimbleness of the College Savings team resulted in ongoing virtual series hosted by College Savings including Webinar Wednesdays, during which a new college savings topic is discussed; Millennium Mondays, which covers common questions surrounding the Millennium Scholarship; and Panel Fridays, wherein the State Treasurer moderates a panel of experts on different college savings topics or hosts conversations with Nevada education leaders. The heightened online presence has allowed College Savings to reach many more Nevadans than prior years events in a format that is accessible and convenient.

## NEVADA ABLE SAVINGS PROGRAM

### Program Overview

The Office is responsible for administering the Nevada ABLE Savings Program ("ABLE") which allows people with disabilities to save and earn money without threatening the loss of state and federal benefit programs.

The federal Achieving a Better Life Experience (ABLE) Act was signed into law in 2014 and gave states the ability to establish tax advantaged savings programs for people with disabilities. Funds deposited into ABLE accounts can be used to help account beneficiaries pay for qualified disability expenses on tax-free basis and, in turn, help to increase an account holder's overall level of independence. Nevada currently partners with 17 states in the National ABLE Alliance to help administer ABLE. The use of a multi-state consortium helps to keep fees low for participants and reduce the overall impact on the State.

### Duties

ABLE is outlined in NRS 427A.889. Senate Bill 419 of the 79th Nevada Legislative Session codified the Nevada ABLE Program into law. Initially, the Office was responsible for administration of ABLE accounts and regulatory duties of ABLE, and responsibilities for marketing and outreach to potential participants was placed with the Aging and Disabilities Division of the Department of Health and Human Services.

Assembly Bill 130 ("AB130") of the 80th Nevada Legislative Session moved responsibility for outreach and marketing of ABLE into the Office, which allows for a streamlined approach to reaching potential participants and assisting current participants with questions.

### Major Accomplishments

The change in statute provided by AB130 allowed the Office to provide a concerted and targeted approach to reaching people in the disability community and their families and raising awareness about ABLE. In FY20, ABLE experienced an increase in accounts and assets under management. On June 30, 2020, the ABLE program had 805 accounts, with assets totaling $4,628,663.

The Office is excited to continue to grow ABLE, while also looking for more opportunities to increase competitive integrated employment for Nevada's disability community.

Nevada State Treasurer
Annual Report – Fiscal Year 2020

## ORGANIZATIONAL CHART



## ZACH CONINE BIOGRAPHY

Zach Conine currently serves as Nevada's 23rd State Treasurer. Elected on November 6th, 2018, Zach knows that responsible financial management is the key to ensuring long-term growth for the State. As Treasurer, Zach leads a team of more than 45 professionals that are responsible for investing the State's and many local governments' money, financing community assets and facilities, processing payments for public agencies, and collecting and returning unclaimed property. Additionally, Zach is responsible for Nevada College Savings Plans and administration of numerous scholarship programs and other services that help Nevadans plan, save, and pay for post-secondary education.

In addition to the daily management of the State Treasurer's Office, Zach serves as a member of the State Board of Finance, the Executive Branch Audit Committee, and the Board of Trustees of the College Savings Plans of Nevada, of which he serves as chair. Zach also serves as the Vice Chair of the State Debt Management Network, a nationwide professional organization for issuers and managers of state debt.

In his first year as Treasurer, the State has received two bond rating increases, the first since 2006; generated the highest investment returns for the State since the recession of 2008; and returned the largest amount of unclaimed property back to Nevadans since the inception of the State's Unclaimed Property Program.

Prior to serving as State Treasurer, Zach built a successful business career in the gaming, finance, and consulting sectors. Over the course of his career, Zach has been committed to creating economic opportunities for local businesses and working families. As co-founder of a consulting business, he has helped dozens of small and medium sized businesses expand, increase efficiencies, and decrease expenses. In doing so, he assisted in the creation and preservation of more than 3,000 jobs in Nevada.

Zach graduated with a B.A. from Cornell University's School of Hotel Administration and holds a J.D. from the from UNLV's William S. Boyd School of Law. He and his wife Layke are happily raising their daughter Ruby, twin sons Rutherford and Theodore, and two dogs, Democracy and Liberty.

## SENIOR STAFF BIOGRAPHIES

### Chief Deputy Treasurer
#### *Tara Hagan*

Tara Hagan serves as the Chief Deputy Treasurer for the State Treasurer's Office. Tara joined the Office in June 2012 as Deputy Treasurer - Finance. Her responsibilities as Chief Deputy Treasurer include working closely with the Debt Management, Investment Management, and Cash Management divisions, including assisting with investment and contract responsibilities related to the Nevada College Savings Plans. Tara previously served nearly five years as the Executive Director of the Nevada Deferred Compensation Program, where she was responsible for managing the daily operations. Prior to this position, Tara was the Regional Manager for Voya Financial Services (formerly ING Financial Services) where she was responsible for the relationship management of several government defined contribution plans in California and Nevada. Tara holds a Bachelor of Arts degree in journalism and political science from the University of Iowa.

### Senior Deputy Treasurer – Northern Nevada
#### *Erik Jimenez*

Erik Jimenez serves as the Senior Deputy Treasurer for Northern Nevada for the State Treasurer's Office. Prior to joining the office, Erik managed Reno Mayor Hillary Schieve's successful reelection campaign in 2018, while also working on Treasurer Conine's statewide campaign. Erik has represented various gaming, health care, education, energy, and transportation interests in front of the Nevada Legislature, and has also worked to pass numerous disability reforms in Nevada. Erik serves on numerous community and volunteer boards including the Access Advisory Committee for the City of Reno, the Nevada Office of Minority Health and Equity, and the Northern Nevada International Center. Erik holds both a bachelor's degree in political science and a master's degree in Public Administration from the University of Nevada Reno.

### Senior Deputy Treasurer – Southern Nevada
#### *Kirsten Van Ry*

Kirsten Van Ry currently serves as the Senior Deputy Treasurer - South for the State Treasurer's Office. Born and raised in Nevada, Kirsten holds a baccalaureate degree in political science from the University of Nevada, Las Vegas, and a law degree from William S. Boyd School of Law. Prior to joining the office, Kirsten served as the Deputy Chief of Staff under former Nevada Lieutenant Governor Mark Hutchison. Kirsten's previous positions include experience in legislative and community relations in Las Vegas and Carson City.

## Deputy Treasurer – Cash Management
### Amber Law

Amber Law serves as the Deputy Treasurer of Cash Management, a role she was appointed to in March 2016. Amber is a Certified Public Manager and has served in governmental finance and accounting since 2005, and previously worked for the State Treasurer's Office from 2007 to 2012. Amber's duties include managing the Cash Management Division which oversees the State's banking relationships, the reconciliation of bank transactions with state accounting records, the e-payment merchant services program, and administers the state's check distribution program. She also oversees the day-to-day budget process, biennial budget request, purchasing, contract management, revenue forecasts, reports, and financial statements for the Treasurer's Office.

## Deputy Treasurer – College Savings
### Tya Mathis-Coleman

Tya serves as the organization's Deputy Treasurer of College Savings. In this position her primary focus is on the education initiatives administered by the State Treasurer's Office. Tya is a passionate servant leader who is committed to public education. Most recently Tya served as the Director of Recruitment for the Clark County School District. Tya is a native of Nevada and a proud product of the Clark County School District and the Nevada System of Higher Education. Tya strongly believes that together we can impact our community one child at a time. As the Deputy Treasurer of College Savings, Tya is responsible for ensuring all College Savings programs are effectively and efficiently managed. The Deputy Treasurer oversees administration, marketing, and execution of all programs, and guides and supports College Savings staff and vendors. Additionally, the Deputy Treasurer develops and maintains various community partnerships that advance College Savings goals.

## Deputy Treasurer – Debt
### Lori Chatwood

Lori Chatwood serves as the of Deputy Treasurer of Debt Management, to which she was appointed in March 2008. She has been employed by the State Treasurer's Office since 1997 and has worked within the Debt Management division since 2000. As Deputy Treasurer, Lori's responsibilities include overseeing the issuance of State securities, rating agency relations, investor relations, and the administration of the Consolidated Bond Interest and Redemption Fund budgets as well as managing the Debt Management Division. The Division is responsible for the collection and payment of various State obligations, the post issuance compliance of State securities with federal and State securities law and the reconciliation of the State's debt portfolio accounting transactions with banks, agencies, entities, and State accounting records. The Division administers bonding for the Municipal Bond Bank, the Permanent School Fund Guarantee, the Water Pollution Control Revolving Fund, the Safe Drinking Water Revolving Fund, the Unemployment Compensation Bond Fund, Lease-Backed Financings, Colorado River Commission Bonds, Public Works Capital Improvements, Tahoe Environmental

Improvements, Open Space, Parks, Cultural and Natural Resources, Wildlife Fish Hatchery Improvements, Nevada System of Education Slot Tax, Water Grants, Cultural Centers and Historic Preservation Grants, Marlette Lake Water System, and Highway Improvements.

## Deputy Treasurer – Investments
### *Kimberly Shafer*

Kimberly Shafer serves as the Office's Deputy Treasurer for Investments. Kim is responsible for management of the investment activities conducted through and for the Treasurer's Office, including the state's $2.815 billion General Portfolio, $1.26 billion Local Government Investment Pool, and the $344 million Permanent School Fund, among others. Before joining the Treasurer's Office in March 2016, Kim has worked for the Controller's Office, the Legislative Counsel Bureau's Audit Division, and the Treasurer's Office as the Deputy Treasurer for Cash Management. Kim received her Bachelors of Science degree in 1998 from Sonoma State University. Prior to working for the State, Kim was employed by a public accounting firm in Reno. She is a Certified Public Accountant. Kim lives in Dayton with her husband, Rick, and her two sons.

## Deputy Treasurer – Unclaimed Property
### *Linda Tobin*

Linda Tobin serves as the Office's Deputy Treasurer of Unclaimed Property. Linda is a graduate from UNLV and is both a Certified Public Accountant and Certified Public Manager. Linda manages the state's Unclaimed Property program which is responsible for collecting unclaimed property from businesses across the country due to Nevadan's and then working to return these funds back to the rightful owner. Linda has worked for the State of Nevada for more than 21 years, including spending her first 20 years of state service with the Nevada Gaming Control Board.

Nevada State Treasurer
Annual Report – Fiscal Year 2020

# Financial Section

Cash Basis – Unaudited

# UNCLAIMED PROPERTY

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2020 and June 30, 2019

| Revenues | | 2020 | | 2019 |
|---|---|---:|---|---:|
| Unclaimed Property Receipts | | | | |
| Utility Companies | $ | - | 1 | $    11,759 |
| Insurance Companies | | - | 2 | 3,439,624 |
| Financial Institutions | | 537,077 | 3 | 475,694 |
| Security Sales & Dividends | | 11,392,160 | 4 | 11,043,070 |
| Local Governments | | 17,849 | 5 | 1,370,180 |
| Other State Governments | | - | 6 | 1,875,191 |
| Other Businesses | | 66,484,164 | 7 | 52,574,647 |
| Audit Proceeds | | 6,382,797 | 8 | 416,903 |
| | | | | |
| Direct Payment From FDIC | | 49,521 | 9 | 578 |
| Miscellaneous Sales | | 1,600 | 20 | 1,335 |
| | | | | |
| Penalties, Interest and Other | | 2,316,157 | 10 | 2,317,054 |
| Total Revenues | | 87,181,325 | | 73,526,036 |
| | | | | |
| Expenditures | | | | |
| | | | | |
| Payments to Claimants | | 45,910,759 | 11 | 42,516,756 |
| Payments FDIC Claimants | | 754,303 | 12 | 1,140,126 |
| Personnel Costs | | 964,889 | 13 | 885,737 |
| Contractual Services | | 1,093,350 | 14 | 1,054,405 |
| Operating Costs | | 174,267 | 15 | 139,409 |
| Advertising and Public Relations | | 110,715 | 16 | 114,076 |
| Total Expenditures | | 49,008,282 | | 45,850,509 |
| | | | | |
| Other Financing Sources (Uses) | | | | |
| Transfer to General Fund | | (31,198,989) | 17 | (20,964,747) |
| Transfer to Educational Trust Fund | | (78,836) | 18 | (250,328) |
| Transfer to Gov. Guinn Scholarship Fund | | (7,600,000) | 19 | (7,600,000) |
| Total Other Financing Sources (Uses) | | (38,877,825) | | (28,815,075) |
| | | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | | (704,782) | | (1,139,547) |
| | | | | |
| Beginning Balance, July 1 | | 11,231,870 | | 12,371,418 |
| Ending Balance, June 30 | | $ 10,527,088 | | $ 11,231,870 |

Cash Basis – Unaudited

## MILLENNIUM SCHOLARSHIP TRUST FUND
### Statement of Revenues, Expenditures and Changes in Fund Balance
### For the Fiscal Years Ended June 30, 2020 and June 30, 2019

| Revenues | | 2020 | | 2019 |
|---|---|---|---|---|
| Tobacco Settlement Income | $ | 15,360,519 | 1 | $ 16,086,597 |
| Appropriation | | - | 11 | 33,000,000 |
| Interest Income | | 451,927 | 12 | 225,278 |
| Prior Year Correction | | - | 13 | - |
| Refunds | | - | 14 | - |
| Total Revenues | | 15,812,445 | | 49,311,875 |
| | | | | |
| **Expenditures** | | | | |
| Scholarship Payments | | 38,729,697 | 3 | 37,061,746 |
| Personnel | | 204,155 | 5 | 226,101 |
| Travel | | 1,461 | 6 | 2,672 |
| Administrative | | 155,326 | 7 | 130,803 |
| Total Expenditures | | 39,090,638 | | 37,421,322 |
| | | | | |
| **Other Financing Sources (Uses)** | | | | |
| Transfer from College Savings Endowment Account | | - | 4 | - |
| Transfer from Treasurer | | 360,941 | 8 | 359,576 |
| Transfer from Unclaimed Property | | 7,600,000 | 2 | 7,600,000 |
| Total Other Financing Sources (Uses) | | 7,960,941 | | 7,959,576 |
| | | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | | (15,317,252) | | 19,850,129 |
| | | | | |
| Beginning Balance, July 1 | | 38,200,939 | 9 | 18,350,810 |
| Ending Balance, June 30 | $ | 22,883,687 | 10 | $ 38,200,939 |

Cash Basis – Unaudited

## PREPAID TUITION TRUST FUND
### Statement of Revenues, Expenditures and Changes in Fund Balance
### For the Fiscal Years Ended June 30, 2020 and June 30, 2019

| Revenues | | 2020 | | 2019 |
|---|---|---|---|---|
| | Participant Contributions | $ 13,591,170 | 1 | $ 15,869,029 |
| | Application Fees | 52,300 | 2 | 66,800 |
| | Administrative Charges | 25,100 | 3 | 25,800 |
| | Interest Income | 84,687 | 4 | 131,146 |
| | Investment Gain (Loss) | 12,089,267 | 5 | 6,346,085 |
| | Total Revenues | 25,842,524 | | 22,438,860 |
| **Expenditures** | | | | |
| | Tuition Payments | 11,999,639 | 6 | 11,366,735 |
| | Personnel Costs | 212,704 | 7 | 209,883 |
| | Travel | 120 | 8 | 2,692 |
| | Operating Costs | 580,868 | 9 | 457,407 |
| | Contract Cancellation Refunds | 2,796,172 | 10 | 2,470,138 |
| | Contract Rollover Payments | 165,344 | 11 | 51,160 |
| | Total Expenditures | 15,754,847 | | 14,558,015 |
| **Other Financing Sources (Uses)** | | | | |
| | Transfer from College Savings Endowment Account | - | 12 | - |
| | Transfer from College Savings to Pay Operating | 793,692 | 13 | 669,982 |
| | Total Other Financing Sources (Uses) | 793,692 | | 669,982 |
| Excess of revenues and other financing sources over expenditures and other financing uses | | 10,881,369 | | 8,550,827 |
| Beginning Balance, July 1 | | 217,557,272 | 14 | 209,006,445 |
| Prior Period Adjustment | | - | | - |
| Ending Balance, June 30 | | $ 228,438,641 | | $ 217,557,272 |

Cash Basis – Unaudited

Nevada State Treasurer
Annual Report – Fiscal Year 2020

## COLLEGE SAVINGS

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2020 and June 30, 2019

| | 2020 | | 2019 |
|---|---:|---|---:|
| **Revenues** | | | |
| Investment Management Fees | $ 5,645,505 | 1 | $ 5,408,794 |
| Gifts and Donations | - | 2 | - |
| Noncash Revenues | 413,664 | 3 | 521,632 |
| Settlement Income | - | | - |
| Interest Income | 165,783 | 4 | 174,963 |
| Cost Allocation/Fund Transfers | 2,754,535 | 5 | 3,108,037 |
| Total Revenues | 8,979,486 | | 9,213,426 |
| | | | |
| **Expenditures** | | | |
| Personnel | 311,560 | 6 | 245,359 |
| Operating | 2,448,180 | 7 | 2,867,663 |
| In-Kind Marketing | 413,664 | 8 | 521,632 |
| Total Expenditures | 3,173,404 | | 3,634,654 |
| | | | |
| **Other Financing Sources (Uses)** | | | |
| Administrative Transfers | | | |
| College Savings | 2,754,535 | 9 | 3,108,037 |
| Millennium Scholarship | 360,941 | 10 | 359,576 |
| Prepaid Tuition | 793,692 | 11 | 669,982 |
| Transfer to Prepaid Tuition Trust Fund | | 12 | |
| College Kick Start | | 13 | |
| Cost Allocation | - | 14 | 2,732 |
| Settlement Expenses | | 15 | |
| Total Other Financing Sources (Uses) | 3,909,168 | | 4,140,327 |
| | | | |
| Excess of revenues and other financing sources over expenditures and other financing uses | 1,896,914 | | 1,438,446 |
| | | | |
| Beginning Balance, July 1 | 8,609,987 | 16 | 7,171,541 |
| Ending Balance, June 30 | $ 10,506,901 | | $ 8,609,987 |

Cash Basis – Unaudited

## CONSOLIDATED BOND INTEREST & REDEMPTION FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2020 and June 30, 2019

**Revenues**

| | | 2020 | | 2019 |
|---|---|---|---|---|
| Taxes | | | | |
| | Real Property | 147,554,779 | [1] | 138,496,344 |
| | Personal Property | 18,021,973 | [1] | 16,759,456 |
| | Centrally Assessed Property | 10,869,776 | [1] | 10,705,560 |
| | | 176,446,528 | | 165,961,360 |
| Other | | | | |
| | Lease Purchase Building Rent | 6,835,984 | [2] | 7,794,861 |
| | Interest Income | 3,323,907 | [3] | 3,658,384 |
| | Excess Escrow Funds | - | [4] | 9 |
| | | 10,159,891 | | 11,453,253 |
| Total Revenues | | 186,606,420 | | 177,414,613 |

**Expenditures**

| | 2020 | | 2019 |
|---|---|---|---|
| Personnel | 323,543 | [5] | 232,236 |
| Statewide Cost Allocation (SWCAP) | 21,897 | [16] | 4,850 |
| Operating | - | [6] | - |
| Professional Services CIP Construction Contracts COP Projects Refunds Arbitrage Insurance | 637,767 | [17] | 370,527 |
| Trust Agent Fees | 24,822 | [7] | 24,822 |
| | 1,008,030 | | 632,435 |
| Debt Service | | | |
| Bond Principal Redemption | 132,940,000 | [8] | 120,375,000 |

Cash Basis – Unaudited

Nevada State Treasurer
Annual Report – Fiscal Year 2020

| | | | | |
|---|---|---|---|---|
| Bond Interest Expense | 57,305,899 | 9 | | 59,962,010 |
| | 190,245,899 | | | 180,337,010 |
| Total Expenditures | 191,253,929 | | | 180,969,445 |

Other Financing Sources (Uses)

| | | | | |
|---|---|---|---|---|
| Transfers from State Agencies | 14,347,740 | 10 | | 12,483,368 |
| US Treasury - Build America Bonds Subsidy | 635,587 | 11 | | 1,112,544 |
| State Treasurer's Assessment | 191,355 | 12 | | 57,100 |
| Transfers-out | | | | |
| Transfer to UCCSN | - | 13 | | - |
| Transfer to Local Government | | | | |
| Transfer to Public Works Board | - | | | - |
| Net Proceeds from Refundings | | 14 | | |
| Net Prior Year Refunds/Expenditures | - | 15 | | (144,584) |
| Bond Proceeds for Cost of Issuance | 620,222 | 18 | | 333,087 |
| Total Other Financing Sources (Uses) | 15,794,904 | | | 13,841,515 |

Excess of revenues and other financing sources

| | | | | |
|---|---|---|---|---|
| over expenditures and other financing uses | 11,147,395 | | | 10,286,683 |
| Beginning Balance, July 1 | 144,693,110 | 1082 | | 134,352,232 |
| Balance Forward Prior Year from other accounts | - | 9999 | | - |
| Prior Period Adjustment | - | | | - |
| Ending Balance, June 30 | 155,840,505 | | $ | 144,638,915 |

Cash Basis – Unaudited

# MUNICIPAL BOND BANK BOND INTEREST & REDEMPTION FUND

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2020 and June 30, 2019

|  | 2020 |  | 2019 |
|---|---|---|---|
| **Revenues** |  |  | $ |
| Receipts from municipalities-Interest | $ 3,256,787 | 1 | 3,417,513 |
| Receipts from municipalities-Principal | 4,405,000 | 9 | 3,425,000 |
| Other |  |  |  |
|     Interest Income | 6,666 | 2 | 6,032 |
|     Reimbursement of Expenses | - | 3 | - |
| Total Revenues | 7,668,453 |  | 6,848,545 |
|  |  |  |  |
| **Expenditures** |  |  |  |
|     Administrative Costs | - | 4 | - |
|     Transfer to Administration | - | 8 | 6,032 |
|     Trust Agent Fees | - | 5 | - |
|  | - |  | 6,032 |
| Debt Service |  |  |  |
|     Bond Principal Redemption | 4,405,000 | 6 | 3,425,000 |
|     Bond Interest Expense | 3,256,787 | 7 | 3,417,513 |
|  | 7,661,787 |  | 6,842,513 |
| Total Expenditures | 7,661,787.48 |  | 6,848,545 |
|  |  |  |  |
| **Other Financing Sources (Uses)** |  |  |  |
|     Reversion to General Fund | - |  | - |
|     Total Other Financing Sources (Uses) | - |  | - |
|  |  |  |  |
| Excess of revenues and other financing sources over expenditures and other financing uses | 6,666 |  | - |
|  |  |  |  |
| Beginning Balance, July 1 | - |  | - |

Cash Basis – Unaudited

Nevada State Treasurer
Annual Report – Fiscal Year 2020

|  |  |  |  | $ |
|---|---|---|---|---|
| Ending Balance, June 30 | $ | 6,666 | | - |

odd # years balance reverts to
General Fund
even # years balances forward to the following year or pursuant to NRS 350A.190
2(d)
money reverted to General Fund and closed with zero
balance

Cash Basis – Unaudited

# FUND FOR HEALTHY NEVADA

Statement of Revenues, Expenditures and Changes in Fund Balance
For the Fiscal Years Ended June 30, 2020 and June 30, 2019

| Revenues | | 2020 | | | 2019 |
|---|---|---|---|---|---|
| Tobacco Settlement Income | $ | 23,040,778 | 1 | $ | 24,129,896 |
| Interest Income | | 668,663 | 2 | | 743,417 |
| Appropriations | | - | | | - |
| Refund of Unused Grant Money | | 2,514 | 3 | | - |
| Transfer From Health Division | | 1,089,517 | 18 | | - |
| Total Revenues | | 24,801,472 | | | 24,873,313 |
| | | | | | |
| Expenditures | | | | | |
| Operating | | 62,820 | 4 | | 59,265 |
| Total Expenditures | | 62,820 | | | 59,265 |
| | | | | | |
| Other Financing Sources (Uses) | | | | | |
| Transfer to Department of Health and Human Services | | | | | |
| Administrative Services | | 669,565 | 19 | | 820,752 |
| Senior RX Program | | 1,133,139 | 5 | | 1,375,837 |
| Children & Disabled Persons | | 6,410,046 | 6 | | 4,730,556 |
| Aging Services | | 5,855,473 | 7 | | 5,678,226 |
| Disability RX | | - | 8 | | 141,998 |
| Differential Response | | 1,260,275 | 9 | | 1,327,804 |
| Child & Adolescent Services * | | 2,302,918 | 10 | | 2,302,751 |
| Autism | | 2,870,000 | 11 | | 1,600,000 |
| Family Resource Center | | 1,669,664 | 12 | | 1,341,611 |
| Consumer Health Asst | | 350,344 | 14 | | 306,913 |
| Tobacco Cessation | | 912,357 | 15 | | 942,009 |
| Public and Behavioral Health | | 1,303,906 | 16 | | 400,150 |
| Transfer to Millennium Scholarship | | | | | - |
| Total Other Financing Sources (Uses) | | 24,737,687 | | | 20,968,606 |

Cash Basis – Unaudited

| | | | |
|---|---|---|---|
| Excess of revenues and other financing sources over expenditures and other financing uses | 965 | | 3,845,443 |
| Beginning Balance, July 1 | 39,276,779 | 17 | 35,431,336 |
| Prior Year Adjustment | | | |
| Ending Balance, June 30 | $ 39,277,744 | | $ 39,276,779 |

Cash Basis – Unaudited